UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

LORI GARDNER-ALFRED and JEANETTE DIAZ, :
                                                          :
                                        Plaintiffs,       :    Civ No.: 22-cv-1585 (LJL)
                                                          :
            -against-                                     :    **JURY TRIAL**
                                                          :    **DEMANDED**
FEDERAL RESERVE BANK OF NEW YORK,                         :
                                                          :
                                        Defendant.        :

----------------------------------------------------------------------X

## AMENDED COMPLAINT

Lori Gardner-Alfred and Jeanette Diaz, for their Amended Complaint, herein state as follow:

## INTRODUCTION

1.      Plaintiffs were both long-serving employees of the Defendant Federal Reserve Bank of New York (the "New York Fed" or "Defendant") until March 2022, when the New York Fed fired them for failing to comply with a requirement that its employees be vaccinated against the COVID-19 virus. Because Plaintiffs' sincerely held religious beliefs prevent them from becoming vaccinated and because the New York Fed's vaccine mandate is not narrowly tailored to serve a compelling state interest, Plaintiffs are entitled to relief under the First Amendment, the Religious Freedom Restoration Act ("RFRA"), and other statutes as described below.

## THE PARTIES

2.      Plaintiff Lori Gardner-Alfred ("Gardner-Alfred" or "Plaintiff") is an African American woman. She was employed by the New York Fed as a Senior Executive Specialist to the CHRO, Executive Vice President of the New York Fed until she was terminated on March 14, 2022.

3.      Plaintiff Jeanette Diaz ("Diaz" or "Plaintiff") is a Hispanic woman. She was employed by the New York Fed as a Senior Executive Specialist to the CIO, Executive Vice President of the New York Fed until she was terminated on March 14, 2022.

4.      Defendant the New York Fed is one of twelve Federal Reserve Banks that make up the Federal Reserve System. The New York Fed is an instrumentality of the United States government, established by the Federal Reserve Act, 12 U.S.C. § 341 ("the FRA").

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983 because Plaintiffs allege an ongoing violation of their rights under RFRA. This Court also has jurisdiction under 28 U.S.C. § 1346 because this is a civil action against the United States of which the New York Fed is a federal instrumentality under the FRA. This Court has further jurisdiction pursuant to 42 U.S.C. § 2000bb-1(c) because the New York Fed is a "covered entity" under RFRA.

6.      This Court also has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332.

7.      This Court has both general and specific jurisdiction over Defendant.

8.      This Court has authority to award the requested relief pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 2000bb-1; the requested declaratory relief pursuant to 28 U.S.C. §§ 2201-02; and costs and attorneys' fees pursuant to 42 U.S.C. § 1988(b) and 28 U.S.C. § 2412.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because Defendant is an instrumentality of the United States doing business in the District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial District.  Venue also lies in this judicial district under 28 U.S.C. § 1391(b)(1) & (2).

## FACTUAL ALLEGATIONS

10.     Plaintiff Gardner-Alfred began her employment with the New York Fed on or about February 2, 1987. Gardner-Alfred has held several titles over the course of her over 35-year career with the New York Fed, most recently Senior Executive Specialist. In this role, Plaintiff Gardner-Alfred served as the Executive Assistant to the Executive Vice President of the New York Fed (the "EVP"), providing direct administrative support to the EVP of People & Engagement. Her job responsibilities included: facilitating and coordinating communications between the EVP and other areas of the New York Fed; scheduling appointments and maintaining an electronic calendar for the EVP; electronically organizing and coordinating meetings and the EVP's attendance at events; electronically reserving conference rooms and arranging video conference meetings and conferences attended by the EVP; and coordinating all travel arrangements & reimbursements for the EVP.

11.     Plaintiff Diaz began her employment with the New York Fed on or about July 5, 1994. Over Plaintiff Diaz's 27-year career with the New York Fed, she has held several titles, most recently Senior Executive Specialist, providing direct administrative support to the EVP of Information Technology. Plaintiff Diaz's job responsibilities are substantively the same as those of Plaintiff Gardner-Alfred, as set forth in ¶ 10 above.

12.     On or about March 11, 2020, at the onset of the COVID-19 pandemic in the United States, Defendant informed its workforce, including Plaintiffs, that it was implementing a mandatory remote work policy until employees were otherwise notified.

