UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___1/18/2023___
```

------------------------------------------------------------------X
:
LORI GARDNER-ALFRED AND JEANETTE DIAZ,            :
:
Plaintiffs,            :
:                 22-cv-1585 (LJL)
-v-                       :
:                 OPINION AND ORDER
FEDERAL RESERVE BANK OF NEW YORK,                 :
:
Defendant.            :
:
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

       Plaintiffs Lori Gardner-Alfred and Jeanette Diaz ("Plaintiffs") bring claims against their former employer, Federal Reserve Bank of New York ("FRBNY" or "Defendant"), related to the termination of their employment for failing to comply with the requirement that employees be vaccinated against the COVID-19 virus. Dkt. No. 24. Defendant moves to dismiss the operative complaint. Dkt. No. 31.

       For the following reasons, the motion to dismiss is granted with respect to Plaintiffs' claims under New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, and New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8–101 *et seq.* The motion to dismiss is denied with respect to Plaintiffs' claims under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, the Free Exercise Clause of the First Amendment, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*

**BACKGROUND**

The Court accepts the well-pleaded facts of the amended complaint ("Amended Complaint"), as supplemented by the documents incorporated by reference therein, as true for purposes of the motion to dismiss.

Defendant is one of twelve Federal Reserve Banks that make up the Federal Reserve System and that were established by the Federal Reserve Act, 12 U.S.C. § 341 (the "FRA"). Dkt. No. 24 ¶ 4. Plaintiff Lori Gardner-Alfred ("Gardner-Alfred") began her employment with the FRBNY approximately thirty-five years ago, has held several titles over that time period, and most recently served as the Executive Assistant to the Executive Vice President ("EVP") of the FRBNY. *Id.* ¶ 10. In that position, she facilitated and coordinated communications between the EVP and other areas of the FRBNY, maintained the EVP's calendar, organized and scheduled meetings and events for the EVP, electronically reserved conference rooms and video conference meetings for the EVP, and coordinated travel and reimbursements for the EVP. *Id.* Plaintiff Jeanette Diaz ("Diaz") began her employment with the FRBNY approximately twenty-seven years ago, has held several titles over that time period, and most recently served as Senior Executive Specialist, providing direct administrative support to the EVP of Information Technology. *Id.* ¶ 11. Diaz's job responsibilities were substantively the same as Gardner-Alfred's. *Id.*

At the onset of the COVID-19 pandemic in March 2020, Defendant implemented a mandatory remote work policy for its employees until employees were otherwise notified. *Id.* ¶ 12. Plaintiffs began working remotely almost immediately and their job performance was unaffected by remote work. *Id.* ¶¶ 13–14. Both employees received strong performance evaluations for the years 2020 and 2021. *Id.* ¶ 38.

In March 2021, the COVID-19 vaccine became widely available to adults in the United States.  *Id.* ¶ 15.  Plaintiffs, however, have both declined to receive any vaccination against COVID-19 for religious reasons.  *Id.* ¶ 64.  Gardner-Alfred is a member of the Temple of Healing Spirit, which is a belief system that emphasizes "holistic approaches to health focused on diet and spiritual self-awareness, and opposes the invasive techniques of traditional Western medicine."  *Id.* ¶ 18.  For Gardner-Alfred, the COVID-19 vaccines, by reasons of their "provenance, chemical composition, and origin," represent "unacceptable intrusions on her personal form."  *Id.*  Diaz is a baptized Catholic and, because of her religious convictions, is morally against receiving certain vaccines.  *Id.* ¶ 19.  In particular, Plaintiffs claim that "[t]he COVID-19 injections available in the US all involve use of aborted fetal cells in their manufacturing and/or testing," *id.* ¶ 16, and Diaz believes, among other things, that any individual Catholic may "refuse a vaccine that used abortion-derived cell lines at any stage of the creation of the vaccine," *id.* ¶ 21.

On or about June 4, 2021, Defendant notified its employees that it would soon require employees to return to office on a part-time basis.  *Id.* ¶ 26.  Shortly thereafter, Defendant asked its employees to provide their COVID-19 vaccination status.  *Id.*  Plaintiffs responded that they were not vaccinated.  *Id.*  On or about August 2, 2021, Defendant implemented a COVID-19 vaccination policy ("Vaccination Policy"), requiring that every FRBNY employee be fully vaccinated against COVID-19.  *Id.* ¶ 28.

The Vaccination Policy allows for certain religious and medical exemptions.  *Id.* ¶ 30. Specifically, the Vaccination Policy provides an exemption "as required by law, for employees unable to obtain a vaccine due to a medical condition or sincerely held religious belief that precludes receiving the COVID-19 vaccine."  *Id.* (citation omitted).  Further "[a]n employee

requesting an accommodation based on religious belief must complete a religious accommodation request form and submit it to the People Relations team.  The employee must clearly explain why receiving the COVID-19 vaccination would be contrary to their religious beliefs and may be required to provide supporting information." *Id.* (citation omitted) (emphasis omitted).  The Vaccination Policy also notes that persons who do not comply may be terminated. *Id.* ¶ 31.

Because neither of Plaintiffs is vaccinated, each submitted a Notification of Vaccination Exemption ("Notification") by Affidavit to the People Relations team at the FRBNY; Gardner-Alfred submitted her Notification on or about August 9, 2021, and Diaz submitted her Notification on or about September 1, 2021.  *Id.* ¶¶ 33–34.  Each participated in a religious exemption interview conducted by the People Relations Team and answered questions about her religious views as well as her responsibilities and interactions with other individuals during a typical workday.  *Id.* ¶ 35.  On or about October 1, 2021, Plaintiffs were individually notified that Defendant had temporarily granted their request.  *Id.* ¶ 36.

Defendant subsequently announced an official return to work date of January 10, 2022. *Id.* ¶ 37.  On or about November 29, 2021, Defendant informed each Plaintiff by email that "as of January 7, 2022, your accommodation exempting you from the [FRBNY]'s mandatory COVID-19 Vaccination Policy will end."  *Id.* ¶ 41 (citation omitted).  The email further warned that "if you decide not to become vaccinated, by on or about January 7, 2022, you will receive additional information on your departure from the Bank . . . ."  *Id.*  As for their religious accommodation requests, the Defendant stated it had reassessed "your temporary accommodation based on an evaluation of health, safety and population conditions related to the pandemic that impact the mission of the [FRBNY].  Those conditions include the increasing

number of employees returning to the [FRBNY] in January, the return of external visitors, and

your essential job functions (including the frequency of your interaction with external visitors

and others at the [FRBNY]) and your proximity to others while conducting your job

responsibilities." *Id.* ¶ 42 (citation omitted).  Plaintiffs were surprised by this reasoning as they

had been able to satisfactorily perform their job functions remotely and, even prior to the remote

work policy, had not regularly interacted with visitors to the building.  *Id.* ¶ 45.

Despite denying Plaintiffs' religious accommodation, the FRBNY approved exemptions

for other employees for medical and religious reasons.  *Id.* ¶ 46.  For example, Defendant

approved a religious accommodation for at least one executive assistant.  That individual

supports one senior vice president and a team comprised of multiple individuals, whereas

Plaintiffs each support only one EVP.  *Id.*  Defendant has articulated no reason for granting the

request for religious accommodation for certain individuals and not others.  *Id.*  Defendant has

also implemented a procedure to accommodate those individuals; that procedure involves

requiring the employees to submit weekly negative COVID-19 tests.  *Id.* ¶ 49.  Plaintiffs claim

that Defendant could have accommodated their requests for accommodations, including by

requiring testing to determine infection status or temperature checks.  *Id.* ¶ 52.

Plaintiffs attempted to obtain additional information from Defendant about why their

religious accommodation requests had been denied.  *Id.* ¶ 53.  Defendant noted that it could not

reasonably accommodate Plaintiffs due to some of their essential job functions which required

them to be physically at the FRNBY's premises.  *Id.* ¶¶ 54–55.  Defendant also noted that it

could not reasonably accommodate Plaintiffs onsite because doing so would create increased

safety risks for the FRNBY and its employees.  *Id.* ¶ 56.

Because Plaintiffs continued to refuse to be vaccinated against COVID-19, their employment at the FRBNY was terminated on March 14, 2022. *Id.* ¶ 68.

## PROCEDURAL HISTORY

On February 23, 2022, Plaintiffs (who at that time were still employed by the FRBNY) commenced actions in New York State Supreme Court against the Defendant. Dkt. No. 1-1. Plaintiffs sought an immediate injunction barring Defendant from firing them (the "TRO"). *Id.* at 13, 39. That same day, Justice Frank of the New York State Supreme Court granted Plaintiffs an *ex parte* restraining order directing the FRBNY to show cause on March 7, 2022, why Plaintiffs should not be granted a permanent injunction restraining the FRBNY from firing Plaintiffs. *Id.* at 4–5.

The action was removed to this Court on February 25, 2022. Dkt. No. 1. On March 2, 2022, the FRBNY moved to dissolve the TRO. Dkt. No. 7. The Court granted that request. Dkt. No. 15. The Court held that the state court's entry of the TRO did not satisfy the requirements of Federal Rule of Civil Procedure 65. *Id.* at 6. The Court also found that Plaintiffs had not shown irreparable harm justifying the issuance of a preliminary injunction. *Id.* at 7–8. In particular, the Court noted that while Plaintiffs' argument that they would suffer irreparable harm hinged on the loss of their First Amendment freedoms,

> Plaintiffs' petitions here, however, do not allege any violation of their First Amendment freedoms; their operative pleadings assert no Free Exercise claims. Rather, they challenge the vaccination policy not as impinging on their free exercise of religion but because it is "clearly discriminatory, arbitrary, and capricious," and "is not supported by scientific knowledge and fact but fear and intimidation.