13.     Plaintiffs last day working from the New York Fed's office, located at 33 Liberty Street, New York, New York, was on or about March 12, 2020. Plaintiffs began working remotely on March 13, 2020 and continued working remotely until their termination in March 2022.

14.     Plaintiffs' job performance was unaffected by the requirement that they work remotely.

### The COVID-19 Vaccine

15.     Beginning in or about March 2021, COVID-19 vaccinations became widely available to adults in the United States.

16.     The COVID-19 injections available in the US all involve use of aborted fetal cells in their manufacturing and/or testing. In particular:

- Johnson & Johnson/Janssen: Fetal cell cultures are used to produce and manufacture the J&J COVID-19 vaccine and the final formulation of this vaccine includes residual amounts of the fetal host cell proteins (:s0.15 mcg) and/or host cell DNA (:s3 ng).

- Pfizer/BioNTech: The HEK-293 abortion-related cell line was used in research related to the development of the Pfizer COVID-19 vaccine.

- Moderna/NIAID: Aborted fetal cell lines were used in both the development and testing of Moderna's COVID-19 vaccine.

### Plaintiffs' Sincerely Held Religious Beliefs

17.     Plaintiff Gardner-Alfred is a member of the Temple of Healing Spirit. That system of beliefs prioritizes holistic approaches to health focused on diet and spiritual self-awareness, and opposes the invasive techniques of traditional Western medicine.

18.     Among other documents that shape Plaintiff Gardner-Alfred's belief is the Book of Leviticus which at Chapter 11, Verse 44 contains the directive: "For I am the Lord your God: ye shall therefore sanctify yourselves, and ye shall be holy; for I am holy[.]" )(AKJV) For Plaintiff Gardner-Alfred, by reasons of their provenance, chemical composition, and origin, the COVID-19 vaccines represent unacceptable intrusions on her personal form.

19.     Plaintiff Diaz is a baptized Catholic. She declined to receive the COVID-19 vaccine because of her religious convictions that it is morally unacceptable for her to receive certain vaccines consistent with the teachings of the Catholic Church.

20.     In particular, Plaintiff Diaz holds the following sincere religious convictions pertaining to COVID-19 vaccines:

- Vaccination is not morally obligatory in principle and so must be voluntary.

- There is no moral duty to refuse the use of medical products, including certain vaccines, that are created using human cell lines derived from abortion; however, it is permissible to use such vaccines only under case-specific conditions—if there are no other alternatives available and the intent is to preserve life.

- A person's assessment of whether the benefits of a medical intervention outweigh the undesirable side-effects are to be respected unless they contradict authoritative Catholic moral teachings.

- A person is morally required to obey his or her conscience.

Exhibit A.

21.     The Catholic Church teaches, and Plaintiff Diaz believes, that any individual Catholic may "refuse a vaccine that used abortion-derived cell lines at any stage of the creation of the vaccine." *Id*.

22.     The Catholic Church similarly teaches, and Plaintiff believes, that "a Catholic might refuse a vaccine based on the Church's teachings concerning therapeutic proportionality" which is "an assessment of whether the benefits of a medical intervention outweigh the undesirable side-effects and burdens in light of the integral good of the person, including spiritual, psychological, and bodily goods." *Id*.

**Plaintiffs' Natural Immunity**

23.    Plaintiff Diaz twice contracted and recovered from COVID-19, first in January 2021 and a second time in January 2022, and thus, has acquired robust and lasting natural immunity to the virus.

24.    Plaintiff Gardner-Alfred contracted and recovered from COVID-19 in November 2021, and thus, has acquired robust and lasting natural immunity to the virus.

25.    The CDC recognizes that natural immunity is broad and long-lasting. The CDC's website explains:

- **Active Immunity** results when exposure to a disease organism triggers the immune system to produce antibodies to that disease. Active immunity can be acquired through natural immunity or vaccine-induced immunity.
- **Natural immunity** is acquired from exposure to the disease organism through infection with the actual disease.
- **Vaccine-induced immunity** is acquired through the introduction of a killed or weakened form of the disease organism through vaccination.
- Either way, if an immune person comes into contact with that disease in the future, their immune system will recognize it and immediately produce the antibodies needed to fight it. **Active immunity is long-lasting, and sometimes life-long**.[1]

**The New York Fed's Vaccination Policy**

26.    On or about June 4, 2021, Defendant notified its workforce that for the first time since March 2020, the New York Fed was revising its remote work policy and would soon require employees to return to the office on a hybrid schedule, meaning they would be required to report to the office two or three days a week and work remotely for the remainder of the work week. Soon thereafter, on or about June 28, 2021, the New York Fed asked all employees, including Plaintiffs, to provide Defendant with their COVID-19 vaccination status. Plaintiffs each responded that they were not currently vaccinated against COVID-19.