*Id.* at 8 (citation omitted). The Court also noted that the economic harm of losing a job is not of the type of harm that usually warrants injunctive relief as it can be compensable with money damages. *Id.* After the Court granted the request, both Plaintiff were terminated from their employment by Defendant. Dkt. No. 24.

On April 5, 2022, Plaintiffs filed the Amended Complaint against the Defendant. *Id.* In that Amended Complaint, Plaintiff alleged their terminations violated RFRA; the Free Exercise Clause of the First Amendment; Title VII, 42 U.S.C. §§ 2000e *et al.*; the NYSHRL, N.Y. Executive Law § 290 *et seq.*; and the NYCHRL, N.Y.C. Administrative Code, § 8–101 *et seq.* *Id.*

On April 19, 2022, Plaintiffs moved the Court for a preliminary injunction reinstating their employment. Dkt. Nos. 27–30. Defendant moved to dismiss the Amended Complaint and opposed Plaintiff's request for a preliminary injunction on May 3, 2022. Dkt. Nos. 31–33. On May 10, 2022, Plaintiffs filed a reply memorandum of law in further support of their motion for a preliminary injunction and a memorandum of law in opposition to the motion to dismiss the Amended Complaint (plus a supporting declaration). Dkt. Nos. 34–36. On June 10, 2022, Defendant filed a reply memorandum of law in support of the motion to dismiss the Amended Complaint. Dkt. No. 37.

On June 28, 2022, the parties submitted a joint letter to the Court agreeing to consolidate the hearing on Plaintiffs' motion for a preliminary injunction with a trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). Dkt. No. 41. On July 20, 2022, the Court granted that request. Dkt. No. 43.

## LEGAL STANDARD

### I.    Motion to Dismiss

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint must offer more than "labels and conclusions," "a formulaic

recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555, 557.  The ultimate question is whether "[a] claim has facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

## DISCUSSION

Defendant seeks to dismiss each claim in the Amended Complaint.  First, Defendant argues that the RFRA and Free Exercise Clause claims should be dismissed as Title VII is the exclusive remedy for the redress of federal employment discrimination and precludes the application of RFRA and the First Amendment.  Dkt. No. 32 at 2.  Second, Defendant argues that Plaintiffs' New York City and New York State claims conflict with federal law and thus are preempted.  *Id.*  Finally, Defendant argues that Plaintiffs' Title VII claims should be dismissed as insufficiently pled.[1]  *Id.*

---

[1] In its opening brief, Defendant also argued that Plaintiffs' Title VII claims should be dismissed for failure to exhaust administrative remedies through the Equal Employment Opportunity Commission ("EEOC").  Dkt. No. 32 at 2.  However, Defendant dropped this argument in its reply brief after Plaintiffs presented evidence that they have since exhausted their administrative remedies.  *See* Dkt. No. 35 at 10; Dkt. No. 37 ("As Plaintiffs have obtained right-to-sue letters, ECF Nos. 36-1, 36-2, the New York Fed does not address exhaustion further."); *see also Brunson-Bedi v. New York*, 2018 WL 2084171, at *4 (S.D.N.Y. May 1, 2018) ("Courts in this circuit have already held that where a plaintiff has received a right to sue letter subsequent to commencement of a Title VII action and while the federal action is still pending, the statutory exhaustion requirements have been met based on . . . equitable principles." (cleaned up)).

I.      **RFRA and Free Exercise Clause Claims**

Defendant seeks to dismiss Plaintiffs' RFRA and Free Exercise Clause claims as

preempted by Title VII.  *Id.* at 7–10.  Defendant argues that Title VII sweeps within its reach all

employment discrimination claims whether they are based on religion or any other form of

discrimination that impacts a constitutionally protected right, and RFRA was not intended to

broaden the employment discrimination remedies against federal employers, such as the

FRBNY, that were in existence under Title VII.  *Id.* at 8–10.

"Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on

race, color, religion, sex, or national origin."  *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 825

(1976) (citation omitted).  Until 1972, however, Title VII did not, as a general matter, protect

employees of the federal government.  *Id.*  Instead, charges of discrimination against federal

employers were largely handled within each federal agency.  *Id.*  Concerned that federal

employees who were "treated discriminatorily had no effective judicial remedy," Congress

amended the 1964 Civil Rights Act ("1964 Act") through the addition of Section 717 to cover

federal employees in 1972.  *Id.* at 825, 828.

The exclusivity of Title VII as to claims of federal employment discrimination was

addressed by the Supreme Court in 1976 in *Brown v. General Services Administration*, 425 U.S.

820 (1976).  In that case, a man who was employed by the General Services Administration of

the federal government sued for race discrimination, including under Title VII.  *Id.* at 822–24.

The district court and Second Circuit dismissed the complaint holding that Section "717 provides

the exclusive judicial remedy for federal employment discrimination, and that the complaint had

not been timely filed under that statute."  *Id.* at 824.  The Supreme Court affirmed, holding that

the 1972 amendment was intended to be exclusive and preemptive of all other judicial remedies

for employment discrimination claims by federal employees.  *Id.* at 828–29.  The Supreme Court

discussed the various administrative and enforcement mechanisms that Section 717 included and found that the "[t]he balance, completeness, and structural integrity of § 717 are inconsistent with the petitioner's contention that the judicial remedy afforded by § 717(c) was designed merely to supplement other putative judicial relief." *Id.* at 831–32.

In 1993, nearly two decades after the Court's decision in *Brown*, Congress enacted RFRA to provide broad protection for religious liberty. 42 U.S.C. § 2000bb–3(a); *see Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). RFRA's enactment followed the Supreme Court's decision in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), which rejected the Supreme Court's approach to free-exercise claims in prior cases. *See Burwell*, 573 U.S. at 693. "*Smith* held that neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest." *City of Boerne v. Flores*, 521 U.S. 507, 514 (1997). "Congress responded to *Smith* by enacting RFRA." *Burwell*, 573 U.S. at 694. RFRA states that the Government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless it is "in furtherance of a compelling governmental interest" *and* "is in the least restrictive means of furthering that compelling governmental interest."[2] 42 U.S.C. § 2000bb-1(a)–(b).

RFRA and Title VII have some overlap. Both, on their face, cover claims of religious discrimination (including failure to accommodate an employee's religious practice) by governmental employers. *See id.* § 2000bb–1; *id.* § 2000e *et seq.* Thus, it is possible for a plaintiff, as Plaintiffs do here, to bring claims based on the same operative facts under both

---

[2] RFRA, as enacted, applied to the federal government as well as state and local governments. *See Burwell*, 573 U.S. at 695; *City of Boerne*, 521 U.S. at 515–16. The Supreme Court in *City of Boerne v. Flores*, however, struck down RFRA as applied to state and local governments as exceeding Congress's powers under the U.S. Constitution. 521 U.S. 507.

statutes.  In such a case, the question arises whether *Brown*'s holding that Title VII provides the exclusive remedy for claims of discrimination in federal employment persists even after the passage of RFRA.

Although the Second Circuit has not addressed this issue, several other circuit and district courts have.  In each case, the court held that RFRA was not intended to broaden the remedies available for federal discrimination actions beyond that those existed under Title VII and thus that Title VII still provides the exclusive remedy for claims of religious discrimination stemming from federal employment.  *See, e.g.*, *Harrell v. Donahue*, 638 F.3d 975, 983 (8th Cir. 2011) ("Harrell's claims under RFRA are barred because Title VII provides the exclusive remedy for his claims of religious discrimination."); *Francis v. Mineta*, 505 F.3d 266, 272 (3d Cir. 2007) ("It is equally clear that Title VII provides the exclusive remedy for job-related claims of federal religious discrimination, despite Francis's attempt to rely upon the provisions of RFRA."); *Truskey v. Perdue*, 2021 WL 9316104, at *3 (W.D. Ky. July 30, 2021), *aff'd sub nom. Truskey v. Vilsack*, 2022 WL 3572980 (6th Cir. Aug. 19, 2022) ("Truskey's RFRA claim, by contrast, rests solely on allegations of employment discrimination.  Title VII provides his only possible path to relief."); *Holly v. Jewell*, 196 F. Supp. 3d 1079, 1088 (N.D. Cal. 2016) ("District courts uniformly have held that where a federal employee asserts a RFRA claim that addresses the same basic injury as a parallel claim asserted under Title VII, the RFRA claim is barred because Title VII provides the exclusive remedy.").

These courts have reached this conclusion based on the Supreme Court's holding in *Brown* that Title VII was the exclusive, pre-emptive scheme for the redress of claims of federal employment discrimination, *see Harrell*, 638 F.3d at 983; *Mineta*, 505 F.3d at 271, as well as the legislative history of RFRA which supports the conclusion that RFRA was not designed to alter

11

the exclusive nature of Title VII, *see Harrell*, 638 F.3d at 983; *Mineta*, 505 F.3d at 271.

Specifically, those courts have noted that the Senate Report contains language in a section titled

"Other Areas of Law are Unaffected" stating "[a]lthough the purpose of this act is only to

overturn the Supreme Court's decision in *Smith*, concerns have been raised that the act could

have unintended consequences and unsettle other areas of law."  S. Rep. No. 103–111, at 12

(1993).  The Report then outlines areas of law that are not affected by RFRA and states regarding

Title VII:  "Nothing in this act shall be construed as affecting religious accommodation under

title VII of the Civil Rights Act of 1964."  *Id.* at 13.  The House Report similarly states:

"Nothing in this bill shall be construed as affecting Title VII of the Civil Rights Act of 1964."