---

[1] https://www.cdc.gov/vaccines/vac-gen/immunity-types.htm (emphasis added)

27.     At the time, Defendant permitted vaccinated employees to return to the office on a voluntary basis for a pilot program. Return to the office was not required and Defendant had yet to announce an official return to office date. Plaintiffs who were unvaccinated continued to work remotely.

28.     On or about August 2, 2021, the New York Fed implemented a COVID-19 vaccination policy (the "Vaccination Policy"), requiring as a condition of employment that every New York Fed employee be fully vaccinated against COVID-19.

29.     Effective on December 8, 2021 the Vaccination Policy requires that every NY Fed employee "must be fully vaccinated against COVID-19, as defined in applicable public health guidance, and receive a booster shot within thirty (30) days of becoming eligible to do so, unless they receive an accommodation related to this requirement…" Exhibit B, 2.1.

30.     The Vaccination Policy allows for religious and medical accommodations exempting eligible employees from receiving the COVID-19 vaccine. Specifically, the Vaccination Policy provides an exemption "as required by law, for employees unable to obtain a vaccine due to a medical condition or sincerely held religious belief that precludes receiving the COVID-19 vaccine." *Id* at 2.4.1. Further "[a]n employee requesting an accommodation based on religious belief must complete a <u>religious accommodation request form</u> and submit it to the People Relations team. The employee must clearly explain why receiving the COVID-19 vaccination would be contrary to their religious beliefs and may be required to provide supporting information." *Id.* (emphasis in original).

31.     With respect to violations, the Vaccination Policy punishes "[a]ny person not following any element of this policy or falsifying the reporting of vaccine information" with "disciplinary action, up to and including termination of employment." *Id* at 2.6.

32.     Plaintiffs continued to decline the COVID-19 vaccination in accordance with their sincerely held religious beliefs.

33.     On or about August 9, 2021, Plaintiff Gardner-Alfred submitted a Notification of Vaccination Exemption by Affidavit to the New York Fed's People Relations team (Exhibit C), as directed by the Vaccination Policy.

34.     Likewise, on or about September 1, 2021, Plaintiff Diaz submitted a Request for Religious Accommodation to the People Relations team (Exhibit D), as directed.

35.     Each Plaintiff participated in a religious exemption interview conducted by the New York Fed's People Relations Team, which were held on or about September 8, 2021 for Plaintiff Gardner-Alfred, and on or about September 14, 2021 for Plaintiff Diaz. During these interviews, Plaintiffs responded to Defendant's questions, which called for highly personal information related to their views on certain medical practices. Plaintiffs were also asked questions about their responsibilities and interactions with other individuals on a typical workday. Plaintiffs provided answers to the best of their abilities.

36.     On or about October 1, 2021, Plaintiffs were each individually notified by Karen Lynch, People Relations Leader of the New York Fed ("Lynch"), that Defendant had temporarily granted their request for an accommodation through November 30, 2021: "At this time, the Bank is temporarily granting your request for an accommodation[.]" Exhibit E. At that time, Defendant was not requiring employees to return to work in the office.

37.     A month later, on or about November 1, 2021, the New York Fed announced an official return to work date of January 10, 2022.

**Plaintiffs Received Strong Performance Reviews in 2020 and 2021 Demonstrating
their Ability to Perform the Essential Functions of their Jobs Remotely**

38.     Plaintiff Diaz received strong performance evaluations for the years 2020 and 2021,
having worked the majority of 2020 and all of 2021 remotely. Specifically, for the year 2021,
Plaintiff Diaz received an overall rating of "strong performance," as well as "strong performance"
ratings for the categories of self-management and people management and an "exceptional
performance" rating for diversity & inclusion. Exhibit F. The 2021evaluation recognized "though
the continuation of a remote work posture over the 2021 rating period posed some challenges for
the executive assistants [Plaintiff Diaz] continued to provide effective support to the Chief
Information Officer in support of smooth and productive operations of the Technology Group."
*Id*.