H.R. Rep. No. 103–88, at 9 (1993).  In addition, these courts have noted that RFRA was enacted

"to return to what Congress believed was the pre-*Smith* status quo of requiring the Government

to show a compelling interest for any law that substantially burdened the free exercise of

religion" and was "not intended to broaden the remedies for federal employment discrimination

beyond those that already existed under Title VII."  *Harrell*, 638 F.3d at 984; *see Mineta*, 505

F.3d at 270.

Defendant asks this Court to extend the reasoning of these courts and to hold that

Plaintiffs' RFRA claims are preempted by Title VII.  Dkt. No. 32 at 7–9.  At first, this line of

reasoning seems appealing.  If, as the Supreme Court has stated, Title VII is the exclusive

remedy for claims of federal employment discrimination and RFRA was not intended affect

Title VII, then it seems straightforward that Plaintiffs should not be able to pursue their RFRA

claims in this action against the FRBNY.

Plaintiffs, however, identify an important wrinkle in this mode of analysis.  In each of the

cases in which courts have held that the party's RFRA claims were preempted by Title VII, the

claims were against a federal entity that was made subject to Title VII by the addition of

Section 717 in 1972.  Dkt. No. 25 at 6–8 & n.4; *see* 42 U.S.C. § 2000e-16(a).  In other words,

these cases all involve entities of the federal government that were originally excluded from the

scope of Title VII but were then later made liable under Section 717.  Dkt. No. 25 at 7 7 n.4.

The FRBNY, on the other hand, Plaintiffs argue, was made liable along with private employers

under the 1964 Act and is not liable under Section 717.  *Id.* at 7–8.

Plaintiffs are correct that the FRBNY is not subject to Section 717 of Title VII.  Section

717 applies only to:

> employees or applicants for employment . . . in military departments . . . , in
> executive agencies . . . , in the United States Postal Service and the Postal
> Regulatory Commission, in those units of the Government of the District of
> Columbia having positions in the competitive service, and in those units of the
> judicial branch of the Federal Government having positions in the competitive
> service, in the Smithsonian Institution, and in the Government Publishing Office,
> the Government Accountability Office, and the Library of Congress.

42 U.S.C. § 2000e–16(a).  The FRBNY does not fall into any of these categories and Defendant

does not claim that it does.  Dkt. No. 37 at 3–4.  The FRBNY has also historically been subject to

Title VII under the 1964 Act, not under Section 717 of Title VII.  *See* Enforcement Guidance on

Coverage of Federal Reserve Banks, EEOC Compl. Man. ¶ 6530 (1993) ("[T]he Federal Reserve

Banks have long interacted with EEOC under those provisions of Title VII of the Civil Rights

Act of 1964, as amended, that apply to nongovernment employers." (citation omitted)); *see also*

*Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 874 (1984) (addressing employment

claims against a Federal Reserve Bank under original provisions of the 1964 Act).

That the FRBNY is not subject to Title VII under Section 717 is significant.  First, it

distinguishes this case from prior cases[3] in which the court held that the plaintiff could not bring

---

[3] Defendant states that it has found only one case in which the Court considered a RFRA claim
asserted by a former employee of the Virgin Islands government, which is a "covered entity"

both Title VII and RFRA claims.  In those cases, the federal employers fell within the scope of

Section 717.  *See* 42 U.S.C. § 2000e–16(a); *see, e.g.*, *Harrell*, 638 F.3d at 977 (United States

Postal Service); *Mineta*, 505 F.3d at 268 (Department of Homeland Security); *Holly*, 196 F.

Supp. 3d at 1081 (Department of Interior); *Truskey*, 2021 WL 9316104, at *1 (Department of

Agriculture).  Second, and relatedly, *Brown*'s holding concerning the exclusivity of Title VII as a

judicial remedy—on which those prior cases relied—was specific to entities liable under Section

717.  The *Brown* Court's holding relied on the unique legislative history of Section 717 as well

as "[t]he balance, completeness, and structural integrity of [Section] 717."  425 U.S. at 832; *see

also Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 376 (1979) (summarizing

*Brown*'s holding as "§ 717 of Title VII provides the exclusive remedy for employment

discrimination claims of those federal employees that it covers").

 The Supreme Court both in *Brown* and in its other decisions has made clear that outside

of those entities covered under Section 717, Title VII is not the exclusive remedy for claims of

employment discrimination.  In *Johnson v. Railway. Express Agency, Inc.*, 421 U.S. 454 (1975),

the Court addressed whether a plaintiff's discrimination claims brought against a railroad

company under 42 U.S.C. § 1981 were preempted by the 1964 Act.  The Court held that they

were not and stated:  "Despite Title VII's range and its design as a comprehensive solution for

the problem of invidious discrimination in employment, the aggrieved individual clearly is not

deprived of other remedies he possesses and is not limited to Title VII in his search for relief."

---

under RFRA but not within the scope of Section 717.  Dkt. No. 37 at 4.  In that case, the court
dismissed the RFRA claims finding with little analysis that the Third Circuit's holding in
*Francis v. Mineta* applied.  *Bonelli v. Gov't of the Virgin Islands*, 2015 WL 1407259 (V.I. Super.
Ct. Mar. 19, 2015), *aff'd on other grounds*, 67 V.I. 714 (2017).  In reaching this conclusion, the
court did not address the fact that the employer in *Francis* was within the scope of Section 717
unlike the employer in its case.  *Id.*  Thus, this Court finds *Bonelli*'s analysis and conclusions
unpersuasive.

421 U.S. at 459.  The Court continued: "The legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes." *Id.* (citation omitted) (alteration adopted).[4]

In light of this case law, it is clear that *Brown*'s holding—as well as the holding of those courts that have applied *Brown* to claims under RFRA—does not apply to Plaintiffs' claims.  As outlined *Brown*'s holding was based on the legislative history of Section 717 and was specific to entities covered under Section 717, and the FRBNY is not one of those entities.  Instead, Plaintiffs' Title VII claims are governed by the 1964 Act, which the Supreme Court has held was intended to "allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes." *Johnson*, 421 U.S. at 459 (citation omitted).  Prior case law thus counsels in favor of allowing Plaintiffs' claims under RFRA and Title VII to

---

[4] "The Court in *Brown* . . . expressly reaffirmed the holding in *Johnson*." *Keller v. Prince George's Cnty.*, 827 F.2d 952, 958 (4th Cir. 1987).  *Brown* distinguished its decision as to Section 717 from the decision in *Johnson* stating that "the holding in *Johnson* rested upon the explicit legislative history of the 1964 Act which 'manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes.'" 425 U.S. at 833 (quoting *Johnson*, 421 U.S. at 459).  The Court continued that there was "no such legislative history behind the 1972 amendments" and "[i]ndeed, as indicated above, the congressional understanding was precisely to the contrary." *Id.* at 834.  In dissent, Justice Stevens disagreed that the two cases were so distinguishable, stating:

> Congress intended federal employees to have the same rights available to remedy racial discrimination as employees in the private sector.  Since the law is now well settled that victims of racial discrimination in the private sector have a choice of remedies and are not limited to Title VII, federal employees should enjoy parallel rights.  The reasoning which governed the decisions in [*Johnson*] and *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 [], applies with equal force to federal employees.  There is no evidence, either in the statute itself or in its history, that Congress intended the 1972 amendment to be construed differently from the basic statute.

*Id.* at 836–37 (Stevens, J., dissenting).

proceed simultaneously.  Such a conclusion is further supported by the Supreme Court's guidance that "in the face of congressional emphasis upon the existence and independence of the two remedies," courts are "disinclined to infer any positive preference for one over the other, without a more definite expression in the legislation Congress has enacted."  *Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO, Loc. 790 v. Robbins & Myers, Inc.*, 429 U.S. 229, 237 (1976) (citation omitted).

The legislative history of RFRA is also supportive of the conclusion that Plaintiffs may pursue claims under both Title VII and RFRA.  As noted above, the Senate and House Reports on RFRA substantively state that "[n]othing in this act shall be construed as affecting religious accommodation under title VII of the Civil Rights Act of 1964."  S. Rep. No. 103–111, at 12; *see also* H. R. Rep. No. 103–88, at 9 (1993).  This language is revealing.  The statement that RFRA shall not "affect[]" Title VII indicates, most straightforwardly, that RFRA was not intended to disallow parties from pursuing their remedies for religious accommodation under Title VII.  In other words, to the extent a person could bring a Title VII claim for religious accommodation prior to RFRA's enactment, the person could still bring such a claim even after RFRA's enactment.  However, the language plainly does not indicate that Congress intended for Title VII to be preemptive of RFRA claims of religious accommodation.  Had that been Congress's intent, Congress would have used language such as "a party may only bring claims for religious accommodation under Title VII" or "a party may not bring a religious accommodation claim against an employer under RFRA."  Moreover, even if it were possible to read the language in such a way, it still would not constitute the "definite expression in legislation" from which this Court could infer that Congress intended one remedy to be preemptive of another.  *Robbins & Myers, Inc.*, 429 U.S. at 237.

Furthermore, as mentioned, RFRA was passed to restore the pre-*Smith* approach to Free

Exercise Clauses cases.  H.R. Rep. No. 103-88, at 6 (1993) ("The bill restores the compelling

governmental interest test previously applicable to First Amendment Free Exercise cases by

requiring proof of a compelling justification in order to burden religious exercise."); *see also* S.

Rep. No. 103-111, at 9 (1993).  In other words, RFRA was intended to give Plaintiffs a statutory

cause of action to bring claims that they could have brought pre-*Smith* under the Free Exercise

Clause.  *See*  42 U.S.C. § 2000bb–1(c).  Importantly, pre-*Smith*, employees could and often did

bring Free Exercise claims for religious discrimination against their employers (not subject to

Section 717) alongside Title VII claims.  *See Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 65

& n.4 (1986) (bringing Free Exercise and Title VII claims against school board employer);

*McCormick v. Bd. of Educ. of Belvidere Sch. Dist.*, 1983 WL 537, at *2 (N.D. Ill. July 6, 1983)

(asserting Title VII and Free Exercise claims against school board); *Nottelson v. A. O. Smith

Corp.*, 423 F. Supp. 1345, 1348 (E.D. Wis. 1976) (parallel Title VII and Free Exercise claims).