39.     Plaintiff Gardner-Alfred also received strong performance evaluations for the years
2020 and 2021, having also worked the majority of 2020 and all of 2021 remotely. Specifically for
the year 2021, Plaintiff Gardner-Alfred was rated as "achieves expectations" or "exceeds
expectations" in all competency categories, her supervisors also noted "while the virtual world
may have provided some initial challenges [Plaintiff has] navigated all of them really well."
Exhibit G.

40.     That Plaintiffs each received strong performance evaluations during a period when
they worked entirely remotely, demonstrates that they are each capable not only of performing the
essential functions of their jobs remotely, but that they each excelled at doing so.

**Plaintiffs' Requests for Religious Accommodations were Arbitrarily Denied**

41.     On or about November 29, 2021, Defendant separately informed Plaintiffs by email
from Lynch, that "as of January 7, 2022, your accommodation exempting you from the Bank's
mandatory COVID-19 Vaccination Policy will end" (the "Denial Email"). Exhibit H at 6-8. The

Denial Email warns "if you decide not to become vaccinated, by on or about January 7, 2022, you will receive additional information on your departure from the Bank…" *Id*.

42.     The same perfunctory reasoning was provided by the New York Fed for denying each of Plaintiffs' requests for a religious accommodation. Specifically, it was communicated that Defendant "has reassessed your temporary accommodation based on an evaluation of health, safety and population conditions related to the pandemic that impact the mission of the [New York Fed]. Those conditions include the increasing number of employees returning to the [New York Fed] in January, the return of external visitors, and your essential job functions (including the frequency of your interaction with external visitors and others at the [New York Fed]) and your proximity to others while conducting your job responsibilities." *Id*.

43.     The Denial Emails appear to be form communications that were not individually tailored to respond to the requests submitted by each Plaintiff. The Denial Emails did not provide any information concerning an appeal or review process that would allow Plaintiffs to challenge the denial of their request for religious accommodation. Rather, Plaintiffs were notified that their jobs were threatened if they did not obtain the COVID-19 vaccination.

44.     Plaintiffs were surprised and confused by Defendant's explanation for denying the request for religious accommodation, considering their requests had previously been temporarily granted, they had been able to satisfactory perform all of the functions of their job remotely for over 20 months, and prior to Defendant's implementation of a remote work policy, Plaintiffs did not regularly interreact with visitors to the building.

45.      Prior to Defendant's implementation of a remote work policy, when the EVP each Plaintiff supported had a visitor to the office, Plaintiffs' responsibility was to input the individual's information into the visitor request system. After the visitor passed through security on the first

floor of the building, they would be greeted by the front desk receptionist for the floor, who would then escort the visitor to the appropriate office or conference room. The EVPs of People & Engagement and Technology, who Plaintiffs Gardner-Alfred and Diaz each supported respectively, infrequently had visitors at the office.

**Defendant's Approved Accommodations for other
Individuals Holding the Executive Assistant Title**

46.     The New York Fed approved numerous exemptions for other employees of the New York Fed for both medical and religious reasons. Among others, Defendant approved a religious accommodation for at least one Executive Assistant, who was so informed on or about November 30, 2021, shortly after Plaintiffs were informed that their request for religious accommodation was denied. The individual whose religious accommodation was approved supports one Senior Vice President, and a team comprised of multiple individuals, whereas Plaintiffs each support one EVP.

47.     Defendant also granted a medical accommodation for at least one employee holding the title of Analyst.

48.     Defendant has articulated no reason for granting the request for religious accommodation for certain individuals and not others.

49.     Upon further information and belief, Defendant has implemented a COVID-19 testing procedure to accommodate unvaccinated individuals whose medical or religious accommodations were granted. Upon additional information and belief, these unvaccinated individuals are required to submit on a weekly basis a negative COVID-19 test from an approved medical clinic and on the days these unvaccinated individuals are scheduled to work from the office, they must provide proof of a negative COVID-19 at home test, with such proof including the individual's name, the date of such test, and a photo of the test results sent to a representative of the New York Fed by email.

50.     Additionally, upon information and belief, Defendant does not require vaccinated individuals reporting to the office to provide proof of COVID-19 status, even though it is now well understood that the available COVID-19 vaccines do not prevent infection or transmission of the virus.  That Defendant arbitrarily requires unvaccinated individuals to provide proof of negative COVID-19 status prior to entering the building, but does not require the same for vaccinated individuals, which upon information and belief make up the overwhelming majority of the employment population, creates a substantial risk that vaccinated individuals may be transmitting the COVID-19 virus to other employees at the office.