It thus seems entirely consonant with RFRA's purpose to allow Plaintiffs to bring a claim against

Defendant under RFRA's more expansive scope for religious liberty.  If Title VII would not have

precluded Plaintiff from asserting a Free Exercise claim against Defendant prior to the passage of

RFRA, there is no reason to believe it would prevent them from bringing a RFRA claim after the

passage of that law.  *See Hall v. Am. Nat. Red Cross*, 86 F.3d 919, 921 (9th Cir. 1996) (citing

Senate Judiciary Committee report for the proposition that RFRA was not intended to "expand,

*contract* or alter the ability of a claimant to obtain relief in a manner consistent with the Supreme

Courts's [*sic*] free exercise jurisprudence under the compelling government interest test prior to

*Smith*" (emphasis added)).  In short, if RFRA is not to "be construed as affecting Title VII of the

Civil Rights Act of 1964," H.R. Rep. No. 103–88, at 9 (1993), it should not be construed to give Title VII a broader preemptive scope than the law had prior to the passage of RFRA.

Finding that Plaintiffs can pursue both RFRA and their Title VII claims is also consistent with RFRA's expansive purpose. "RFRA was designed to provide very broad protection for religious liberty." *Burwell*, 573 U.S. at 706. Consistent with that purpose, RFRA, by its plain terms, is expansive in scope. It states that "[t]his chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after" its passage. 42 U.S.C. § 2000bb-3.

For these reasons, this Court holds that Plaintiffs' Title VII claim does not preempt Plaintiffs' RFRA or Free Exercise Clause claims. The Court accordingly declines to dismiss these claims on this basis.

Defendant also appears to argue that Plaintiffs' RFRA and Free Exercise Clause claims should be dismissed for a separate reason. Dkt. No. 32 at 8; Dkt. No. 37 at 2. Defendant states that "[t]he Free Exercise Clause and RFRA apply to the United States government, which RFRA defines as 'a branch, department, agency, instrumentality, and official . . . of the United States.'" Dkt. No. 32 at 8 (quoting 42 U.S.C. § 2000bb-2(1)). Defendant then states that the fact that the FRBNY is a federal instrumentality is not dispositive as "[n]ot all federal instrumentalities fall within RFRA's scope." *Id.*; Dkt. No. 37 at 2. Defendant, however, never follows this argument through or explains exactly why the FRBNY is one of the federal instrumentalities that does not fall within RFRA's scope. Instead, Defendant appears to back away from this argument, noting "[w]hether RFRA and the Free Exercise Clause apply to the New York Fed is a question of first impression," which the Court need not reach if it decides that Plaintiff may only pursue its claims under Title VII. Dkt. No. 37 at 3. In response, Plaintiffs note that the FRBNY is an

instrumentality (a point that Defendant itself concedes) and thus falls under the plain meaning of RFRA.  Dkt. No. 35 at 5.  Plaintiffs also state that the key case that Defendant cites in favor of its argument, *Hall*, 86 F.3d at 921, supports this conclusion.  *Id.* at 5.

This Court is unpersuaded by Defendant's arguments that the RFRA and the Free Exercise Clause do not apply to the FRBNY.  First, the RFRA applies to any "branch, department, agency, instrumentality, and official . . . of the United States."  42 U.S.C. § 2000bb-2(1).  The term "instrumentality" is not defined in the Act and thus the Court must look to its ordinary meaning.  *See Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 407 (2011).

"Congress has expressly designated some entities as federal instrumentalities, *see, e.g.*, 12 U.S.C. § 2121 (banks for farm cooperatives), but it has not done so with respect to Federal Reserve Banks."  *Starr Int'l Co. v. Fed. Rsrv. Bank of New York*, 906 F. Supp. 2d 202, 231 (S.D.N.Y. 2012), *aff'd sub nom. Starr Int'l Co. v. Fed. Rsrv. Bank of New York*, 742 F.3d 37 (2d Cir. 2014).  As to those entities not so designated, "[t]he Supreme Court has used a number of conceptually similar formulations to determine whether an entity is an instrumentality" across a variety of contexts.  *Id.* (collecting cases).  For example, in *Federal Land Bank of St. Louis v. Priddy*, 295 U.S. 229 (1935), the Supreme Court held that a federal land bank was an instrumentality immune from attachment because it was "engaged in the performance of an important governmental function" even though it possessed "some of the characteristics of private business corporations."  *Id.* at 231.  In *Department of Employment v. United States*, 385 U.S. 355 (1966), the Supreme Court held "that the Red Cross is an instrumentality of the United States for purposes of immunity from state taxation levied on its operations."  *Id.* at 358.  The Court reached that conclusion after noting that it was chartered in its present form by Congress, its principal officer was appointed by the President, and the "President and the

Congress have recognized and acted in reliance upon the Red Cross' status virtually as an arm of the Government." *Dep't of Emp. v. United States*, 385 U.S. 355, 359–60 (1966).  In *Lebron v. National Railroad Passenger Corporation*, 513 U.S. 374 (1995), the Supreme Court held that Amtrak was a federal instrumentality subject to the First Amendment as it was (1) "created by a special statute, explicitly for the furtherance of federal governmental goals"; and (2) the government has authority to appoint the majority of directors of the board of the corporation.  *Id.* at 397; *see Hall*, 86 F.3d at 921 (applying this test to determine whether entity was an instrumentality under RFRA).  In each of these cases, the Court looked at how closely related the seemingly private entity was to the federal government and whether it performed a governmental function.

Looking to and applying versions of these various tests, courts in this District as well as outside of this District have repeatedly held that the Federal Reserve Banks are federal instrumentalities.  *See, e.g.*, *Starr Int'l Co.*, 742 F.3d at 40 ("Because federal reserve banks conduct important governmental functions regarding matters including the general fiscal duties of the United States, they are instrumentalities of the federal government." (cleaned up)); *Fed. Rsrv. Bank of St. Louis v. Metrocentre Imp. Dist. No. 1, City of Little Rock, Ark.*, 657 F.2d 183, 186 (8th Cir. 1981), *aff'd sub nom. Metrocentre Improvement Dist. No. 1, City of Little Rock, Arkansas v. Fed. Rsrv. Bank of St. Louis*, 455 U.S. 995, 102 S. Ct. 1625 (1982) ("[W]e hold that the federal reserve banks are instrumentalities of the federal government."); *Goonan v. Fed. Rsrv. Bank of New York*, 2013 WL 1386933, at *2–3 (S.D.N.Y. Apr. 5, 2013); *Starr Int'l Co.*, 906 F. Supp. 2d at 231 (holding that "[a]s a brief review of the powers and characteristics of FRBNY demonstrates, FRBNY satisfies all of these standards [of what constitutes an instrumentality], including the most stringent"); *James v. Fed. Rsrv. Bank of New York*, 471 F.

Supp. 2d 226, 240 (E.D.N.Y. 2007) (finding the FRBNY is a federal instrumentality as it "stand[s] in such a close relationship to the federal government that it must be treated as the government is treated").  In reaching this conclusion, these courts have noted, among other things, that: (1) the "federal reserve banks 'conduct important governmental functions regarding' matters including the 'general fiscal duties of the United States,'" *Starr Int'l Co.*, 742 F.3d at 40 (citation omitted); (2) the "federal reserve banks 'are not operated for the profit of shareholders'; rather, they "were created and are operated in furtherance of the national fiscal policy," *id.* (quoting *Fed. Reserve Bank of Bos. v. Comm'r of Corps. & Taxation of the Commonwealth of Mass.*, 499 F.2d 60, 62 (1st Cir. 1974)); (3) the Federal Reserve Banks are overseen by a central Board of Governors comprised of seven presidential appointees confirmed by the Senate who have "enumerated powers to control their operations," *Starr Int'l Co.*, 906 F. Supp. 2d at 231–32; and (4) the Federal Reserve Banks were established in 1913 by an act of Congress (*i.e.*, the FRA) and to address difficulties with the system of national banks which "provided no central regulating force, and furnished no adequate means for controlling interest rates, or preventing or lessening financial stringencies and panics," *id.* at 231 (citation omitted).

The Court sees no basis to reach a contrary conclusion with respect to whether the FRBNY is an "instrumentality" under RFRA, nor does Defendant provide any.  As noted, Defendant itself repeatedly states that the FRBNY is an instrumentality, Dkt. No. 32 at 8, 10, and, other than noting some doubt,[5] does not explain why it is thus not covered under RFRA's

---

[5] It is possible to interpret Defendant as arguing that because the FRBNY is "formally separate . . . from the government," Dkt. No. 32 at 8 (citation omitted), it is not an instrumentality within the RFRA's scope.  However, formal separateness is a key identifying feature of an instrumentality and what distinguishes it from a governmental department or agency.  *See, e.g.*, *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 394 (1995) (holding that Amtrak is a government instrumentality even though it is "separate and distinct . . . from the government itself" (citation omitted)); *Fed. Land Bank of St. Louis v. Priddy*, 295 U.S. 229, 232

plain language.  Moreover, the Ninth Circuit decision on which Defendant appears solely to rely

in support of its argument, *see Hall*, 86 F.3d 919, supports this view.  In that case, the Ninth

Circuit held that in passing the RFRA, Congress did not intend "to create a broader class of

government actors than previously existed under the Free Exercise Clause of the First

Amendment."[6]  *Id.* at 921.  Thus, the term "instrumentality" in RFRA should be interpreted to

encompass only those types of private entities considered government actors under the First

Amendment.  *Id.*  The court accordingly applied the two-part test from *Lebron*, 513 U.S. 374,

which held that "a corporation created by special law is part of the government for the purposes

of the First Amendment (1) when the corporation is created for the furtherance of governmental

objectives and (2) when government retains for itself permanent authority to appoint the majority

of directors of the corporation."  *Hall*, 86 F.3d at 921.  In applying that two-part test, the Ninth

Circuit concluded that the Red Cross was not a government actor as the Red Cross Board of

Governors consists of fifty persons, but only eight of them were appointed by the President of

the United States.  *Id.* at 922.  Here, by contrast, there is no question that the FRBNY was

specifically created by Congress to further a key governmental objective (*i.e.*, the general fiscal

duties of the United States) and that the Federal Reserve Banks are overseen by a central Board

_____

(1935) ("federal land banks, although concededly federal instrumentalities, possess also some of
the characteristics of private business corporation . . . distinguishing them from the government
itself and its municipal subdivisions, and from corporations wholly government owned and
created to effect an exclusively governmental purpose.").  Under that interpretation of
Defendant's argument, the reference to "instrumentality" in 42 U.S.C. § 2000bb-2(1) would be
meaningless.  *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 299 (2006)
("[I]t is generally presumed that statutory language is not superfluous.").