51.     There is no rational basis for denying Plaintiffs' request for religious accommodations, while granting the medical and/or religious accommodation requests of other similarly situated employees. Plaintiffs were able to perform the essential functions of their jobs remotely for over 20 months before their requests for religious accommodations were arbitrarily and capriciously denied.

52.     The New York Fed could have accommodated Plaintiffs' request for religious exemption by:

- Requiring testing to determine infection status, as it has permitted other unvaccinated individuals to do;

- Temperature checks and/or other screening procedures to determine infection;

- Implementing hybrid work schedules to reduce the number of employees in the building;

- Requiring all employees to wear masks in the building;

- Isolating Plaintiffs from other employees within the building;

- Permitting Plaintiffs to continue remote work temporarily, which they have done successfully since the onset of the pandemic in March 2020.

**Plaintiffs' Attempts to Engage in an Interactive Process are Rejected by Defendant**

53.     Plaintiffs separately responded to the Denial Email on December 9, 2021 requesting additional information from the New York Fed to support their decision denying Plaintiffs' request for religious accommodation. Among other things, they asked Defendant to explain the specific facts and factors that Defendant relied upon to determine that each Plaintiff's failure to provide proof of COVID-19 vaccination would cause "undue hardship" to the New York Fed. Exhibit H at 4-5; Exhibit I. Plaintiffs also asked the New York Fed to explain why certain proposed accommodations, including allowing Plaintiffs to continue performing their jobs remotely, were unavailable to address Defendant's health and safety concerns. *See id*.

54.     By emails dated December 10, 2021, Defendant provided nearly identical responses to Plaintiffs' demands for additional information to justify the denial of their request for religious accommodation. Defendant summarily responded that:

> it cannot reasonably accommodate [Plaintiff] onsite if [she is] unvaccinated due to some of the essential functions of [her] position. This was an individualized analysis that took into account [Plaintiff's] expected job responsibilities in January 2022 when the [New York Fed] begins its flexible onsite work model, as well as the reasonableness and hardships associated with various potential accommodations.

*Id*.

55.     The December 10th responses stated that working remotely is "not a potential accommodation because some of [Plaintiff's] job duties require you to physically be at the Bank's premises," (*id*.) without providing any explanation for what those job duties were or why they could not be performed remotely.

56.     Defendant also arbitrarily concluded that it could not "reasonably accommodate [Plaintiffs] onsite, because doing so poses increased safety risks to the [New York Fed], and its employees, as well as to its external visitors, with whom [their] job requires [them] to have face-

to-face interactions." *Id*. Upon information and belief, the legitimacy of Defendant's inability to accommodate Plaintiffs onsite is called into question by the New York Fed's approval of the very same accommodation for others in the same job family (i.e., persons whose job function is substantially similar to the Plaintiffs').

57.     Defendant did not give either Plaintiff the opportunity to appeal the decision denying their request for religious accommodation, nor did Defendant seek additional information concerning Plaintiffs' requests, including for example information related to their natural immunity status. Instead, Defendant again threatened Plaintiffs with termination, forcing them to choose between their seriously held religious beliefs and their livelihood.

58.     On or about December 21, 2021, Plaintiffs each responded to Defendant's December 10th emails, renewing their requests for additional information to support the New York Fed's denial of their requests for religious accommodations. Exhibit H at 2-3; Exhibit J.

59.     On or about December 23, 2021, Defendant again provided identical responses to Plaintiffs, doubling down on its prior decision by stating:

> Working remotely is not possible for you when the [New York Fed] begins its flexible onsite work model in January because your essential job responsibilities include, among other things, maintaining physical office space and escorting visitors to the [New York Fed], both of which require your presence at [Defendant's] premises. [Defendant] also determined that testing, masking, and other protocols do not sufficiently reduce the safety risks to the [New York Fed] employees and its external visitors given the close proximity and frequency of your interaction with them.

Exhibit H at 1; Exhibit K.

60.     Defendant's conclusion that "no accommodation exists" and "testing, masking, and other protocols do not sufficiently reduce safety risk" was arbitrary and capricious considering Plaintiffs' informed belief that Defendant is presently offering the very same accommodation

requested by Plaintiffs to others across the New York Fed including employees within the same job family.