[6] There is some question about the continuing viability of this holding in light of the Supreme
Court's rejection in *Burwell* of the argument that "RFRA did no more than codify this Court's
pre-*Smith* Free Exercise Clause precedents."  573 U.S. at 713.  This Court, however, need not
address this precise argument since the FRBNY is an instrumentality even under this more
stringent standard.

of Governors comprised of seven presidential appointees confirmed by the Senate who have "enumerated powers to control their operations," *Starr Int'l Co.*, 906 F. Supp. 2d at 231–32; *see Starr Int'l Co.*, 742 F.3d at 40.  The FRBNY thus fits the definition of an instrumentality under even Defendant's proffered definition.

For similar reasons, the Court holds that Defendant is subject to the Free Exercise Clause. As noted, *Lebron* held that a corporation created by special law is part of the government for the purposes of the First Amendment when (1) the entity was created by a special statute explicitly for the furtherance of federal governmental goals and (2) a majority of the board of directors of the entity are appointed by the government itself.  513 U.S. at 397–98.  As discussed, the FRBNY meets both these criteria.  According, it "is part of the Government for purposes of the First Amendment."  *Id.* at 399.

Finally, in their reply brief, Defendant make an entirely new argument as to why Plaintiffs' Free Exercise Clause claims should be dismissed.  Dkt. No. 37 at 5.  Defendant argues that the Free Exercise Clause, as interpreted by *Smith*, does not independently require an employer to provide religious accommodations from neutral and generally applicable policies. *Id.*  The Court declines to address this argument without prejudice to renewal at some other point.  "[T]he law in the Second Circuit is clear that arguments or requests for relief raised for the first time in reply briefs need not be considered."  *In re Various Grand Jury Subpoenas*, 235 F. Supp. 3d 472, 485 (S.D.N.Y. 2017); *Haywin Textile Prod., Inc. v. Int'l Fin. Inv.*, 137 F. Supp. 2d 431, 434 (S.D.N.Y. 2001) ("It is well settled that courts should not consider arguments first raised in a party's reply brief which afford no opportunity for response from the opposing party.").

Defendant's motion to dismiss is accordingly denied with respect to Plaintiffs' claims under RFRA and the Free Exercise Clause.

## II.     State and Local Claims

Next, Defendant argues that Plaintiffs' NYSHRL and NYCHRL claims conflict with and thus are preempted by federal law.  Dkt. No. 32 at 10.  First, Defendant argues that states and localities may not regulate federal activities, including the activities of federal instrumentalities, absent express and unambiguous Congressional authorization and that no such authorization exists here.  *Id.* at 11.  In the alternative, Defendant argues that NYSHRL and NYCHRL conflict with express provisions of federal law.  *Id.* at 11–12.  According to Defendant, the FRA expressly grants the Federal Reserve Banks the discretion to dismiss their employees at pleasure. *Id.* at 12.  While this provision was impliedly amended by Title VII, to which the FRBNY is subject, Defendant argues it "cannot be curtailed beyond what federal law provides."  *Id.*  Thus, Defendant argues that the FRA preempts state or local employment rights and Plaintiffs' state and local claims must be dismissed.  *Id.*

In opposition, Plaintiffs note that Defendant's status as an instrumentality alone does not render it immune from state and local regulation.  Dkt. No. 35 at 13–14.  Instead, the relevant inquiry is whether the state laws will interfere with the FRBNY's performance of its federal function.  *Id.*  Plaintiffs also argue that there is no conflict between state and local employment anti-discrimination statutes and the "at pleasure" language in the FRA.  *Id.* at 15.  Plaintiffs state: "It is well settled that the employment at will doctrine does not bar employment discrimination claims."  *Id.*  Finally, Plaintiffs argue that to the extent the Court does find such a conflict, it should "nevertheless find that the NYSHRL and NYCHRL are preempted only to the extent they exceed the requirements of Title VII."  *Id.* at 17.

This Court first addresses the claim that Defendant's status as an instrumentality renders it immune from state and local regulation regarding employment discrimination absent express and unambiguous Congressional authorization.  It then turns to the question whether application of New York State and New York City law is preempted.

The Court concludes that Defendant's status as a federal instrumentality does not *ipso facto* render it immune from all state and local regulation absent express and unambiguous Congressional authorization.  It is true that the broad language in certain earlier Supreme Court cases seems to support the view that the FRBNY should be free of regulation absent express congressional authorization.  In *Hancock v. Train*, the Supreme Court stated: "where Congress does not affirmatively declare its instrumentalities or property subject to regulation, the federal function must be left free of regulation."  426 U.S. 167, 179 (1976); *see also Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 176 (1988) ("It is well settled that the activities of federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides 'clear and unambiguous' authorization for such regulation." (citation omitted)).  More recently however, the Supreme Court has clarified that "state laws of general application" shall apply "to the extent that such laws do not conflict with the letter or general purposes of" federal statute.  *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007).  Accordingly, "national banks are routinely subject to state laws of general application in their daily business," which have "full force to the extent they do not conflict with the letter or the general purposes of the" federal instrumentality's charter.  *Cantero v. Bank of Am., N.A.*, 49 F.4th 121, 130 (2d Cir. 2022) (cleaned up).  "Whether a state law is preempted is thus a question about the scope of the [FRA]—specifically, the extent to which it 'set[s] aside the laws of a State.'"  *Id.* at 131–32 (citation omitted).

The Court turns next to the question whether state and local discrimination laws conflict with the powers granted the FRBNY by the FRA. Dkt. No. 32 at 12; Dkt. No. 35 at 1.  It is undisputed that the broad powers granted the FRBNY by the FRA do not relieve it of the obligation to comply with federal law anti-discrimination laws, including Title VII.  The Court when "faced with two possibly conflicting federal statutes, a court must, if at all possible, construe them 'to give effect to each if we can do so while preserving their sense and purpose.'" *Cortese v. Skanska Koch, Inc.*, 2021 WL 429971, at *10 (S.D.N.Y. Feb. 8, 2021) (quoting *Watt v. Alaska*, 451 U.S. 259, 267 (1981)).  Thus, Congress—which gave the FRBNY the power to dismiss officers and employees "at pleasure" and for any reason or no reason at all—also has the power by subsequent legislation to prevent the FRBNY from terminating a person by reason of the person's religion.  *See, e.g.*, *Cooper v. Fed. Reserve Bank*, 467 U.S. 867 (1984) (holding that employee suing Federal Reserve Bank for racial discrimination could maintain separate actions against the bank under Title VII).

It is an entirely different question, however, whether states or localities, who are not co-equals with the federal government with respect to federal legislation, have the power to restrict the FRBNY's powers under federal law.  That "state laws of general application" apply to the FRBNY, in the absence of a conflict, raises but does not answer the question how to determine whether in the case of a federal instrumentality such a conflict exists and whether it exists here. *Id.*  "That the conduct at issue was that of a federal instrumentality significantly 'colors the typical preemption analysis.'"  *Starr Int'l Co.*, 906 F. Supp. 2d at 235 (quoting *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 486 (10th Cir. 1998)).  The assumption that the historic police powers of the states are not to be superseded by federal law unless that is the clear and manifest purpose of Congress does not apply when "attempt[ing] to hold federal

instrumentalities to the dictates of federal law," as the concerns "about interference with federal functions are more acute in that context."  *Id.*; *cf. Cantero*, 49 F.4th at 130 (stating that "the presumption against preemption 'disappears'" in the context of state laws regulating national banks (quoting *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005)).  Instead, when the federal charter grants "powers" to the instrumentality "both enumerated and incidental," those powers are "not normally limited by, but rather ordinarily pre-empt[ ], contrary state law." *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 32 (1996); *see also Cantero*, 49 F.4th at 130.