61.    By email dated December 30, 2021, Plaintiffs were informed that the New York Fed's transition to a flexible working model (i.e., hybrid in-office remote work schedule) with a return to office date of January 10, 2022 had again been postponed.

62.    Then, on January 21, 2022, Defendant announced that the flexible working model would begin on February 28, 2022.

63.    Soon after, by email dated February 3, 2022, Plaintiffs were each informed that their temporary accommodations exempting them from the Vaccination Policy, which had previously been extended, would end on February 25, 2022. Exhibit L. Plaintiffs were also told that they would be terminated.

64.    Plaintiffs remained unvaccinated in accordance with their sincerely held religious beliefs and continued to work from home, as they had done for nearly the last two years.

**Plaintiffs Obtained a Temporary Restraining Order**
**From The New York State Supreme Court Which Was Dissolved by This Court**

65.    On February 23, 2022, Plaintiffs commenced actions in New York State Supreme Court complaining that the New York Fed's Vaccination Policy was "clearly discriminatory, arbitrary, and capricious [and] not supported by scientific knowledge and fact but fear and intimidation [and not] based on Petitioner's ability to perform our job functions." Exhibit M at 11, 37. Plaintiffs sought "an immediate injunction barring [the New York Fed] from firing [them] until it c[ould] show cause that [their] non-vaccination will cause it undue hardship and prevent [them] from satisfactorily performing [their] job duties and functions." *Id*. at 13, 39. Plaintiffs also filed a Request for Judicial Intervention seeking a temporary restraining order ("TRO") on February 23, 2022. On that same day, Justice Frank of the New York State Supreme Court granted Plaintiffs an

*ex parte* restraining order directing the FRBNY to show cause on March 7, 2022, why Plaintiffs should not be granted a permanent injunction restraining the FRBNY from firing Plaintiffs due solely to the fact that their non-vaccination status would cause Defendant an undue hardship and prevent Plaintiffs from performing their essential work duties and enjoining and restraining Defendant from terminating their employment pending the hearing on the motion.

66.     On February 25, 2022 Defendant removed this action to this Court. Three days later, on February 28, 2022, Plaintiffs were placed on administrative leave with pay.

67.     On March 2, 2022, Defendant filed a motion to dissolve the TRO, which was granted by this Court on March 11, 2022.

68.     On March 14, 2022, Plaintiffs were each terminated from their employment at the New York Fed.

**The New York Fed's Vaccine**
**Mandate Lacks a Rational Basis and is not Narrowly Tailored to Advance a Compelling**
**State Interest, Either Categorically or as Applied to Plaintiffs**

69.     It is now well understood that the COVID-19 vaccines do not prevent infection or transmission of the virus and that anyone, vaccinated or not, can be infected with and transmit COVID-19.  In fact, scientific studies have shown that vaccinated infected individuals are just as likely to spread the virus as unvaccinated infected individuals.

70.     In addition, it is well understood that individuals who have been infected with and recovered from COVID-19, like the Plaintiffs, have natural immunity to COVID-19. The natural immunity of at least some persons is comparable to persons who have been vaccinated.

71.     Further, measures other than mandatory vaccination, such as temperature checks, mask-wearing, social distancing, regular testing, and quarantining of infected individuals, are as effective, if not more effective, at controlling the spread of COVID-19 than mandatory vaccination

of populations. Given that the "safety risks" posed by the Plaintiffs has been the only interest identified by the New York Fed, and further, given that this goal is advanced little or not at all by the vaccine mandate imposed by the New York Fed, this mandate lacks a rational basis and/or is not narrowly tailored to advance a compelling state interest.

72.     In addition, and in the alternative, the decision by the New York Fed to deny Plaintiffs exemptions and grant them to others was not justified by a rational basis or compelling interest test as applied to the individual Plaintiffs.

## RFRA CLAIM
### COUNT I
### Violation of the Religious Freedom Restoration Act
### (RFRA) 42 U.S.C. § 2000bb *et seq*.

73.     Plaintiffs reincorporate the foregoing as if fully written herein.

74.     The New York Fed is subject to RFRA because the Defendant is a "instrumentality" of the Federal government. 42 USC §2000bb-2(2).

75.     RFRA states that the government shall not substantially burden a person's exercise of religion, even by means of a rule of general applicability. 42 U.S.C. § 2000bb-1(a).

76.     RFRA protects any exercise of religion, whether or not compelled by, or central to, a system of religious belief. 42 U.S.C. § 2000cc-5(7)(A).