As noted, Defendant argues that the NYSHRL and the NYCHRL conflict with Section 341(Fifth) of the FRA.  Section 341(Fifth) provides that "a Federal reserve bank . . . shall have power . . . [t]o appoint by its board of directors a president, vice presidents, and such officers and employees as are not otherwise provided for in this chapter, to define their duties, require bonds for them and fix the penalty thereof, and *to dismiss at pleasure such officers or employees*."  12 U.S.C. § 341(Fifth) (emphasis added).  While the Second Circuit has never ruled on this precise issue, "[o]ther circuit and district courts have addressed whether the FRA or analogous federal statutes containing similar 'dismiss at pleasure' language preempt state anti-discrimination laws and have reached varying conclusions."  *Dobbins v. Fed. Rsrv. Bank of Dallas*, 2020 WL 9071686, at *3 (N.D. Tex. Dec. 29, 2020), *report and recommendation adopted*, 2021 WL 1222138 (N.D. Tex. Mar. 31, 2021).  The first approach, deemed the "total preemption" approach, "suggest[s] that any state-created limitation on the bank's power would fundamentally, and irreconcilably, conflict with Congress's intent to grant total, unlimited discretion."  *Fasano v. Fed. Rsrv. Bank of New York*, 457 F.3d 274, 286 (3d Cir. 2006).  The Fourth and Sixth Circuits have both adopted this approach and have held that the "at pleasure"

language in the FRA—or substantially similar language contained in the Federal Home Loan Bank Act—preempts all state statutory employment rights.  *See Arrow v. Fed. Rsrv. Bank of St. Louis*, 358 F.3d 392, 393 (6th Cir. 2004) (finding that plaintiff's state law claims were properly dismissed as they were preempted under the FRA); *Andrews v. Fed. Home Loan Bank of Atlanta*, 998 F.2d 214, 220 (4th Cir. 1993) ("Congress intended for federal law to define the discretion which the Bank may exercise in the discharge of employees.  Any state claim for wrongful termination would plainly conflict with the discretion accorded the Bank by Congress.").[7]

A second approach is the "more limited approach of partial conflict preemption of state employment laws."  *Fasano*, 457 F.3d at 286.  "In general, these courts have concluded that § 341(Fifth) (and, analogously, provisions in the National Bank Act and National Home Loan Bank Act) preempts state laws only to the extent that the state laws provide additional remedies or liability beyond the federal anti-discrimination laws (such as Title VII or [the Age Discrimination in Employment Act of 1967 ("ADEA")]) that have already impliedly amended § 341(Fifth)."  *Id.* at 286–87 (collecting cases).  The Third and Ninth Circuits have adopted this approach, *Fasano*, 457 F.3d at 287; *see Kroske v. U.S. Bank Corp.*, 432 F.3d 976, 989 (9th Cir. 2005) ("In light of the ADEA's prohibition against age discrimination and the integral role of state anti-discrimination laws in the federal anti-discrimination scheme, we conclude that

---

[7] The Eleventh Circuit similarly adopted this approach regarding nearly identical "at pleasure" language in the National Bank Act, holding that "the at pleasure provision of the NBA preempts Wiersum's claim under the FWA for wrongful discharge under Florida law, because the FWA is in direct conflict with the NBA."  *Wiersum v. U.S. Bank, N.A.*, 785 F.3d 483, 490–91 (11th Cir. 2015).  The court, however, noted in a footnote that for the first time on appeal Wiersum argued reversal was "required under the partial-preemption doctrine, because his [state law] claim [was] consistent with the provisions" of the Dodd–Frank Wall Street Reform and Consumer Protection Act of 2010.  *Id.* at 491 n.8.  The court declined to address the argument finding it had been waived.  *Id.*  It is thus unclear whether the Eleventh Circuit would have adopted a partial-preemption approach had the argument been preserved.

Congress did not intend for § 24(Fifth) to preempt the [Washington state] employment

discrimination provisions, at least insofar as they are consistent with the prohibited grounds for

termination under the ADEA."), as well as certain district courts in this Circuit, *see James*, 471

F. Supp. 2d at 236 ("Accordingly, the Court finds that the NYSHRL is preempted, with regard to

the Federal Reserve Bank of New York, only insofar as it exceeds the requirements of Title VII

and the [Americans with Disabilities Act]."); *Moodie v. Fed. Rsrv. Bank of New York*, 831 F.

Supp. 333, 337 (S.D.N.Y. 1993) ("The New York State Human Rights Law, with provisions

analogous to Title VII, creates no additional employment rights in conflict with the Bank's status

as an employer at will, nor does it place additional constraints on the Bank's exercise of its

statutory powers.").

  Finally, one court in this District has found that there is no conflict between the NYSHRL

and the NYCHRL and the FRA's "dismiss at pleasure" provision.  In *Goonan v. Fed. Reserve*

*Bank of New York*, 916 F. Supp. 2d 470 (S.D.N.Y. 2013), the court reached this conclusion by

reasoning that it was "implausible to conclude that the drafters of the FRA could have possessed

any sort of 'intent' whatsoever with respect to preemption of state (or federal) anti-

discrimination laws, particularly those addressing the rights of people with disabilities," as, at the

time the FRA was enacted, "the very notion of 'disability' as a classification suitable for legal

protection in the workplace would have seemed positively foreign."  *Id.* at 496.  The court noted:

"This conclusion reflects the general point that authors, including Congress, simply cannot

possess 'intentions' or express 'meaning' with respect to concepts or institutions unavailable in

their lived historical moment."  *Id.* at 497.  The court instead found that the drafters were merely

concerned with "contractual obligations under state law that could force the Fed to retain corrupt

or incompetent employees."  *Id.* at 494.  In other words, according to the court: "Congress sought

29

only to protect public confidence in the Fed to the extent that eliminating state law contractual obligations would achieve that end.  It manifested no intent whatsoever toward anti-discrimination statutes."  *Id.* at 500.  Finally, the court noted that "given the presence of multiple, plausible interpretations of legislative purpose, as well as reasonable judicial division on this point, the presumption against preemption adds another thumb to the scale."[8]  *Id.* at 500.

The Court draws guidance from the Second Circuit's recent answer to a question similar to that presented here in *Cantero*, 49 F.4th 121.  There, the question was whether a New York State statute that required mortgage lenders that maintain mortgage escrow accounts to credit the accounts with a 2% minimum interest per year applied to banks operating pursuant to a federal charter.  *Id.* at 125.  The federal and state governments took the position that the state law was preempted by the enumerated power granted national banks by Congress in the National Bank Act ("NBA") to "make, arrange, purchase or sell loans . . . secured by liens on interests in real estate,'" and the incidental power to provide escrow services in connection with home mortgage loans.  *Id.* at 125–26 (quoting 12 U.S.C. § 371(a)).  Plaintiffs—who had executed mortgage agreements with the national bank pursuant to which an escrow agreement was established but who had not received the 2% interest—disagreed and argued that the state law of general applicability applied to national banks.  *Id.* at 125–28.  Plaintiffs also argued that "because the law requires payment of only a 'modest amount of interest,' it may be applied, consistent with federal law, to national banks."  *Id.* at 125 (internal citation omitted).

Drawing on the line of cases dating back to *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), the Second Circuit disagreed with the plaintiffs and held that the state statute was

---

[8] As discussed *infra* pp. 31, 37, no such presumption against preemption applies in the context of federal instrumentalities and so the court's references to it in *Goonan* are apparently in error.

preempted. *See id.* at 125.  The Court held that "ordinary legal principles of pre-emption" were to be applied to the question whether the state statute was preempted, but that under those ordinary principles when the federal statute granted powers to a national bank "'both enumerated and incidental,' those powers are 'not normally limited by, but rather ordinarily pre-empt[], contrary state law.'"  *Id.* at 130 (quoting *Barnett Bank*, 517 U.S. at 32, 37).  The Circuit also stated that "the presumption against preemption 'disappears' in the [NBA] context," *id.* (quoting *Burke*, 414 F.3d at 314), because "Congress's grant of authority to a national bank under the NBA 'does not condition federal permission upon that of the State,'" *id.* (quoting *Barnett Bank*, 517 U.S. at 35).  The Second Circuit further stated that under these principles, the answer to the preemption question does not turn upon the "impact" and "degree of interference" caused by application of state law.  *Id.* at 131 (citation omitted).  The Court held that "in an unbroken line of case law since *McCulloch*, the [Supreme] Court has made clear that the question is not how much a state law impacts a national bank, but rather whether it purports to 'control' the exercise of its powers."  *Id.* at 131 (quoting *McCulloch*, 17 U.S. at 431).  Put differently, "[i]t is the nature of an invasion into a national bank's operations—not the magnitude of its effects—that determine whether a state law purports to exercise control over a federally granted banking power and is thus preempted."  *Id.*  The Second Circuit therefore concluded, "state laws exercising control over national banks—even if their own practical effect may be minimal—are invalid if, when aggregated with similar laws of other states, they would threaten to undermine a federal banking power."  *Id.* at 132; *see also id.* at 133 ("Instead, we ask whether the kind of interference at issue could, taken as a whole, 'destroy' the federal government's grant of a banking power." (citation omitted)).

Applying those principles in *Cantero*, the Second Circuit held that the state law was preempted because it purported to "exert control" over "a banking power granted by the federal government."  *Id.* at 134.  The Court concluded: "The issue is not whether this particular rate of 2% is so high that it undermines the use of such accounts, or even if it substantially impacts national banks' competitiveness.  The power to set minimum rates is the 'power to control,' and the power to control is the 'power to destroy.'"  *Id.* at 134–35 (quoting *McCulloch*, 17 U.S. at 431).

The identical principles compel the conclusion that New York State and New York City anti-discrimination law are preempted by the grant of power to dismiss employees at pleasure to the FRBNY in the FRA.  The FRA, which is considered with the NBA and the Federal Home Loan Bank Act as the "federal banking laws," was enacted approximately fifty years after the NBA and was modeled, in part, on that earlier act.  *See* H.R. Rep. No. 63-69, at 36 (1913) (stating that the "purpose of [Section 4 of the FRA] is to authorize the incorporation of such a reserve bank in each district with powers precisely analogous to those of the national banks except in so far as altered by the [FRA]" and "[t]here is no reason why any important distinction as to type of organization should be drawn or exist between the typical reserve bank and the typical national bank").  Like the NBA at issue in *Cantero*, the FRA grants powers to the Federal Reserve Banks "both enumerated and incidental.'"  *Id.* at 130 (quoting *Barnett Bank*, 517 U.S. at 32); *see* 12 U.S.C. § 341 (titled "General enumeration of powers").  Among those "powers" is Section 341(Fifth) of the FRA that states that the Federal Reserve Banks "shall have power" "[t]o appoint by its board of directors a president, vice presidents, and such officers and employees as are not otherwise provided for in this chapter, to define their duties, require bonds for them and fix the penalty thereof, and *to dismiss at pleasure such officers or employees*."  12

U.S.C. § 341(Fifth) (emphasis added).  The NBA contains a nearly identical provision, 12 U.S.C.