77.     The exercise of religion involves not only belief and profession but the performance of (or abstention from) physical acts for religious reasons.

78.     Plaintiffs sincerely believe that the exercise of their religion prevents them from submitting to injection with any of the presently available COVID-19 vaccines.

79.     Defendant has not contested the sincerity of Plaintiffs' beliefs that their exercise of religion prevents them from receiving the COVID-19 vaccination.

80.    The government and reviewing courts may not question whether sincerely held religious beliefs are reasonable or supported by a "spiritual leader" or the tenets of a "recognized religion."

### Substantial Burden

81.    RFRA imposes strict scrutiny on all actions of the federal government, including the New York Fed as a federal "instrumentality," that substantially burdens a person's exercise of religion. 42 U.S.C. § 2000bb-1(b).

82.    A person's exercise of religion is substantially burdened whenever a measure imposes substantial pressure on an adherent to modify his or her behavior and to violate his or her beliefs, as does the Vaccine Policy by terminating them from employment on account of religious abstention from COVID-19 vaccination.

83.    The Vaccine Policy imposes on Plaintiffs, whose religious exercise prevents vaccination for COVID-19, the choice between violating their religious beliefs and termination from employment and the loss of their livelihood.

84.    Forcing Plaintiffs to violate their religious beliefs or lose their employment and livelihood is a substantial burden on their religious beliefs.

### Strict Scrutiny

85.    Under RFRA, the Vaccine Policy is subject to strict scrutiny because it imposes substantial burdens on Plaintiffs' religious exercise. 42 U.S.C. § 2000bb-1(b).

86.    Strict scrutiny requires that, before imposing a substantial burden on an individual's exercise of religion, the government must demonstrate that application of the burden to that particular individual (1) is in furtherance of a compelling governmental interest; and (2) is the *least*

*restrictive* means of furthering that compelling governmental interest. 42 U.S.C. § 200bb-1(b) (emphasis added).

### No Compelling Interest

87.     Under the "to the person" standard of RFRA, Defendant must establish that it has an *actual* compelling governmental interest in imposing a religious burden on *each Plaintiff in particular* by terminating their individual employment unless they consent to be vaccinated, and that terminating Plaintiffs' employment from the New York Fed is *actually necessary* to serve that alleged interest.

88.     As demonstrated by Plaintiffs ability to perform the essential functions of their jobs remotely for nearly two years, as well as by the fact that Defendant granted a religious accommodation to others across the New York Fed including employees within the same  job family, and the availability of other safety protocols that have been demonstrated to stop the spread of COVID-19, Defendant does not have a compelling governmental interest in burdening Plaintiffs' religious practice in particular by mandating their vaccination. There is no rational basis, much less a compelling governmental interest, in terminating Plaintiffs' employment for lack of COVID-19 vaccination.

89.     The Denial Email offers no consideration of Plaintiffs' particular circumstances, including Defendant's failure to permit Plaintiffs to demonstrate their natural immunity.

90.     During the time since COVID-19 vaccines became available, and during the months since Plaintiffs have applied for a religious exemption, it has been clearly established that COVID-19 vaccines do not prevent infection or transmission of the virus.

91.     In sum, Defendant cannot show any cognizable "hardship" to the New York Fed by allowing Plaintiffs to continue what they have been doing for nearly the past two years, working

remotely, or offering them the same religious accommodations being offered to others and including employees within the same job family. Recitation of the phrase "undue hardship" after permitting Plaintiffs to work remotely for nearly the last two years cannot justify Defendant's imposition of a substantial burden on Plaintiffs' religion.

<h3 align="center">Not the Least Restrictive Means</h3>

92.     The least-restrictive-means standard is exceptionally demanding in that it requires the government to show that it lacks any adequate less restrictive means of achieving its desired goal.

93.     So long as the government can achieve its interests in a manner that does not burden religion, it must do so.

94.     This standard requires Defendant to show that measures less restrictive of First Amendment activity could not address its purported interest in reducing the spread of COVID-19.

95.     Requiring Plaintiffs to be vaccinated against COVID-19 is not the least restrictive means Defendant could have employed to serve its alleged compelling interest.

96.     Plaintiffs have been able to perform the essential functions of their job remotely for nearly the last two years without any adverse consequences.