§ 24(Fifth) ("dismiss such officers or any of them at pleasure"), which courts look to in

construing Section 341(Fifth) of the FRA.  *See, e.g.*, *Fasano*, 457 F.3d at 284 n.8.

Giving the statute's language "its ordinary meaning, considering the 'commonly

understood meaning of the statute's words at the time Congress enacted the statute, and with a

view to their place in the overall statutory scheme,'" *Springfield Hosp., Inc. v. Guzman*, 28 F.4th

403, 418 (2d Cir. 2022) (quoting *In re Bernard L. Madoff Inv. Secs. LLC*, 12 F.4th 171, 186 (2d

Cir. 2021)), Section 341(Fifth) of the FRA gives the Federal Reserve Banks the power to dismiss

employees as "the will dictates or prefers" or as they "please[]."  Webster's Practical Dictionary

(1910) (definition of "pleasure"); *see also* Webster's New Standard American Dictionary (1911)

(defining "pleasure" as "What the will prefers").  For someone to be dismissed "at pleasure" thus

implies that it was done at the employer's fancy—exactly as her or his will "dictate[d] or

prefer[ed]"— for any reason or no reason at all, for good reasons or bad.  Webster's Practical

Dictionary (1910).

As much as the power to establish escrow accounts and to set the terms for those

accounts at issue in *Cantero*, the power to hire and fire employees is central to the banking

powers of a Federal Reserve Bank.  *Cf. Myers v. United States*, 272 U.S. 52, 132 (1926) ("Made

responsible under the Constitution for the effective enforcement of the law, the President needs

as an indispensable aid to meet it the disciplinary influence upon those who act under him of a

reserve power of removal.").  A bank cannot function without officers and employees and cannot

function well unless it is able both to hire them and, if necessary, to fire them.  Case law from

shortly before the passage of the FRA on the similar at-pleasure clause in the NBA supports this

view:

Observation and experience alike teach that it is essential to the safety and prosperity of banking institutions that the active officers, to whose integrity and discretion the moneys and property of the bank and its customers are intrusted, should be subject to immediate removal whenever the suspicion of faithlessness or negligence attaches to them.  High credit is indispensable to the success and prosperity of a bank. Without it, customers cannot be induced to deposit their moneys.  When it has once been secured, and then declines, those who have deposited demand their cash, the income of the bank dwindles, and often bankruptcy follows.  It sometimes happens that, without any justification, a suspicion of dishonesty or carelessness attaches to a cashier or a president of a bank, spreads through the community in which he lives, scares the depositors, and threatens immediate financial ruin to the institution.  In such a case it is necessary to the prosperity and success—to the very existence—of a banking institution that the board of directors should have power to remove such an officer, and to put in his place another, in whom the community has confidence.  In our opinion, the provision of the act of congress to which we have referred was inserted, ex industria, to provide for this very contingency.

*Westervelt v. Mohrenstecher*, 76 F. 118, 122 (8th Cir. 1896).  Thus, the original congressional intent behind at-pleasure provisions for federal banking instrumentalities has been interpreted as to "ensure the financial stability of the banking institutions by affording them the means to discharge employees who were felt to compromise an institution's integrity." *Kroske*, 432 F.3d at 984 (quoting Sharon A. Kahn & Brian McCarthy, *At–Will Employment in the Banking Industry: Ripe for a Change*, 17 Hofstra Lab. & Emp. L.J. 195, 215 (1999)).

It follows then that the New York State and New York City laws are preempted if their "enforcement . . . would exert control over" this power and "if taken to [their] extreme, threaten to 'destroy' the grant made by the federal government." *Cantero*, 17 F.4th at 132.  Here, this condition is met.  Although the federal grant of authority gives the FRBNY the right to dismiss an officer or employee for no reason or any reason whatsoever, New York State and New York City law purport to limit those reasons.  They provide that the FRBNY may not dismiss an employee for those reasons that New York State and New York City have prohibited.  Although it might not appear particularly onerous to limit the FRBNY's power to dismiss an officer or employee for reasons of race, gender, national identify or religion (or permit state and local laws

to apply to the extent they are coextensive with federal anti-discrimination laws),[9] that is not the appropriate frame of analysis.  The question is whether application of state and local law limiting the grounds on which a Reserve Bank can dismiss an officer or employee would "curtail, and hinder a power granted to [it] by the federal government."  49 F.4th at 134.  The answer is yes. Both of these statutes implicitly condition the exercise of a federal power on state and local control and thereby restrict the grounds on which the FRBNY can act.[10]

Moreover, the application of New York State and City anti-discrimination laws generally—if "aggregated with similar laws"—would threaten to undermine the FRBNY's exercise of its power to dismiss employee at-pleasure.  *Cantero*, 49 F.4th at 132.  State and city laws governing employment relations take many different forms in different states and cities. Some jurisdictions impose few restrictions on the reasons an employer may lawfully terminate an employment relationship or, if they do impose restrictions, they are co-extensive with (and no broader than) federal law.  *See* Chad A. Readler, *Local Government Anti-Discrimination Laws: Do They Make A Difference?*, 31 U. Mich. J. L. Reform 777, 780–82, 787–90 (1998).  Other jurisdictions, such as New York State and New York City, are more protective of employee rights.  *See id.*  They might prohibit discrimination on the basis of a characteristic that is not protected under federal law, *see, e.g.*, N.Y.C. Admin. Code § 8-107(1) (barring discrimination based on, among other things, "marital status, partnership status, caregiver status, sexual and

---

[9] Thus Court therefore declines Plaintiffs' request that the Court apply these laws to the extent they do not exceed the requirements of Title VII.

[10] They also are not coextensive with federal anti-discrimination law: for example, they restrict the lawful reasons for which an employee may be terminated beyond those outlawed by federal law and are to be construed liberally (untethered to federal law).  *See* N.Y. Exec. Law § 296; N.Y.C. Admin. Code § 8-107; *see Teachey v. Equinox Holdings Inc.*, 2022 WL 1125279, at *12 (S.D.N.Y. Apr. 14, 2022); *Syeed v. Bloomberg L.P.*, 568 F. Supp. 3d 314, 321 (S.D.N.Y. 2021) (noting that the NYSHRL was amended on August 19, 2019 to establish that its provisions should be construed liberally).

reproductive health decisions, [] or immigration or citizenship status of any person"); Wis. Stat. § 111.31 (barring discrimination based on, among other things, "marital status, . . . arrest record, conviction record, military service, use or nonuse of lawful products off the employer's premises during nonworking hours"), impose notice requirements before an employee is terminated for cause, or prohibit an employer from taking employment action based on certain conduct in the workplace.  States and localities may outlaw dismissal on the basis that the employee has a criminal record, a poor credit score, or interactions with the criminal justice system.  *See, e.g.*, N.Y. Exec. Law § 296(16) (barring discrimination based on a person's arrest or criminal accusations under certain circumstances); N.Y.C. Admin. Code § 8-107(24) ("[I]t shall be an unlawful discriminatory practice for an employer . . . to . . . discriminate against an applicant or employee with regard to hiring, compensation, or the terms, conditions or privileges of employment based on the consumer credit history of the applicant or employee.").

Such laws might have salutary effects.  The states can serve as "laborator[ies]" for democracy, developing regulations that might serve as blueprints for subsequent federal legislation. *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932).  But precisely because states and localities must be permitted to enjoy such flexibility, it cannot follow that the laws that they adopt for their citizens must apply also to a branch of a federal instrumentality, *i.e.*, the FRBNY, operating within their jurisdiction.  To hold otherwise would subject the Federal Reserve Banks, which carry out their duties in districts that span all fifty states, Dkt. No. 37 at 9–10, to a patchwork of state and city laws in each of the jurisdictions in which they are located or conduct business and would undermine the uniformity afforded by federal law.  *See Cantero*, 49 F.4th at 133 ("[F]ederal control shields national banking from unduly burdensome and duplicative state regulation." (quoting *Watters*, 550 U.S. at 11)); *cf. Talbott v. Bd. of Comm'rs of*

*Silver Bow Cnty.*, 139 U.S. 438, 443 (1891) (stating with respect to national banks that Congress intended "to create a national banking system co-extensive with the territorial limits of the United States, and with uniform operation within those limits").  It would also conflict with the very objective of the at-pleasure provision, *i.e.*, that the Federal Reserve Bank whose functions are so important to the national economy have the right "to discharge employees who were felt to compromise an institution's integrity" in its discretion, without that discretion being limited by local law.  *Kroske*, 432 F.3d at 984 (citation omitted); *cf. Watters*, 550 U.S. at 15 ("[W]here Congress has not expressly conditioned the grant of 'power' upon a grant of state permission, the Court has ordinarily found that no such condition applies." (quoting *Barnett Bank*, 517 U.S. at 34)).  The Court thus concludes that Plaintiffs' New York State and New York City anti-discrimination claims are preempted and accordingly dismisses these claims in full.