97.     Defendant has granted a religious exemption to others and including employees within the same job family, and is employing COVID-19 testing as a less restrictive means of advancing any purported interest in protecting the health and safety of employees of the New York Fed.

98.     Vaccinating someone with natural immunity, like Plaintiffs, does not minimize the risk to others any more than vaccination itself has done so, as both the vaccinated and the unvaccinated can spread the virus.

99.     At the very least, Defendant has an obligation to demonstrate that requiring Plaintiffs to be vaccinated is the *least restrictive* way of pursuing their interests. That requires demonstrating why other paths to the same goal are all inferior, which Defendant cannot do.

100.    Moreover, Defendant cannot establish that requiring Plaintiffs to be vaccinated is the least restrictive means of pursuing a compelling interest compared to the means that have already been shown to be sufficient: i.e., allowing Plaintiffs to work remotely as they have done for nearly the past two years or permitting them to work from the office with proof of a negative COVID-19 test.

### RFRA Relief

101.    Defendant's Vaccine Mandate violates Plaintiffs' rights under RFRA.

102.    Because of Defendant's policy and actions, Plaintiffs have suffered irreparable harm and will suffer continued irreparable harm from loss of their employment and livelihood if they continue to decline vaccination on account of their religious convictions.

103.    Plaintiffs are entitled to a declaration that Defendant violated their rights under RFRA to the free exercise of religion, and an Order requiring Defendant to reinstate their employment and enjoining them from taking any other adverse action against Plaintiffs' employment based on their unvaccinated status.

104.    Absent injunctive and declaratory relief against Defendant, Plaintiffs will suffer imminent and irreparable harm.

### First Amendment Claim
### COUNT II

105.    Plaintiffs reincorporate the foregoing as if fully written herein.

106.    The First Amendment of the Constitution protects the "free exercise" of religion.

21

107.    Fundamental to this protection is the right to maintain bodily integrity consistent with one's religious beliefs.

108.    Defendant's actions, as described herein, including hostility towards religious beliefs as reflected by Defendant's refusal to grant Plaintiffs' religious accommodations, constitute a violation of their rights under the First Amendment's Free Exercise Clause.

109.    Plaintiffs seek declaratory and injunctive relief for these First Amendment violations, and reasonable attorney fees.

### Title VII Religious Discrimination Claims
### Count III

110.    Plaintiffs reincorporate the foregoing as if fully written herein.

111.    By the acts, policies, and practices set forth in more detail above, Defendant has discriminated against Plaintiffs in the terms and conditions of their employment on the basis of their religion, in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e *et al*.

### NYSHRL Religious Discrimination Claim
### Count IV

112.    Plaintiffs reincorporate the foregoing as if fully written herein

113.    By the acts, policies, and practices set forth in more detail above, Defendant has discriminated against Plaintiffs in the terms and conditions of their employment on the basis of their religion, in violation of the New York State Human Rights Law (NYSHRL), N.Y. Executive Law § 290 *et seq*.

**NYCHRL Religious Discrimination Claim**
**Count V**

114.    Plaintiffs reincorporate the foregoing as if fully written herein

115.    By the acts, policies, and practices set forth in more detail above, Defendant has discriminated against Plaintiffs in the terms and conditions of their employment on the basis of their religion, in violation of the New York City Human Rights Law (NYSHRL), New York City Administrative Code, § 8–101 *et seq*.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Lori Gardner-Alfred and Jeanette Diaz, respectfully request that the Court enter judgment against Defendant and provide them with the following relief:

A.    A declaratory Judgment that Defendant violated their rights under RFRA.

B.    A declaratory Judgment that Defendant violated their rights under the Free Exercise Clause of the First Amendment.

C.    A preliminary and permanent injunction prohibiting Defendant from enforcing the Vaccine Policy against them, or from taking actions adverse to their employment, or from otherwise retaliating against them.

D.    A preliminary and permanent injunction requiring that Defendant reinstate their employment with back pay.

E.    An award of nominal damages.

F.    An award of compensatory damages.

G.    An award of punitive damages.

H.    Reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 2412.

I.    All and any further relief to which Plaintiffs may be entitled.

J.   A trial by jury of all such matters properly tried as such is requested.

Dated: April 4, 2022
New York, New York

Respectfully submitted,

___/s/_____
Andrew St. Laurent
Megan Dubatowka
HARRIS ST. LAURENT & WECHSLER LLP
40 Wall Street, 53rd Floor
New York, New York 10005
(212) 397-3370