In reaching the conclusion that Plaintiffs' local and state claims are preempted, the Court declines to follow the reasoning or conclusion of *Goonan*, 916 F. Supp. 2d 470.  The court there rested its conclusion that the NYSHRL and the NYCHRL were not preempted on what it characterized as the "weighty presumption against preemption, particularly in areas of traditional state control."  *Id.* at 486.  It also rested its conclusion on "the absence of a regime of employment discrimination statutes in the 1860s and 1910s" when the FRA and its predecessor, the NBA, were enacted.  *Id.* at 493.  It concluded from the fact that the "systemic statutory regime, designed to promote equality of opportunity in the American workforce, [would have been] in many respects inconceivable to the drafters of the NBA in 1864—and even the drafters of the FRA in 1913" and thus it was "implausible to conclude that the drafters of the FRA could have possessed any sort of 'intent' whatsoever with respect to preemption of state (or federal) anti-discrimination laws [or could] have 'intended' anything with respect to the role (or lack

thereof) or state versus federal anti-discrimination laws vis-a'-vis an entity like the Fed." *Id.* at 496–97.  But, with respect, that analysis, which was rendered without the benefit of the recent guidance provided by the Second Circuit in *Cantero*, 49 F.4th 121, misconstrues the preemption analysis.  The presumption against preemption does not apply in the case of a federal instrumentality.  *See Cantero*, 49 F.4th at 130.  And the appropriate question is not what specific laws the Congress of 1913 had in mind when it gave the Federal Reserve Banks discretion to terminate officers and employees at pleasure.  *Id.* at 129 (stating that court should not attempt to "divine" the intent of Congress where ordinary preemption principles apply (citation omitted)).  As the history of employment and labor laws across the country demonstrates, the scope of protection granted employees has evolved; it has been limited only by the inventiveness of legislators and the felt needs of the time.  What a state legislature deemed to be sufficient to protect employee rights in 1913 has not been sufficient in subsequent decades just as what a state legislature deems sufficient today might not be deemed sufficient in ensuing decades.  Instead, the question is whether the 1913 Congress intended to subject to state and local control the right of Federal Reserve Banks to dismiss their workforce.  The answer is, as discussed, no: "Congress's grant of authority" to a federal instrumentality "does not condition federal permission upon that of the State."  *Id.* at 130–31 (quoting *Barnett Bank*, 517 U.S. at 35).  Thus, that the 1913 Congress did not have in mind anti-discrimination statutes when it gave the Federal Reserve Banks the power to dismiss officers and employees "at pleasure" does not support that it would have intended state and local governments to have the authority to apply such laws against the FRBNY once they had been adopted.

## III.    Title VII Claims

Finally, Defendant argues that Plaintiffs' Title VII claims are deficient because Gardner-Alfred has not adequately pleaded facts to show that her stated beliefs are "religious" and neither

Plaintiff has adequately pleaded that the FRBNY's policy conflicts with their beliefs.  Dkt. No. 32 at 16–17.  Defendant also argues that the Amended Complaint does not offer facts to explain how the vaccines conflict with Plaintiffs' own alleged religious beliefs.  *Id.* at 19.  In response, Plaintiffs note that nondenominational beliefs steeped in matters of the spirit, like Gardner-Alfred's beliefs here, qualify as religion under Title VII.  Dkt. No. 35 at 20.  Plaintiffs also respond that "[t]he Amended Complaint sufficiently pleads that both Plaintiffs' religious beliefs prevent them from obtaining the vaccine, and they were forced to choose between their religious beliefs or termination."  *Id.* at 22 (internal citations omitted).

To make out a prima facie case of religious discrimination, a plaintiff must allege that "(1) they held a bona fide religious belief conflicting with an employment requirement; (2) they informed their employers of this belief; and (3) they were disciplined for failure to comply with the conflicting employment requirement."  *Baker v. The Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006).  Defendant challenges whether Plaintiffs have made sufficient allegations to state a prima facie case regarding requirements (1) and (2).

Title VII defines religion capaciously to include "all aspects of religious observance and practice, *as well as belief*."  42 U.S.C. § 2000e(j) (emphasis added).  The inquiry as to whether a person's belief is religious is twofold: "whether the beliefs professed by a [claimant] are sincerely held and whether they are, in his own scheme of things, religious."  *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984).

Both the Supreme Court and Second Circuit have warned that courts have a limited function in determining whether religious beliefs are protected.  *See, e.g.*, *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 714 (1981); *Friedman v. Clarkstown Cent. Sch. Dist.*, 75 F. App'x 815, 818 (2d Cir. 2003).  As to the second requirement (*i.e.*, that the beliefs be

religious), the Supreme Court has noted that "[t]he determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task." *Thomas*, 450 U.S. at 714. "[T]he resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Id.* It is also "understood to be, without qualification, a highly 'subjective definition of religion, which examines an individual's inward attitudes towards a particular belief system.'" *United States v. Manneh*, 645 F. Supp. 2d 98, 108 (E.D.N.Y. 2008) (quoting *LeFevre*, 745 F.2d at 157). The Second Circuit has held that the question is whether the beliefs professed are in the plaintiff's "own scheme of things, religious" and "[i]mpulses prompted by dictates of conscience as well as those engendered by divine commands are [] safeguarded against secular intervention, so long as the claimant conceives of the beliefs as religious in nature." *LeFevre*, 745 F.2d at 158 (citation omitted). "A person's 'intellectual' concerns, however, are not safeguarded." *Rivera*, 2004 WL 1444852, at *5 (citation omitted).

The first requirement (*i.e.*, sincerity of a person's religious belief) is a question of fact—unsuitable to resolution at the motion to dismiss stage. *See Davis v. Fort Bend Cnty.*, 765 F.3d 480, 485 (5th Cir. 2014); *E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 56 (1st Cir. 2002) ("Credibility issues such as the sincerity of an employee's religious belief are quintessential fact questions."); *LeFevre*, 745 F.2d at 159 ("The need for a full exposition of facts is profound under such circumstances since determining a man's state of mind is 'an awesome problem,' capable of resolution only by reference to a panoply of subjective factors." (citation omitted)). As the Fifth Circuit has noted: "the sincerity of a plaintiff's engagement in a particular religious practice is rarely challenged,"

and "claims of sincere religious belief in a particular practice have been accepted on little more than the plaintiff's credible assertions." *Tagore v. United States*, 735 F.3d 324, 328 (5th Cir. 2013).

Gardner-Alfred has made sufficient allegations that that she was forced to act in violation of her alleged bona fide religious beliefs. The Amended Complaint alleges that Gardner-Alfred is a member of the Temple of Healing Spirit, which believes in "holistic approaches to health focused on diet and spiritual self-awareness, and opposes the invasive techniques of traditional medicine" and that she also believes in the dictates of the "Book of Leviticus." Dkt. No. 24 ¶¶ 17–18. These allegations are, at this stage, sufficient under Title VII's definition of religion. They raise a plausible inference that Gardner-Alfred follows the mandates of the Temple of Healing Spirit as, in her own scheme of things, religious mandates and not purely as intellectual beliefs or views about her own self-interest. Moreover, that the Temple of Healing Spirit may not be a well-recognized belief system does not impact this conclusion as "a person need not be a member of a formal religious sect or church to have 'religious' beliefs." *Caviezel v. Great Neck Pub. Sch.*, 701 F. Supp. 2d 414, 427 (E.D.N.Y. 2010), *aff'd*, 500 F. App'x 16 (2d Cir. 2012); *LeFevre*, 745 F.2d at 157 ("This limited inquiry reflects our society's abiding acceptance and tolerance of the unorthodox belief."); *cf. Storm v. Town of Woodstock, N.Y.*, 32 F. Supp. 2d 520, 527 (N.D.N.Y.), *aff'd*, 165 F.3d 15 (2d Cir. 1998) ("[P]laintiffs have adequately demonstrated that their participation in full moon gatherings is to them religious and spiritual in nature."). The sincerity of Gardner-Alfred's religious beliefs is also a factual question best resolved at summary judgment or trial. *See Davis*, 765 F.3d at 485; *Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d at 56.

The Amended Complaint also sufficiently alleges a nexus between the objection to immunization and their own religious beliefs.  Dkt. No. 32 at 18–19.  As to Gardner-Alfred, the Amended Complaint alleges that the Temple of Healing Spirit, of which she is a member, "opposes the invasive techniques of Western medicine" and thus the "COVID-19 vaccines represent unacceptable intrusions on her personal form" due to their "provenance, chemical composition, and origin."  Dkt. No. 24 ¶¶ 17–18.  As to Diaz, the Amended Complaint states that Diaz is a baptized Catholic and believes that it is "morally unacceptable for her to receive certain vaccines consistent with the teachings of the Catholic church," including that there is a "moral duty to refuse the use of medical products, including certain vaccines, that are created using human cell lines derived from abortion" unless there are no alternatives available.[11]  Dkt. No. 24 ¶¶ 19–22.  The Amended Complaint also alleges that "[t]he COVID-19 injections available in the US all involve use of aborted fetal cells in their manufacturing and/or testing," *id.* ¶ 16, and that there are alternatives to being vaccinated including Diaz's natural immunity to the virus, which she acquired from contracting COVID-19 twice, *id.*  Thus, the Amended Complaint alleges a nexus between Diaz's religious beliefs as a Catholic and her refusal to receive the vaccine.

---

[11] While the Amended Complaint states "[t]here is *no* moral duty to refuse the use of medical products . . . that are created using human cell lines derived from abortion," Dkt. No. 24 ¶ 20 (emphasis added), the insertion of the word "no" appears to be an error in light of the surrounding context.  Accordingly, this Court understands the Amended Complaint to read "there is [a] moral duty . . . ."

## CONCLUSION

The motion to dismiss is GRANTED IN PART and DENIED IN PART.  The Clerk of

Court is respectfully directed to close Dkt. Nos. 27, 31.[12]


SO ORDERED.

Dated: January 18, 2023
      New York, New York

                                       LEWIS J. LIMAN
                              United States District Judge

---

[12] Plaintiffs' motion for a preliminary injunction should be closed as this Court on July 20, 2022, upon consent of the parties, consolidated the motion for an injunction with the trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2).