UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 09/25/2023
```

------------------------------------------------------------------X
                                :

LORI GARDNER-ALFRED AND JEANETTE DIAZ,   :

              Plaintiffs,        :

                                :        22-cv-1585 (LJL)

          -v-              :

                                :       OPINION AND ORDER

FEDERAL RESERVE BANK OF NEW YORK,    :

              Defendant.      :

                                :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Plaintiffs Lori Gardner-Alfred and Jeanette Diaz ("Plaintiffs") bring claims against their former employer, the Federal Reserve Bank of New York (the "FRBNY," the "Bank," or "Defendant"), for the termination of their employment following their failure to comply with the requirement that employees be vaccinated against the Covid-19 virus.  Dkt. No. 24.  Plaintiffs claimed religious exemptions, which were denied by Defendant.  Defendant moves, pursuant to Federal Rule of Civil Procedure 56, for an order granting it summary judgment and dismissing Plaintiffs' operative complaint.  Dkt. No. 158.

For the following reasons, the motion for summary judgment is granted for each of Plaintiffs' claims.

## BACKGROUND

The following facts are drawn from the parties' statements of material facts submitted pursuant to Local Rule 56.1 and the materials submitted in connection with the motion.  Dkt. Nos. 164, 171-2, 175.  The facts are undisputed unless otherwise indicated.  The record is construed in favor of the nonmoving party.

I.      **The Relevant Parties**

Defendant is an operating arm of the United States' central bank, the Federal Reserve System.  Dkt. No. 164 ¶ 1; Dkt. No. 171-2 ¶ 1.

Plaintiff Lori Gardner-Alfred ("Gardner-Alfred") was an employee of the FRBNY for approximately thirty-six years, and held several titles over that time period, including, most recently, as a Senior Executive Specialist working for the FRBNY's Executive Vice President ("EVP") of People & Engagement.  Dkt. No. 171-2 ¶ 86.  In that position, she facilitated and coordinated communications between the EVP of People and Engagement and other areas of the FRBNY, maintained the EVP of People and Engagement's calendar, organized and scheduled meetings and events for the EVP of People and Engagement, electronically reserved conference rooms and video conference meetings for the EVP of People and Engagement, and coordinated travel and reimbursements for the EVP of People and Engagement.  Dkt. No. 171-2 ¶ 89.  Plaintiff Jeanette Diaz ("Diaz") began her employment with the FRBNY approximately twenty-nine years ago, held several titles over that time period, and most recently served as Senior Executive Specialist, providing direct administrative support to the EVP of Information Technology.  Dkt. No. 171-2 ¶¶ 87–88.  Diaz's job responsibilities were largely similar to Gardner-Alfred's.  *Id.* ¶ 89.

As set forth below, Gardner-Alfred and Diaz were fired from their positions at the FRBNY on March 14, 2022.  *Id.* ¶ 103.

II.     **Defendant's Vaccination Policy**

The FRBNY has a Pandemic Steering Committee ("PSC") which acts as an incident response team during a pandemic event.  Dkt. No. 164 ¶ 5; Dkt. No. 171-2 ¶ 5.  The PSC was co-chaired by Lacey Dingman and Helen Mucciolo, both of whom are members of Defendant's Executive Committee.  Dkt. No. 164 ¶ 5; Dkt. No. 171-2 ¶ 5.  The PSC met regularly starting in

January 2020 to discuss the FRBNY's response to Covid-19.  Dkt. No. 164 ¶ 5; Dkt. No. 171-2 ¶ 5.  The FRBNY extensively monitored Covid-19 infection levels and medical guidance regarding Covid-19 throughout the pandemic.  Dkt. No. 164 ¶ 6; Dkt. No. 171-2 ¶ 6.  The PSC regularly reviewed compilations of relevant data that included, for example, hospitalizations and intensive care unit statistics in New York City, local vaccination rates, the number of staff on-site, and reported Covid-19 infections among FRBNY employees.  Dkt. No. 164 ¶ 7; Dkt. No. 171-2 ¶ 7.  There were points of the pandemic when the number of reported infections among staff surged, including in late 2021, and compensating measures were required at times to continue workflows.  Dkt. No. 164 ¶ 8; Dkt. No. 171-2 ¶ 8.  Covid-19 has caused over 6.8 million deaths, with more than 755 million confirmed cases worldwide.  Dkt. No. 164 ¶ 3; Dkt. No. 171-2 ¶ 3.

At the onset of the COVID-19 pandemic in March 2020, Defendant implemented a remote work policy for its employees and most FRBNY employees, including Plaintiffs, began working remotely.  Dkt. No. 171-2 ¶¶ 9, 94.  On June 4, 2021, Defendant notified its employees that it would soon require them to return to office on a part-time basis.  Dkt. No. 164 ¶ 10; Dkt. No. 171-2 ¶ 10; Dkt. No. 162-2.  On August 2, 2021, Defendant announced it would be implementing a COVID-19 vaccination policy (the "Vaccination Policy") requiring every FRBNY employee to be fully vaccinated against Covid-19.  Dkt. No. 164 ¶ 11; Dkt. No. 171-2 ¶ 11; *see also* Dkt. No. 160 ¶ 7; Dkt. No. 171-6 at ECF p. 3.  The Vaccination Policy allows for certain religious and medical accommodations.  Dkt. No. 164 ¶ 11; Dkt. No. 171-2 ¶ 11.  Specifically, the Vaccination Policy states that accommodations "may be granted, as required by law, for employees unable to obtain a vaccine due to a medical condition or sincerely held religious belief that precludes receiving the COVID-19 vaccine."  Dkt. No. 24-2.  Further, the

Vaccination Policy states that "[a]n employee requesting an accommodation based on religious belief must complete a religious accommodation request form and submit it to the People Relations team.  The employee must clearly explain why receiving the COVID-19 vaccination would be contrary to their religious beliefs and may be required to provide supporting information."  *Id*.  The Vaccination Policy also notes that persons who do not comply may be terminated.  *Id.*  As stated in the FRBNY's Covid-19 Vaccine Policy Frequently Asked Questions, Defendant required vaccination because it determined that "[b]ased on the extensive medical data available, the most effective way to prevent getting or spreading COVID-19 is to get vaccinated," and "[i]n requiring vaccinations, [the FRBNY is] able to meet [its] goals of trying to keep everyone healthy while being able to continue operating despite the uncertainty the pandemic presents."  Dkt. No. 164 ¶ 13; Dkt. No. 171-2 ¶ 13; *see also* Dkt. No. 160 ¶ 8.

Plaintiffs, however, declined to receive any vaccination against Covid-19 and asserted that their refusal was due to their religious beliefs.  Dkt. No. 24 ¶ 1.  Gardner-Alfred submitted a Notification of Vaccination Exemption ("Notification") by Affidavit on August 9, 2021, Dkt. No. 24-3; Dkt. No. 164 ¶ 21; Dkt. No. 171-2 ¶ 21.  Diaz submitted a request for accommodation on September 1, 2021.  Dkt. No. 24-4; Dkt. No. 171-2 ¶ 48.  On October 1, 2021, Defendant informed both Plaintiffs that it was "temporarily" granting their requests for an accommodation through November 30, 2021, at which time it would reassess the request "to determine whether and how the Bank may be able to continue accommodating you at that time as we continue to evaluate health and safety conditions related to the pandemic that impact the Bank."  Dkt. No. 24-5 at ECF p. 2–3.

On November 1, 2021, Defendant set a return to work date of January 10, 2022.  Dkt. No 24-13 at ECF p. 19.  On November 29, 2021, Defendant notified both Plaintiffs that their

requests for an accommodation would not be granted once employees returned to the office, that

their accommodations for the Vaccination Policy would end on January 7, 2022, and that if they

did not receive a complete series of a Covid-19 vaccine by December 26, 2021, they would

"receive additional information on [their] departure from the Bank . . . ."  Dkt. No. 24-13 at ECF

pp. 25, 48; Dkt. No. 164 ¶ 78; Dkt. No. 171-2 ¶ 78.  Defendant stated that the temporary

accommodation that previously had been granted to each Plaintiff had been reassessed "based on

an evaluation of health, safety and population conditions related to the pandemic that impacts the

mission of the Bank," including "the increasing number of employees returning to the Bank in

January, the return of external visitors, and your essential job functions (including the frequency

of your interaction with external visitors and others at the Bank and your proximity to others

while conducting your job responsibilities)."  Dkt. No. 24-13 at ECF pp. 25, 48; Dkt. No. 164 ¶

78; Dkt. No. 171-2 ¶ 78.  At the time the exemption requests were under consideration, the

number of reported infections among staff was surging.  Dkt. No. 164 ¶ 8; Dkt. No. 171-2 ¶ 8;

Dkt. No. 160 ¶ 14.

Diaz responded to the notification by asking, among other things, whether if she showed

proof of vaccination after December 26, 2021, and before January 7, 2022, she would still be

terminated.  Dkt. No. 24-13 at ECF p. 51.  The FRBNY replied to Diaz on December 10, 2021,

stating that Diaz could not be accommodated by permitting her to work remotely because some

of her job duties required her to be physically present at the FRBNY and "doing so poses

increased safety risks to the Bank, and its employees, as well as to its external visitors, with

whom your job requires you to have face-to-face interactions."  *Id.* at ECF p. 56.  The FRBNY

requested that Diaz let it know whether she decided to become vaccinated but that if she did not

become vaccinated on or after January 7, 2022, she would receive further information about her

separation from the FRBNY.  *Id.*  The FRBNY repeated its position that Diaz could not be accommodated by remote work in communications on December 23, 2021, January 5, 2022, and February 3, 2022.  *Id.* at ECF pp. 58, 60, 62.[1]

In assessing religious accommodation requests under the Vaccination Policy, the FRBNY's People and Engagement Group assembled specific facts relevant to assessing the risk of Covid-19 spread and operational disruption posed by each individual who requested an accommodation.  Dkt. No. 164 ¶ 61; Dkt. No. 171-2 ¶ 61.  Personnel in the People and Engagement Group interviewed individuals relevant to assessing requests, including those who sought religious accommodations and their managers.  Dkt. No. 164 ¶ 62; Dkt. No. 171-2 ¶ 62.  The facts were contemporaneously recorded on an Excel spreadsheet.  Dkt. No. 164 ¶ 62; Dkt. No. 171-2 ¶ 62.  With respect to the question whether she would engage in any face-to-face interaction with others upon her return to the Bank, the Excel spreadsheet records for Gardner-Alfred that the FRBNY considered that Gardner-Alfred was expected to greet visitors to Dingman's tenth floor office, which was shared by Mucciolo and Muccciolio's executive assistant, and to escort visitors throughout the Bank.  Dkt. No. 160-3 at ECF p. 5.  The spreadsheet also indicated that Gardner-Alfred worked with other executive assistants on the tenth floor and routinely visited the second floor to engage with People and Engagement colleagues.  *Id*.  With respect to whether Gardner-Alfred would have individuals coming to her workspace or would be moving about the floor or floors and going to others' workspaces, it recorded:  "Lori would have others coming to her workspace [sic], she would also be moving about the floor and other floors and also, on occasion, would need to go into a meeting with

---

[1] The FRBNY extended Plaintiffs' temporary accommodation to February 25, 2022, based on a new launch date of its Flexible Work Model of February 28, 2022.  Dkt. No. 24-13 at ECF pp. 59, 60, 62.

messages or to ask Lacey [Dingman]/Matt [Wagner] to step out of a meeting for an urgent call or matter." *Id.* For the same questions, it recorded that Diaz "[p]rovides administrative support to Group Head; sits in a shared office suite with another Group Head and executive assistant. Interacts with visitors for both Group Heads in suite and other assistants on the 10th floor." *Id.* at ECF p. 2. It further recorded: "Other people would be coming to her workspace, and she would move around the 10th floor as well as other locations in the building. She may also need to escort guests/visitors on the 10th floor and the building." *Id.* The Excel spreadsheet records for both individuals that the interactions were necessary for them to do their jobs. *Id.* at ECF pp. 2, 5.

The FRBNY has granted medical and religious accommodations to its Vaccination Policy. Dkt. No. 171-6 at ECF pp. 6–8. Other employees have worked from home in "special situations." *Id.* at ECF p. 10. Plaintiffs were the only Senior Executive Specialists who requested religious accommodations and both were informed that they could not be accommodated once employees returned to the office. Dkt. No. 164 ¶ 79; Dkt. No. 171-2 ¶ 79. No FRBNY employee who worked on the executive floor was granted a religious accommodation from the Vaccination Policy once employees returned to the office. Dkt. No. 164 ¶ 80; Dkt. No. 171-2 ¶ 80.

Because Plaintiffs continued to refuse to be vaccinated against COVID-19, their employment at the FRBNY was terminated on March 14, 2022. Dkt. No. 171-2 ¶ 103.

## III.    Gardner-Alfred's Request for Religious Accommodation

Gardner-Alfred claims to be a member of the Temple of Healing Spirit, which is a belief system that she describes as "oppos[ing] the invasive techniques of traditional Western medicine." Dkt. No. 163-3 at 12; Dkt No. 164 ¶ 16; Dkt. No. 171-2 ¶ 16; Dkt. No. 171-7 at ECF p. 3. For Gardner-Alfred, the Covid-19 vaccines and Covid-19 tests, by reasons of their

"invasive," "Western," "foreign," and "mankind" nature, run counter to her religious beliefs.
Dkt. No. 163-6 at 9, 16.  She claims to believe in the sanctity of her body and that it should not
be defiled.  Dkt. No. 164 ¶ 17; Dkt. No. 171-2 ¶ 17.  She also alleges that, because of her
religious beliefs, she does not undergo invasive Western medical techniques or take medications,
including Covid-19 vaccines, and cannot take Covid-19 tests.  Dkt. No. 164 ¶ 18; Dkt. No. 171-2
¶ 18.

Gardner-Alfred submitted to the FRBNY a Notification of Vaccination Exemption on
August 9, 2021.  Dkt. No. 24-3 at ECF p. 3.  The request for accommodation contained a signed
affidavit, dated August 7, 2023.  *Id.*; Dkt. No. 164 ¶ 21; Dkt. No. 171-2 ¶ 21.  That document
contained a "Presentation of Facts" that first referenced the Free Exercise Clause of the First
Amendment; the New York State Constitution; Title VII of the Civil Rights Act of 1964; Title 21
of the "Fed. Food Drug & Cosmetic Act," Title 18 U.S.C., Section 242 "Deprivation of Rights
Under Color of Law"; and the Supreme Court Decision "'Frazee v. Illinois / Dept. of Empl.
Security', 489 U.S. 829 (1989)."  Dkt. No. 24-3 at ECF p. 3; *see also* Dkt. No. 164 ¶ 21; Dkt.
No. 171-2 ¶ 21.  It then stated, in part:

> I file by lawful Right this 'Notification of Vaccination Exemption' (by Affidavit)—
> exemption to include all vaccinations, all injections of foreign proteins, prophylaxis
> and testing, Tests for Diseases; . . . which include (but are not limited to) any and
> all inoculations, Oral or Inhaled Vaccines, Epidermal Patches, and any other way(s)
> that live or killed Bacterium, Viruses . . . obtained from human babies electively
> aborted; Pathogens, Germs, Animal and/or human DNA and related blood by-
> products, or other natural or genetically engineered Microorganisms that would be
> introduced into or upon Me, because the practice of Vaccination (et.al [sic]) is
> contrary to My sincere and conscientiously held Religious Beliefs and Convictions,
> and violates the Free Exercise of these Principles."

Dkt. No. 24-3 at ECF p. 3; *see also* Dkt. No. 164 ¶ 21; Dkt. No. 171-2 ¶ 21.  The Notice of
Vaccination Exemption did not mention the Temple of the Healing Spirit.  Dkt. No. 164 ¶ 32;

Dkt. No. 171-2 ¶ 32.  Although it stated that exhibits would be available upon request, Dkt. No. 24-3 at ECF p. 3, it did not attach any exhibits.

Gardner-Alfred's claim for a religious exemption is supported by, and based upon, a July 25, 2021 letter (the "July 25, 2021 Letter") from the Temple of the Healing Spirit with an address in "Deland city, Florida Republic."  Dkt. No. 163-4.  The letter is addressed "To whom it may concern;" and begins: "Ms. Lori Gardner-Alfred is a member in excellent standing with our Church, and as such, are [sic] bound by the moral and ethical tenets of conduct that guide and govern our Congregation."  *Id.* (citing 1 Corinthian 3:16–17; 1 Corinthian 6:19–20; 2 Corinthian 7:1).  It continues as follows:

> Because of her deeply held religious beliefs and convictions, Ms. Gardner-Alfred is extremely concerned about her participation in certain surgical/medical/pharmaceutical procedures, that radically conflict with said beliefs and convictions; viz, Vaccinations/Inoculations; Time Tests or Montaux [sic] TPPD Skin Tests; HIV AIDS/COVID-19 Tests . . . .

> Therefore, Pursuant to the "Free Exercise Clause" within the Bill of Rights to the de jure 1787 Constitution of these united [sic] States of America . . . [w]e the Church herewith submit this letter in support of Ms. Gardner-Alfred's Notification of Vaccination Exempt. (by Affidavit), because the practice of Vaccination (et al) is contrary to her/our sincere and conscientiously held religious beliefs and practices, and violates the free exercise of these principles.

*Id.*  The letter is signed by "[Rev. Dr.] : Phillip : Valentine ©TM All Rights Reserved."  *Id.*

It is not disputed that Gardner-Alfred paid $487 to Valentine in exchange for both the affidavit attached to the Notice of Vaccine Exemption and the July 25, 2021 Letter as part of a "vaccination exemption package."  Dkt. No. 164 ¶ 22; Dkt. No. 171-2 ¶ 22.[2]  Valentine

---

[2] In her response to Defendant's Rule 56.1 statement, Gardner Alfred denies the allegation that she purchased the materials, stating that she testified that she made a "cash donation" to the Temple of Healing Spirit, but "not a required payment."  Dkt. No. 171-2 ¶ 22.  The underlying testimony from Gardner-Aldred is that she paid money in exchange for the letter.  Dkt. No. 163-3 at ECF pp. 46–47.  It is immaterial to the Court's decision whether Gardner-Alfred characterizes her payment for the package as a donation or a required payment.

advertises this package on Facebook for sale to the public.  Dkt. No. 159-3; Dkt. No. 164 ¶ 23; Dkt. No. 171-2 ¶ 23.  In December 2022, after this litigation had commenced, an independent investigator hired by Defendant, with no affiliation with Valentine or the Temple of the Healing Spirit, successfully purchased the vaccination exemption package simply by calling Valentine by phone and paying the requested $475 fee plus $12 for shipping and handling ($487 total).  Dkt. No. 159-4; Dkt. No. 164 ¶ 25; Dkt. No. 171-2 ¶ 25.  The vaccination exemption package came with a letter ostensibly signed by Valentine that is nearly identical to the July 25, 2021 Letter.  It is on the letterhead of the Temple of the Healing Spirit, with an address in "Deland City, Florida Republic," and is signed "[Rev. Dr.] : Phillip : Valentine ©TM All Rights Reserved."  Dkt. No. 159-5.  It states that "Mr. Adam Deutsch is a member in excellent standing with our Church, and as such, is bound by the moral and ethical tenets of conduct, that guide and govern our Congregation," with the same citations to Corinthians.  *Id.*  It then recites similar (but not identical) language in support of "Mr. Deutsch's Notification of Vaccination Exemption (by Affidavit)," indicating that "the practice of Vaccination, and/or, participation in unreliable, inaccurate, 'prejudicial' medical testing, is contrary to his/our sincerely held religious beliefs, and compelling him to do so, violate[s] the free exercise of said beliefs, pursuant to the 'Free Exercise Clause' added to the Bill of Rights (1791) . . . ."  *Id.*

Valentine told the investigator that, since 1983, he has sold "per year, about three or four hundred" vaccination exemption packages.  Dkt. No. 164 ¶ 25; Dkt. No. 171-2 ¶ 25; *see generally* Dkt. No. 159 ¶¶ 5–12.[3]  Defendant's investigator not only did not have any affiliation

---

[3] Defendant has submitted evidence of posts from "Dr. Phil Valentine's Official Forum" on Facebook that advertised vaccination exemption documents for purchase, including (1) a post from February 18, 2014 that states that the package has been available for nearly 30 years, provides a telephone number to call for information about acquiring the package, and states: "Do not become party to a 'science' that is nothing more than an on-going genocidal campaign of

with the Temple of Healing Spirit or Valentine before calling him in December 2022, but he had never previously spoken to Valentine and, after receiving the vaccination exemption package in January 2023, he did not have any other conversations with Valentine, did not maintain any connection to or affiliation with the Temple of the Healing Spirit, and was not asked to engage in any activity in order to join the Temple of the Healing Spirit or to receive the vaccination package, besides paying the $487 fee.  Dkt. No. 164 ¶ 27; Dkt. No. 171-2 ¶ 27.  The investigator was not asked to participate in any Temple of the Healing Spirit activities, speak to anyone affiliated with the Temple of the Healing Spirit, or learn or indicate agreement with any Temple of the Healing Spirit teachings.  Dkt. No. 164 ¶ 27; Dkt. No. 171-2 ¶ 27.

At deposition, Gardner-Alfred claimed to have been a member of the Temple of the Healing Spirit for over twenty years.  Dkt. No. 163-3; Dkt. No. 164 ¶ 30; Dkt. No. 171-2 ¶ 30. She testified that she joined the Temple of the Healing Spirit "to be more in align [sic] in the traditions of my ancestors" and because of its emphasis on "holistic healing" and the "spiritual, natural way of living."  Dkt. No. 163-3 at ECF p. 3; Dkt. No. 171-7 at ECF p. 4.[4]  She testified that as a member of the Temple of the Healing Spirit, she meditates and prays a lot, and does "prayer practice in terms of my diet."  Dkt. No. 163-3 at ECF p. 3; Dkt. No. 171-7 at ECF p. 4. However, at deposition, Gardner-Alfred could not recall the name of a single person who attended a service or meeting of the Temple of the Healing Spirit with her or who attended a virtual service with her.  Dkt. No. 171-2 ¶ 30; Dkt. No. 171-7 at ECF p. 17.  She testified that she

---

medical experimentation"; (2) an August 2014 post that states that there is "proof" that vaccines are "BIO-WEAPONS form the arsenals of those in the Parasitic Elite sponsoring eugenics-based programs," and provides a telephone number for information about the vaccination exemption package; and (3) a February, 22 2016 post that offers the vaccination exemption package in response to an inquiry for paperwork to avoid taking a vaccine.  Dkt. No. 159 ¶ 4.
[4] According to Gardner-Alfred, the tradition of her ancestors was "[l]iving a more holistic, traditional, healing, meditation, natural way of living."  Dkt. No. 171-7 at ECF p. 4.

attended services virtually, Dkt. No. 171-7 at ECF p. 6, but she also testified that no link had ever been sent to her, *id.*, and could not produce any emails with links to virtual services, Dkt. No. 164 ¶ 30; Dkt. No. 171-2 ¶ 30; Dkt. No. 163-3 at 6–7; Dkt. No. 97-4.[5]  She admitted to never having seen the Temple of the Healing Spirit's description of its "ecumenical doctrine."  Dkt. No. 164 ¶ 31; Dkt. No. 171-2 ¶ 31.[6]

According to Gardner-Alfred, because of her religious beliefs, she "doesn't put foreign, mankind medicines in her body."  Dkt. No. 163-3 at ECF p. 9.  In her testimony, she claimed to have "oppose[d] the invasive techniques of traditional Western medicine" as much as she could.  *Id.* at ECF p. 12.  When asked if she "consider[ed] COVID tests to be an invasive technique of Western medicine," Gardner-Alfred responded, "Yes."  *Id.* at ECF p. 16.  Her professed religious tenet appears to be a matter of convenience.  Although she testified at deposition that she "[doesn't] put foreign, mankind medicines into [her] body," and that she does not "take medications in order to prevent" illness, she has put "foreign, mankind medicines" in her body both before and after she was asked—but refused—to take the Covid vaccine; over the ten years prior to her termination from the FRBNY, she received injections and took several prescription medications.  Dkt. No. 163-3 at ECF pp. 9–10, 27–28.  She has had an anesthesia injection, two septocaine injections, dental implants, punctual eye plugs (after acknowledging that they involved foreign material),[7] several biopsies, and a bunionectomy.  Dkt. No. 163-3 at ECF pp.

---

[5] Gardner-Alfred testified to attending services in person in Brooklyn, "[s]ometimes a home," but she did not recall the last time she attended a service in person other than that it would "a long time ago, years ago."  Dkt. No. 163-3 at ECF p. 7.

[6] At deposition, Gardner-Alfred could not recall how many virtual services she participated in and whether it was more than five.  Dkt. No. 163-3 at ECF p. 6.  She testified that at meetings, "[w]e just talk about, you know, uplifting spirituality, you know, reconnecting."  *Id.* at ECF p. 5.  She could not recall how many people attended the in-person meetings or how many she attended.  *Id.* at ECF p. 8.

[7] Gardner-Alfred testified that taking the prescription eye drops which involved foreign

32, 37, 40, 45; Dkt. No. 164 ¶ 34; Dkt. No. 171-2 ¶ 34.  She admitted to taking "two or three

tablets" of ivermectin as a "[p]reventative measure[]," Dkt. No. 150 at 53, and purchasing

medical supplements from an individual named Gary Null, Dkt. No. 164 ¶ 35; Dkt. No. 171-2 ¶

35.  Gardner-Alfred denied that she considered the medications to be "invasive techniques of

Western medicine," but when queried on the basis for that conclusion, she stated merely "[i]t's

my opinion."  Dkt. No. 171-7 at ECF p. 12.

Additionally, it is undisputed that in November 2021, after Gardner-Alfred had filed her

affidavit in support of her request for a religious accommodation to the Vaccination Policy that

stated her opposition to Covid-19 tests, she took a Covid-19 test.  Dkt. No. 163-3 at ECF p. 16.

She testified that at the time in November 2021 that she took the Covid-19 test she considered it

to be an invasive technique of Western medicine.  *Id.*  When asked how she reconciled taking a

Covid-19 test when she believed it was an invasive technique of Western medicine, she initially

responded "[b]ecause I took it myself."  Dkt. No. 171-7 at ECF pp. 10–11.  She then backtracked

and stated that when she took the Covid-19 test she did not believe it was an invasive technique

of Western medicine.  *Id.* at ECF p. 11.  Gardner-Alfred offered as an example of a "foreign.

Mankind medicine" that she was prohibited from taking, "the vaccines and the ingredients."

Dkt. No. 171-7 at ECF pp. 7–8.  When asked what ingredients were in the vaccine, she testified

"[a]borted fetuses, and I just can't think of all of them off the top of my head, but that one

certainly stands out."  *Id.* at ECF p. 8.

IV.    **Diaz's Request for Religious Accommodation**

Diaz claims to be a baptized Catholic.  Dkt. No. 164 ¶ 39; Dkt. No. 171-2 ¶ 39.  She also

is opposed to the Covid-19 vaccine.  She attended an August 22, 2021 webinar entitled "How to

---

manmade material did not violate her religious beliefs because "[a]t the time, I thought it was
something that was necessary."  Dkt. No. 171-7 at ECF p. 14.

Survive COVID" given by an individual named Garry Null.  Dkt. No. 164 ¶ 44; Dkt. No. 171-2 ¶ 44.  The seminar materials included a URL list with links to twelve documents including: "White Paper—Experimental Covid Vaccines;" "Review of Ivermectin Efficacy;" and a document from Children's Health Defense "Preventing Vaccine Mandates Toolkit."  *Id.*  From October 2021 through March 2022, Diaz subscribed to at least eight email newsletters from anti-vaccination sources from which she received several hundred emails from sources opposing the vaccine on secular grounds.  Dkt No. 164 ¶ 50; Dkt. No. 171-2 ¶ 50.[8]  Diaz sent similar messages to others containing secular concerns about the Covid-19 vaccines.  Dkt. No. 164 ¶ 51; Dkt. No. 171-2 ¶ 51.  On December 22, 2021, she sent an email to Gardner-Alfred in which the letters of "Delta" and "Omicron" (two Covid-19 variants) were rearranged to spell "Media Control."  Dkt. No. 164 ¶ 52; Dkt. No 171-2 ¶ 52.

Diaz wanted a medical accommodation and submitted a request for one, but because she and her doctor "did not agree on the vaccine," she abandoned her attempt to avoid vaccination on medical grounds.  Dkt. No. 164 ¶ 46; Dkt. No. 171-2 ¶ 46.  On August 30, 2021, eight days after the Null webinar, Diaz spoke to her pastor by phone and followed up by email, asking him to help her obtain a religious exemption from the Vaccination Policy.  Dkt. No. 164 ¶ 47; Dkt. No. 171-2 ¶ 47.  She asked him to sign a template letter for a religious accommodation request that she found on the internet from the Colorado Catholic Conference, an organization with which she has no affiliation.  Dkt. No. 164 ¶ 47; Dkt. No. 171-2 ¶ 47.  Her pastor refused to sign the Colorado Catholic Conference letter and responded to her the next day with a statement from

---

[8] The eight newsletters are Children's Health Defense, Lawrence B. Palevsky's Holistic Child Health Newsletter, Freedom Angels, The Daily Wire, The Epoch Times, The Daily Shapiro, Connecting Consciousness, and Warren Horak—Lion Brands.  Dkt. No. 164 ¶ 50, Dkt. No. 171-2 ¶ 50.

the Archdiocese of Newark, which read:  "It is important to note that the Archdiocese of Newark does not provide for an exemption on religious grounds from receiving the vaccine. . . .  As such, it is not possible for a Catholic to claim an exemption from vaccination on religious grounds." Dkt. No. 164 ¶ 48; Dkt. No. 171-2 ¶ 48; Dkt. No. 163-11.  The letter stated, "[a] Catholic may claim a personal exemption on grounds of conscience."  Dkt. No. 163-11.

Diaz signed the internet template letter herself and the next day, September 1, 2021, Diaz submitted it with her request for a religious accommodation.  Dkt. No. 164 ¶ 48; Dkt. No. 171-2 ¶ 48; Dkt. No. 24-4.  The internet template letter from the Colorado Catholic Conference stated that Diaz was "a baptized Catholic seeking a religious exemption from an immunization requirement."  Dkt. No. 24-4.  The letter states that "[t]he Catholic Church teaches that a person may be required to refuse a medical intervention, including a vaccination, if his or her conscience comes to this judgment."  *Id.*  The letter explains that the Catholic Church "does not prohibit the use of most vaccines, and generally encourages them to safeguard personal and public health," but it adds that "if a Catholic comes to an informed judgment that he or she should not receive a vaccine, then the Catholic Church requires that the person follow this judgment of conscience and refuse the vaccine."  *Id.*  It cites the Catechism as "clear" that "Man has the right to act in conscience and in freedom so as personally to make moral decisions" and "must not be forced to act contrary to his conscience [or] prevented from acting according to his conscience, especially in religious matters."  *Id.*  More specifically, it notes that "[a]n individual Catholic may invoke Church teaching to refuse a vaccine that used abortion-derived cell lines at any stage of the creation of the vaccine" and "might refuse a vaccine based on the Church's teachings concerning therapeutic proportionality."  *Id.*  It explains that "[t]herapeutic proportionality is an assessment of whether the benefits of a medical intervention outweigh the

undesirable side-effects and burdens in light of the integral good of the person, including spiritual, psychological, and bodily goods." *Id.* It adds: "The judgment of therapeutic proportionality must be made by the person who is the potential recipient of the intervention, not by public health authorities or by other individuals who might judge differently in their own situation." *Id.*

Diaz objects to vaccines "created using human cell lines derived from abortion." Dkt. No. 164 ¶ 39; Dkt. No. 171-2 ¶ 39. She testified at deposition that her objection is to vaccines that "contain," "are manufactured with," or are "produced with" aborted fetal cell lines. Dkt. No. 164 ¶ 40; Dkt. No. 171-2 ¶ 40. She further testified that the Covid-19 vaccine violated her religious beliefs because "the COVID vaccine is produced with aborted fetal cell lines," Dkt. No. 163-6 at ECF p. 3, and that if a medication was not made with aborted cell lines and her doctor recommended it, she would take it, Dkt. No. 164 ¶ 41; Dkt. No. 171-2 ¶ 41. Her doctor wanted her to get vaccinated and she has no objection to vaccines "that don't contain aborted fetal cell lines" or "are not manufactured with aborted fetal cell lines." *Id.*

Diaz testified that she follows the teachings of her Archdiocese on religious teachings except with respect to vaccines. Dkt. No. 171-3 at ECF p. 4. Specifically, she testified that she did not follow the Archdiocese's guidance with respect to vaccines,

> Because the Catholic church teaches that I am to follow my moral conscious [sic], and because the Catholic church also teaches that it's pro-life. And the Catholic church also teaches on the 5th Commandment, thou should not kill. So that would be contradicting to me that the Catholic church teaches all these things, yet the vaccine that's derived from aborted cell lines, and where I can make it my moral duty, and where I can also follow my moral conscious [sic] as the Catholic church teaches. So, to me, it's contradictory.

*Id.* at ECF pp. 4–5. When asked what she meant by consulting her moral conscience, Diaz answered: "I had to pray about it and read my bible." *Id.* at ECF p. 6.

16

In the decade from August 2012 through August 2022, Diaz filled and refilled prescription medications roughly forty times for fourteen different medications.  Dkt. No. 164 ¶ 55; Dkt. No. 171-2 ¶ 55.  She also received a pain medicine injection.  *Id.*  Diaz admits that she has over the past ten years taken medications without first checking if they were manufactured with aborted fetal cell lines.  Dkt. No. 164 ¶ 56; Dkt. No. 171-2 ¶ 56.  She testified that if she did not know if something was made using aborted fetal cell lines, she could take it.  Dkt. No. 164 ¶ 56; Dkt. No. 171-2 ¶ 56.

At deposition, Diaz could not recall knowing anything about the Covid-19 vaccines, including whether there was any actual connection between aborted fetal cell lines and the vaccines, when she made her initial religious accommodation request.  Dkt. No. 164 ¶ 57; Dkt. No. 171-2 ¶ 57.  She testified that she could not remember whether she considered whether there was a vaccine that was not produced with aborted fetal cell lines when she made her accommodation request, that she could not remember whether she knew anything about the Covid-19 vaccines, and she could not remember whether before September 2021 she did any research on the Covid-19 vaccines.  Dkt. No. 163-6 at ECF p. 4–5.

The mRNA Covid-19 vaccines produced by Pfizer and Moderna are neither manufactured with nor contain aborted cell lines.  Dkt. No. 164 ¶ 58; Dkt. No. 171-2 ¶ 58; Dkt. No. 163-1 at 11.  They do not use any fetal cell cultures in order to manufacture or produce the vaccine.  Dkt. No. 163-1 at 11.  The mRNA vaccines themselves do not contain any aborted fetal cells or fetal cell cultures, nor are they manufactured or produced with such cells or cell cultures.  *Id.*[9]

---

[9] Diaz points to evidence that fetal cell lines were used in the testing of MRNA vaccines during their research and development phase.  Dkt. No. 171-2 ¶ 58.  But Diaz testified that her objection was to vaccines that contain fetal cell material.  Dkt. No. 164 ¶ 40; Dkt. No. 171-2 ¶ 40.  She

## PROCEDURAL HISTORY

On February 23, 2022, Plaintiffs (who at that time were still employed by the FRBNY and were proceeding pro se) commenced actions in New York State Supreme Court against Defendant. Dkt. No. 1-1. Plaintiffs alleged that the Vaccination Policy was "clearly discriminatory, arbitrary, and capricious [and] not supported by scientific knowledge and fact but fear and intimidation [and not] based on [Plaintiffs'] ability to perform [their] job functions." *Id.* at ECF p. 11. Plaintiffs sought an immediate injunction barring Defendant from firing them (the "TRO"). *Id.* at ECF pp. 13, 39. That same day, Justice Frank of the New York State Supreme Court granted Plaintiffs an *ex parte* restraining order directing the FRBNY to show cause on March 7, 2022, why Plaintiffs should not be granted a permanent injunction restraining the FRBNY from firing Plaintiffs. *Id.* at 4–5.

The action was removed to this Court on February 25, 2022. Dkt. No. 1. On March 2, 2022, the FRBNY moved to dissolve the TRO. Dkt. No. 7. The Court granted that request. Dkt. No. 15. The Court held that the state court's entry of the TRO did not satisfy the requirements of Federal Rule of Civil Procedure 65. *Id.* at 6. The Court also found that Plaintiffs had not shown irreparable harm justifying the issuance of a preliminary injunction. *Id.* at 7–8. In particular, the Court noted that while Plaintiffs' argument that they would suffer irreparable harm hinged on the loss of their First Amendment freedoms,

> Plaintiffs' petitions here, however, do not allege any violation of their First Amendment freedoms; their operative pleadings assert no Free Exercise claims. Rather, they challenge the vaccination policy not as impinging on their free exercise of religion but because it is "clearly discriminatory, arbitrary, and capricious," and "is not supported by scientific knowledge and fact but fear and intimidation."

admits that the Pfizer and Moderna vaccines were not themselves manufactured with fetal cell lines. Dkt. No. 171 at 2.

*Id.* at 8 (citation omitted).  The Court also noted that the economic harm of losing a job is not of the type of harm that usually warrants injunctive relief as it can be compensable with money damages.  *Id.*  After the Court granted the request, the FRBNY terminated the employment of both Plaintiffs.  Dkt. No. 24.

On April 5, 2022, Plaintiffs, now proceeding with the assistance of counsel, filed an amended complaint (the "Amended Complaint") against the Defendant.  *Id.*  In that Amended Complaint, Plaintiffs alleged that the termination of their employments violated the Religious Freedom Restoration Act ("RFRA"); the Free Exercise Clause of the First Amendment; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et al.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law § 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Administrative Code, § 8–101 *et seq*.  *Id.*

On April 19, 2022, Plaintiffs moved the Court for a preliminary injunction reinstating their employment.  Dkt. Nos. 27–30.  Defendant moved to dismiss the Amended Complaint and opposed Plaintiff's request for a preliminary injunction on May 3, 2022.  Dkt. Nos. 31–33.  On May 10, 2022, Plaintiffs filed a reply memorandum of law in further support of their motion for a preliminary injunction and a memorandum of law in opposition to the motion to dismiss the Amended Complaint, along with a supporting declaration.  Dkt. Nos. 34–36.  On June 10, 2022, Defendant filed a reply memorandum of law in support of the motion to dismiss the Amended Complaint.  Dkt. No. 37.

On June 28, 2022, the parties submitted a joint letter to the Court agreeing to consolidate the hearing on Plaintiffs' motion for a preliminary injunction with a trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2).  Dkt. No. 41.  On July 20, 2022, the Court granted that request.  Dkt. No. 43.  Trial is now scheduled for December 11, 2023.  Dkt. No. 187.

On January 18, 2023, the Court granted in part and denied in part Defendant's motion to dismiss. Dkt. No. 83. The Court granted the motion to dismiss with respect to Plaintiffs' claims under NYSHRL and NYCHRL and denied the motion to dismiss with respect to Plaintiffs' claims under RFRA, the Free Exercise Clause of the First Amendment, and Title VII. *Id.*

Defendant moved for summary judgment of the Amended Complaint on June 15, 2023. Dkt. No. 158. On the same day, Defendant filed its Rule 56.1 Statement and a memorandum of law in support of the motion for summary judgment. Dkt. Nos. 164–65. On July 6, 2023, Plaintiffs filed a memorandum of law in opposition to Defendant's motion for summary judgment, which included as an attachment Plaintiffs' Response to Defendant's 56.1 Statement. Dkt. No. 171. Defendant filed a reply memorandum of law in support of the motion for summary judgment on July 20, 2023, along with a reply to Plaintiff's Response to Defendant's 56.1 Statement. Dkt. Nos. 174–75.[10]

## LEGAL STANDARDS

### I.   Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[10] Though Rule 56.1 replies are not categorically impermissible, *see Cap. Recs., LLC v. Vimeo, LLC*, 2018 WL 4659475, at *1 (S.D.N.Y. Sept. 7, 2018) ("Local Civil Rule 56.1 does not provide for a 'reply' in further support of a Rule 56.1 statement of undisputed facts . . . [but] the Rule does not prohibit such replies."), the Court notes that Defendant did not seek leave to submit such a reply and did not give the Court an opportunity to fashion a fair process for the submission of such a reply, for example by giving Plaintiffs the ability to respond, *see, e.g.*, *id.* (permitting the plaintiffs to submit a Rule 56.1 reply but noting that "[t]he Court is sympathetic . . . to [the d]efendants' concerns about the potential unfairness of doing so" and permitting the defendants "to submit either a reply in further support of their own Rule 56.1 statement or a sur-reply to [the p]laintiffs' reply").

242, 248 (1986).  And "[a]n issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009).

The party seeking summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  If the movant meets its burden, "the nonmoving party must come forward with admissible evidence to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeusert Co.*, 537 F.3d 140, 145 (2d Cir. 2008).  To survive summary judgment, the nonmoving party "may not rely on mere speculation or conjecture as to the true nature of the facts," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted), and must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).  But if "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied.  *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983).

In cases involving claims of discrimination, "an extra measure of caution is merited in [granting] summary judgment . . . because direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial evidence found in affidavits and depositions."  *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted) (quoting *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001)).  However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing

trials—apply no less to discrimination cases than to . . . other areas of litigation." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).  "[T]rial courts should not 'treat discrimination differently from other ultimate questions of fact,'" *id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, (2000)), and even in the discrimination context, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).

Local Civil Rule 56.1 of the Southern District of New York sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented.  Any party moving for summary judgment must "annex[] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  L.R. 56.1(a).  Local Rule 56.1(b), in turn, requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  L.R. 56.1(b).  All statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible."  L.R. 56.1(d).  "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  L.R. 56.1(c).  In accordance with Local Rule 56.1, "the movant's statements are deemed to be admitted where [the non-moving party] has failed to specifically controvert them with

citations to the record." *Rhee v. SHVMS, LLC*, 2023 WL 3319532, at *4 (S.D.N.Y. May 8, 2023) (citation and quotation marks omitted).

## II.    Substantive Standards Under RFRA, Title VII, and the First Amendment

Plaintiffs bring claims against Defendant under RFRA, Title VII, and the First Amendment.  Dkt. No. 24.  RFRA provides that the government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless it is "in furtherance of a compelling government interest" and "is the least restrictive means of furthering that compelling interest."  42 U.S.C. § 2000bb-1(a)–(b).  In order to state a *prima facie* case under RFRA, a claimant must first establish that the challenged government policy would (1) substantially burden (2) a sincere (3) religious exercise.  *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006).  Congress enacted RFRA in response to the Supreme Court's decision in *Employment Division, Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), which held that laws of general applicability that incidentally burden religion do not trigger strict scrutiny under the First Amendment's Free Exercise Clause.  *Id.* at 883–90.  RFRA's stated purpose and actual result is to reinstate the strict scrutiny standard of the Free Exercise analysis that the Supreme Court applied before its decision in *Smith*.  *See* 42 U.S.C. § 2000bb(b).

Title VII of the Civil Rights Act prohibits discrimination in employment on the basis of religion and requires employers to reasonably accommodate an employee's religion unless doing so would constitute an undue hardship.  42 U.S.C. § 2000e *et seq.*; *see Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 64 (1977) ("The intent and effect of [including religion in Title VII] was to make it an unlawful employment practice under § 703(a)(1) for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees.").  To make out a *prima facie* violation of Title VII,

plaintiffs must show that "(1) they held a bona fide religious belief conflicting with an employment requirement; (2) they informed their employers of this belief; and (3) they were disciplined for failure to comply with the conflicting employment requirement." *Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir. 2001) (citing *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir. 1985)).  If the plaintiff is able to make out a *prima facie* case of discrimination, "the burden shifts onto the employer to show that it cannot reasonably accommodate the plaintiff without undue hardship on the conduct of the employer's business." *Philbrook*, 757 F.2d at 481.

The Free Exercise Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend. I.  The protections guaranteed by the Free Exercise Clause pertain "if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons."  *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993).  Such protections are not invoked in situations in which a neutral, generally applicable law incidentally burdens the exercise of religion.  *See Cent. Rabbinical Congress of U.S. & Canada v. N.Y.C. Dept. of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014) (quoting *Smith*, 494 U.S. at 879).  "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature."  *Fulton v. City of Philadelphia, PA.*, 141 S. Ct. 1868, 1877 (2021).

## DISCUSSION

Defendant moves for summary judgment on each of Plaintiffs' claims contained in the Amended Complaint, not previously dismissed by the Court.  Dkt. No. 158.  Defendant argues that Plaintiffs' religious beliefs are not sincerely held, that the Vaccination Policy did not impose a substantial burden on Plaintiffs' exercise of their religion, that the Vaccination Policy was

neutral, generally applicable, and had a rational basis, that the Vaccination Policy was the least restrictive means of furthering compelling government interests, that granting Plaintiffs an accommodation from the Vaccination Policy would have caused undue hardship, and that Plaintiffs' claims fail under the doctrine of fraud on the court and unclean hands. Dkt. No. 165. The Court first addresses whether there is sufficient evidence from which a reasonable jury could find that Plaintiffs' objections to the Vaccination Policy were based in their sincerely held religious beliefs, and whether those beliefs conflicted with or were burdened by the Vaccination Policy. Having addressed those issues, the Court need not address whether the Vaccination Policy was the least restrictive means of furthering Defendant's compelling interest, whether the Vaccination Policy was neutral and generally applicable, and whether granting an accommodation would have caused an undue hardship.

I.   **Defendant Is Entitled to Summary Judgment for Plaintiffs' Failure to Present a Genuine Issue of Fact That Their Opposition to the Vaccination Policy Is Based on Sincerely Held Religious Beliefs**

Defendant argues that summary judgment should be granted in its favor against the claims of each of Gardner-Alfred and Diaz for Plaintiffs' failure to show that enforcement of the Vaccination Policy against them would violate their sincerely held religious beliefs. Dkt. No. 165 at 14–19. Defendant does not dispute that each of Gardner-Alfred and Diaz are genuinely opposed to taking the vaccine. They have gone to great lengths to avoid becoming vaccinated, resisting the vaccine even in the face of knowledge that they might lose their jobs as a result. Defendant does argue, however, that the rooting of that opposition in religion is contrived. Dkt. No. 165 at 14–19. Moreover, Defendant argues that, even if the views of Gardner-Alfred and Diaz are based in religion, the Vaccination Policy does not require Plaintiffs to take action inconsistent with those views. *Id.* at 19–22.

The Court concludes that Defendant is entitled to summary judgment for failure of either Plaintiff to show that their asserted objections to the Vaccination Policy was based in sincerely held religious beliefs.  For Gardner-Alfred, her opposition to the vaccine is based on a purported religion to which there is no evidence, other than her conclusory say-so, that she ever belonged, whose practices she never followed (with the exception of her opposition to the vaccine), and from which she obtained an "affidavit" that is available to anyone who would pay.  For Diaz, her opposition is based on what she says is her reading of the Bible, without accompanying evidence that her religion subscribes to the beliefs underlying her objection or evidence that she herself subscribed to those beliefs either before or after she objected to the Vaccination Policy.  For both Plaintiffs, Defendant has proffered evidence that their beliefs are rooted in non-religious objections to the vaccine, which Plaintiffs later tried to cloak in religious garb.  Moreover, as discussed in Section II of this Discussion, the Court further concludes, based on the undisputed evidence on the record, that the Vaccination Policy does not conflict with Diaz's views, even if those views were sincerely rooted in religion.

The Court first discusses the legal standard applicable to the question whether the Plaintiffs' views were sincerely held religious ones.  It next turns to the argument by both Plaintiffs that the question whether their views were sincerely held religious ones is not appropriate for resolution at the summary judgment stage.  Having rejected that argument, the Court finally turns to the assessment of the evidence on the summary judgment record for each Plaintiff.

### A.    The Legal Standard for Sincerely Held Religious Views

Each of the claims brought by Plaintiffs—under RFRA, Title VII, and the First Amendment—requires them to establish the sincerity of their religious beliefs as the basis of their objections to the challenged policy.  To qualify for protection under RFRA, the Supreme

Court has held that "an asserted belief must be 'sincere.'"  *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 717 n.28 (2014); *cf. Holt v. Hobbs*, 574 U.S. 352, 360 (2015) (holding in context of Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), the sister statute to the RFRA, that the plaintiff bears the burden of showing his request for an accommodation is "sincerely based on a religious belief and not some other motivation").  In the Title VII context, "[a] plaintiff in a [Title VII] case makes out a prima facie case of religious discrimination by proving: (1) he or she has a bona fide religious belief that conflicts with an employment requirement. . . ."  *Philbrook*, 757 F.2d at 481 (citation omitted).  Finally, the Second Circuit has held that a plaintiff's Free Exercise claim is precluded where she fails to demonstrate that her objection to the challenged policy is based on "genuine and sincere religious beliefs."  *Caviezel v. Great Neck Public Schools*, 500 F. App'x 16, 18 (2d Cir. 2012) (quoting *Caviezel v. Great Neck Pub. Sch.*, 701 F. Supp. 2d 414, 430 (E.D.N.Y.2010)); *see also Sherr v. Northport-East Northport Union Free School Dist.*, 672 F. Supp. 81, 94 (E.D.N.Y. 1987) ("It must also be demonstrated that the espoused beliefs are sincerely held and that the stated beliefs, even if accurately reflecting plaintiffs' ultimate conclusions about the advisability of inoculation of their children, do in fact stem from religious convictions and have not merely been framed in terms of religious belief so as to gain the legal remedy desired.").  The Second Circuit has stated that "it is entirely appropriate, indeed necessary, for a court to engage in analysis of the sincerity—as opposed, of course, to the verity—of someone's religious beliefs in both the free exercise context, and the Title VII context.  We see no reason for not regarding the standard for sincerity under Title VII as that used in free exercise cases."  *Philbrook*, 757 F.2d at 481–82 (internal citations omitted).

The inquiry into sincerity of religious beliefs consists of two parts: "whether the beliefs professed by a [claimant] are sincerely held and whether they are, in his own scheme of things, religious." *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984). Analysis of a claimant's sincerity "seeks to determine an adherent's good faith in the expression of his religious belief," in order to "provide[] a rational means of differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud." *Id.* (citing *Int'l Soc'y for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 432 (2d Cir. 1981)). However, even where "the 'truth' of a belief is not open to question, there remains the significant question of whether it is 'truly held.'" *United States v. Seeger*, 380 U.S. 163, 185 (1965). "[T]h[e] analysis is most useful where extrinsic evidence is evaluated." *Int'l Soc'y for Krishna Consciousness*, 650 F.2d at 441. "[A]n adherent's belief [is] not . . . 'sincere' if he acts in a manner inconsistent with that belief . . . or if there is evidence that the adherent materially gains by fraudulently hiding secular interests behind a veil of religious doctrine." *Id.*; *see Philbrook*, 757 F.2d at 482 (same); *see also E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 57 (1st Cir. 2002) ("Evidence tending to show that an employee acted in a manner inconsistent with his professed religious belief is, of course, relevant to the factfinder's evaluation of sincerity."). "A believer's sincerity is also evaluated in light of the religion's size and history, but this is not dispositive." *Int'l Soc'y for Krishna Consciousness*, 650 F.2d at 441 (citations omitted). Beliefs "animated by motives of deception and fraud . . . must be subject to governmental invasion, lest our society abjure from distinguishing between the incantation of 'sincerely held religious beliefs' as a talisman for self-indulgence or material gain and those beliefs genuinely dictated by conscience." *Patrick*, 745 F.2d at 157.

28

In order to enjoy constitutional and statutory protection, the plaintiff's belief must not only be sincerely held, but must also be rooted in religion.  "[O]nly beliefs rooted in religion are protected by the Free Exercise Clause, which, by its terms, gives special protection to the exercise of religion."  *Thomas v. Review Board of Indiana Employment Security Division*, 450 U.S. 707, 713 (1981).  When inquiring into the religious nature of the beliefs, courts apply a "subjective definition of religion, which examines an individual's inward attitudes towards a particular belief system."  *Patrick*, 745 F.2d at 157 (citing *Thomas*, 450 U.S. at 713–15).  The factfinder's inquiry is limited to a determination of whether "the beliefs professed . . . are, in [the claimant's] own scheme of things, religious . . . ."  *Seeger*, 380 U.S. at 185.  But despite the broad, subjective test employed in this inquiry, courts are nonetheless clear that "a person's 'intellectual' concerns . . . are not safeguarded."  *Eatman v. United Parcel Service*, 194 F. Supp. 2d 256, 267–68 (S.D.N.Y. 2002) (quoting *Int'l Soc'y for Krishna Consciousness*, 650 F.2d at 440).  Summary judgment on these grounds is appropriate where the beliefs in question are "so clearly nonreligious in motivation, as not to be entitled to protection."  *Thomas*, 450 U.S. at 715.

The requirement that a view be sincerely held and rooted in religion is critical to the effective functioning of civil society and to the respect in which religion is rightly owed in civil society.  "[M]any [laws] affect certain groups unevenly, even though the law itself treats them no different from all other members of the class described by law."  *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 271–72 (1979).  Some may feel burdened while others will believe themselves benefitted by any law or rule of general applicability.  At the same time, however, the Supreme Court has long recognized that religion places a special role in our society and under our Constitution.  "Respect for religious expressions is indispensable to life in a free and diverse Republic—whether those expressions take place in a sanctuary or on a field, and

whether they manifest through the spoken word or a bowed head." *Kennedy v. Bremerton School District*, 142 S. Ct. 2407, 2432–33 (2022). For those who are adherents, religion gives meaning and purpose to life. Religion defines objectives, fosters community, instills ethical values, and can convert the pedestrian to the transcendent.

A rule that would permit a citizen to avoid a law or regulation of general applicability by the mere expedient of cloaking an exclusively political objection in a religious veil would disserve both civic society and religion. It would give anyone who disagrees with a law license to disobey by the mere invocation of the divine. It would also undermine the respect owed to religion if the views of those who are genuine adherents and who express faith could be co-opted by those who are merely out to avoid a civil obligation believed to be inconvenient or even harsh.

### B.     Sincerity Is Suitable for Summary Judgment

Plaintiffs argue initially that, as a matter of law, the sincerity of their claimed religious beliefs is unfit for resolution at summary judgment because each of Plaintiffs' claimed "religious reasons for refusing the Covid-19 vaccine," and therefore the issue of whether they sincerely held such beliefs, necessarily raises "a credibility question that must be decided by the jury." Dkt. No. 171 at 1. In so arguing, Plaintiffs ask the Court to adopt a categorical rule that whenever a plaintiff asserts a religious reason for not complying with a civic obligation—no matter how contrived or conclusory the assertion—such plaintiff is entitled to a jury trial and, presumably if the jury agrees with the plaintiff, is entitled to a plaintiff's verdict.

Plaintiffs' argument finds no support in the law. Before a plaintiff is entitled to present a claim for the jury's determination, he or she must be able to demonstrate in response to a summary judgment motion that there exists a "genuine" factual dispute—meaning that sufficient evidence exists from which a reasonable jury could find in favor of that plaintiff on each

challenged material element of the claim.  *See McKinney v. City of Middletown*, 49 F.4th 730,

738 (2d Cir. 2022).  Thus, properly framed, the question is not whether the Court finds the

evidence offered by Plaintiffs to be more credible than that offered by Defendants.  "[A]t the

summary judgment stage the judge's function is not himself to weigh the evidence and determine

the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*,

477 U.S. at 249.  The question, as properly framed, is whether a reasonable jury could find in

Plaintiffs' favor based on the facts on the summary judgment record.  *See Konikoff v. Prudential

Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000); *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*,

875 F.3d 107, 113–14 (2d Cir. 2017).

   To prevail on any of her claims, each Plaintiff must demonstrate that the religious belief

that she claims conflicted with the Vaccination Policy was sincerely held.  If Plaintiffs survive

summary judgment, that will be an issue for trial with the Plaintiffs required to offer evidence

that their views were sincerely held, Defendant entitled to probe that assertion, and the jury

required to sit in judgment.  *See Int'l Soc'y for Krishna Consciousness*, 650 F.2d at 433.  To get

to a jury, however, Plaintiffs must offer evidence from which a reasonable jury could determine

that their views were other than animated by fraud and deception.  *See Celotex v. Catrett*,

477 U.S. 317, 324 (1986); *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586 ("When the moving

party has carried its burden under Rule 56(c), its opponent must do more than simply show that

there is some metaphysical doubt as to the material facts.").  The law "'does not require the

accommodation of personal preferences, even if wrapped in religious garb.'"  *Hussein v. The

Waldorf Astoria*, 134 F. Supp. 2d 591, 597 (S.D.N.Y. 2001) (Chin, J.) (quoting *Hussein v. Local

6*, 108 F. Supp. 2d 360, 370 (S.D.N.Y. 2000)).  In other areas of law, the courts have not been

hesitant to require more than a conclusory assertion before allowing a claim to go forward.  *See*

*Woods v. Ruffino*, 8 F. App'x 41, 42 (2d Cir. 2001) (affirming district court's grant of summary judgment for defendants against claims of racial discrimination under Title VII); *Rodriguez v. County of Nassau*, 2023 WL 2667076, at *10 (E.D.N.Y. Mar. 28, 2023) (granting summary judgment for defendants against claims brought under the First and Fourteenth Amendments for allegedly illegal search and seizure); *Lievre v. JRM Construction Mgmt.*, 2019 WL 4572777, at *8 n.8 (S.D.N.Y. Sept. 20, 2019) (granting summary judgment for defendants against claims of wrongful termination under the Family and Medical Leave Act and Americans with Disabilities Act).  Thus, while the sincerity analysis must be treated with a "light touch," *Tagore v. United States*, 735 F.3d 324, 328 (5th Cir. 2013) (quoting *Moussazadeh v. Texas Dep't of Criminal Justice*, 703 F.3d 781, 792 (5th Cir. 2012) , *as corrected* (Feb. 20, 2013)), Plaintiffs have offered no reason why the result should be any different when the question is the sincerity of their beliefs.  While "it is unusual to grant a summary judgment motion when a party's intent is at issue," such relief is appropriate where "a reasonable jury could only find that [the plaintiff's] religious assertion was not bona fide," *Hussein*, 134 F. Supp. 2d at 597, or where "no reasonable juror could conclude that Plaintiff had a sincerely held religious belief," *Bob v. Madison Sec. Grp., Inc.*, 2016 WL 6952259, at *9 (S.D.N.Y. Nov. 28, 2016).  *See also Sherr*, 672 F. Supp. at 96; *Eatman*, 194 F. Supp. 2d at 267–68; *Bailey v. Associated Press*, 2003 WL 22232967 (S.D.N.Y. Sept. 29, 2003).[11]

---

[11] Even the cases cited by Plaintiffs do not support the notion that summary judgment is never available on the sincerity of a plaintiff's professed religious beliefs.  In *Tagore v. United States*, 735 F.3d 324, the Fifth Circuit held that a plaintiff proffered sufficient evidence to create a genuine issue of material fact regarding the sincerity of her practice of wearing "a kirpan with a 3-inch blade," when (1) the plaintiff testified to holding a belief that her religion required such practice; (2) "[s]he adduced voluminous evidence from the Sikh community . . . that kirpans are mandated to be worn by the religion's adherents and . . . most Sikhs ear kirpans with blades longer than 2.5 inches"; (3) she testified to a regular and uninterrupted practice of wearing her kirpan; and (4) she "was willing to sacrifice her government employment for the sake of wearing

**C.      Defendant Is Entitled to Summary Judgment on Gardner-Alfred's Claims**

Defendant argues that no reasonable jury could find that Gardner-Alfred's objections to the vaccine were grounded in sincerely held religious beliefs. Dkt. No. 165 at 15–19. Defendant argues that there is no evidence Gardner-Alfred enjoyed any relationship with the Temple of Healing Spirit beyond paying for a vaccination exemption package and that her medical history, both before and after she made her request for a religious accommodation, is inconsistent with her alleged religious beliefs. *Id.*

Gardner-Alfred has failed to identify sufficient evidence to create a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586. It is not necessarily fatal to Gardner-Alfred's claim that she has not always adhered to what she claims to be her religious beliefs. "A finding of sincerity does not require perfect adherence to [the] beliefs expressed . . . , and even the most sincere practitioner may stray from time to time." *Moussazadeh*, 703 F.3d at 791–92. It is also not fatal to her claim that the religion Gardner-Alfred claims to belong to, the Temple of the Healing Spirit, is not a conventional one. "[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *See Thomas*, 450 U.S. at 714; *see also Int'l Soc'y for Krishna Consciousness*, 650 F.2d at 447 ("Our commitment to precious First Amendment freedoms is tested when unpopular organizations seek refuge within its scope. . . . ISKCON advocates a philosophy alien to our

---

a religiously significant symbolic kirpan." *Id.* at 328–29. The court held: "Tagore's actions, the independent evidence of Sikh practices, and the government's acknowledgment [that some Sikhs believe a kirpan must be worn at all times] create a genuine issue of material fact as to her sincere belief in wearing a 3-inch bladed kirpan." *Id.* at 329. And, in *E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, the question was not the quantum or quality of evidence a plaintiff would need to adduce to forestall summary judgment, but the evidence the plaintiff would need to adduce to be entitled to summary judgment and foreclose the defendant's right to challenge plaintiff's sincerity at trial. *Id.* at 55–57.

Western traditions. . . .  They are entitled to the First Amendment freedoms we all enjoy, and

considerations of comfort or convenience cannot prevail."); *see also* Laurence Tribe, Note,

*Toward a Constitutional Definition of Religion*, 91 HARV. L. REV. 1056, 1059 (1978) ("Freedom

of religious choice is assured by the clause's proscription of all favoritism—even the most

subtle—in matters of belief.").

      In this case, however, Gardner-Alfred has failed to "provide concrete evidence," *Hussein*,

134 F. Supp. 2d at 596, to support her claim.  She offers only a "conclusory assertion" that her

professed religious belief was anything more than one adopted for the purpose of avoiding what

Gardner-Alfred independently (and not on the basis of religion) believed to be an inconvenient or

dangerous obligation, and one which was abandoned after it was invoked to avoid that

obligation.  *Id.*

      Although Gardner-Alfred claimed to have been a member of the Temple of Healing

Spirit for twenty years, she offers nothing other than her statement to support that assertion.  She

was not able to recall any other member of the Temple of Healing Spirit.  Dkt. No. 164 ¶ 30;

Dkt. No. 171-2 ¶ 30.  She could not say when she attended Temple of the Healing Spirit events.

Although she claimed to have attended events remotely, she was unable to offer an internet link

through which she accessed Temple of the Healing Spirit events.  Dkt. No. 97-4; Dkt. No. 164 ¶

30; Dkt. No. 171-2 ¶ 30.  She could not identify how many meetings she attended in person,

where she attended them (other than a home in Brooklyn), or anyone who attended with her,

including how many people attended.  *Id.*  The vaccine exemption letter does not provide

evidence that Gardner-Alfred's purported religious views were genuinely held; the evidence is

overwhelming that Gardner-Alfred solicited the vaccine exemption letter on the eve of the

Vaccination Policy and for the purpose of obtaining an exemption.  She paid for the letter and an

identical letter was available to anyone else who requested it, whether they were members of the Temple of the Healing Spirit or subscribed to its views. Dkt. No. 164 ¶¶ 22–23; Dkt. No. 171-2 ¶¶ 22–23. Therefore, the vaccination exemption letter does not provide evidence that the views Gardner-Alfred espouses were anything other than conveniently held ones adopted only for the purpose of avoiding having to receive the Covid-19 vaccine. Dkt. No. 164 ¶ 25; Dkt. No. 171-2 ¶ 25.[12] There is no evidence that Gardner-Alfred adopted her views until "the incident in question." *Hussein*, 134 F. Supp. 2d at 597.

Further, Defendant has adduced substantial undisputed evidence that Gardner-Alfred repeatedly, both before and after objecting to the Vaccination Policy, "act[ed] in a manner inconsistent with [her] belief." *Int'l Soc'y for Krishna Consciousness*, 650 F.2d at 441. She claims a religious objection to undergoing "invasive" "Western" medical procedures but there is no evidence that she forewent any such procedures either before or after she was asked to take the Covid-19 vaccine; it is undisputed that she voluntarily chose to undergo invasive Western medical procedures before and after she submitted her request for an accommodation. Dkt. No. 164 ¶ 33; Dkt. No. 171-2 ¶ 33; *see Bob*, 2016 WL 6952259 at *8 (granting summary judgment for failure to identify a genuine issue of fact regarding sincerity where plaintiff's "work schedule makes plain plaintiff's willingness to work full shifts on Fridays"); *Sherr*, 672 F. Supp. at 96 (granting summary judgment against plaintiffs where plaintiffs had subjected their son to many medical procedures that they later claimed violated their religious beliefs). Gardner-Alfred has offered no explanation for why, if her religion permitted her to undergo those treatments, it forbade her to take the Covid-19 vaccine. Nor has she offered any other reason why if her

---

[12] In addition, Valentine's statement in the vaccination exemption letter would not be admissible for its truth.

religion forbade invasive Western medical treatment, she nonetheless underwent these treatments.  *See Bailey*, 2003 WL 22232967, at *15 (granting summary judgment where plaintiff did not offer any explanation for why, after working on the weekends for several years, the plaintiff sought religious accommodation to forgo work on Sundays).

Finally, this is not a case in which sincerity can be inferred from evidence that the plaintiff engaged in the claimed religious practice notwithstanding adverse personal consequences to her from doing so.  To the contrary, in her view, Plaintiff could "materially gai[n] by fraudulently hiding secular interests behind a veil of religious doctrine."  *Int'l Soc'y for Krishna Consciousness*, 650 F.2d at 441.  Gardner-Alfred generally opposed the vaccine on non-religious grounds; it is undisputed that Gardner-Alfred has purchased medical supplements from Gary Null, the individual that hosted the secular anti-vaccination seminar attended by Diaz.  Dkt. No. 164 ¶ 35; Dkt. No. 171-2 ¶ 35.  She exchanged messages with Diaz regarding what were claimed to be the harmful side effects to the vaccine.  Dkt. Nos. 163-16, 163-17.  Gardner-Alfred viewed the Covid-19 vaccine as something to be avoided and not as something that—but for religion—should be embraced.

Thus, Gardner-Alfred necessarily would have the Court accept the argument that a claim can survive a motion for summary judgment based solely on a plaintiff's conclusory and self-serving testimony that she had a religious belief and that it was held sincerely.  But, confronted with evidence from the moving party, the non-moving party who bears the burden of proof cannot satisfy that burden with conclusory assertions.  *See Hussein*, 134 F. Supp. 2d at 596–97.  No reasonable jury thus would be able to conclude that her claimed religious beliefs were anything other than contrived.

**D.**     **Defendant Is Entitled to Summary Judgment on Diaz's Claims**

Defendant also argues that no reasonable jury could find that Plaintiff Diaz's objection to the Covid-19 vaccine was grounded in sincerely held religious beliefs.  Dkt. No. 165 at 15–19. Defendant argues that Diaz's claims fail on two related grounds:  First, that Diaz's beliefs were not sincerely held, and second, that they were intellectually motivated rather than religious in nature.  *Id.* at 18.  Defendant points to undisputed evidence that Diaz had a general objection to the Covid-19 vaccine, that before seeking a religious accommodation she sought a medical exemption, and that she engaged in acts inconsistent with her claimed beliefs.  *Id.* at 18–19. There is no dispute that Diaz is Catholic and genuinely subscribes to the views of the Catholic Church.  Dkt. No. 164 ¶ 39; Dkt. No. 171-2 ¶ 39.  Her claim to having been a victim of religious discrimination, however, turns upon the sincerity of her belief in "[t]he specific religious practice" rather than "the general scope of applicable religious tenets."  *Tagore*, 735 F.3d at 328.

As with Gardner-Alfred, there is undisputed evidence that Diaz would have a motive to "fraudulently hid[e] secular interests behind a veil of religious doctrine."  *Int'l Soc'y for Krishna Consciousness*, 650 F.2d at 441.  Diaz has demonstrated a secular interest in avoiding the vaccine.  When Diaz first learned of the Vaccination Policy, she sought exemption from her doctor on medical grounds, and not initially on religious grounds.  Dkt. No. 164 ¶ 46; Dkt. No. 171-2 ¶ 46.  Diaz submitted her accommodation request days after attending a secular anti-vaccination webinar featuring materials entitled "White Paper—Experimental Covid Vaccines," and "Review of Ivermectin Efficacy."  Dkt. No. 164 ¶ 44; Dkt. No. 171-2 ¶ 44.  Diaz does not dispute that she subscribed to at least eight newsletters, which sent her several hundred emails, from sources opposing the vaccine on secular grounds.  Dkt. No. 164 ¶ 50; Dkt. No. 171-2 ¶ 50. Diaz sent emails to others containing secular concerns about the Covid-19 vaccines, including an

email to Gardner-Alfred in which the letters of "Delta" and "Omicron" were rearranged to spell "Media Control."  Dkt. No. 164 ¶ 52; Dkt. No. 171-2 ¶ 52.

There also is evidence of Diaz acting in a manner inconsistent with her claimed religious views.  *Int'l Soc'y for Krishna Consciousness*, 650 F.2d at 441.  Diaz concedes that she has on many occasions taken medications and received injections without first checking whether they contain or were made or manufactured with aborted fetal cell lines.  Dkt. No 164 ¶ 56; Dkt. No 171-2 ¶ 56.  Over the course of ten years, spanning both before and after she sought an exemption from the Vaccination Policy, Diaz filled and refilled prescription medications roughly forty times without ever inquiring into whether the prescription medications were manufactured with or contained aborted fetal cells.  Dkt. No 164 ¶¶ 55, 56; Dkt. No 171-2 ¶¶ 55, 56.  Diaz testified at deposition "that 'because [she doesn't] know' if something was made using aborted fetal cell lines, '[she] can take it.'"  Dkt. No 164 ¶ 56 (quoting Dkt. No. 163-6); Dkt. No 171-2 ¶ 56 (same).  Also at deposition, however, Diaz could not recall being aware of any actual connection between aborted fetal cell lines and Covid-19 vaccines when she made her initial religious accommodation request purportedly due to concerns about the use of aborted fetal cell lines in the development, testing, and manufacturing of Covid-19 vaccines.  Dkt. No 164 ¶ 57; Dkt. No 171-2 ¶ 57.  That Diaz did not even inquire—and has no memory of ever learning—whether a medication she was taking was manufactured with or contains aborted fetal cells undermines her claim to have a genuine religious objection to the taking of the Covid-19 vaccine on the grounds that it is manufactured with or contains aborted fetal cells.  She offers no explanation why, if she has a genuine religious objection to the vaccine because of its content, and not because of its perceived side effects or for some other political reason, she never asked before or after about the content of any other medication—and did not even ask about the content

of the Covid-19 vaccine. *See Hussein*, 134 F. Supp. 2d at 596–97 ("Hussein has made no effort to explain why, if his religion prevented him from shaving, he had never worn a beard before. He does not contend, for example, that he had just converted to his religion. Finally, within three months, he shaved his beard, an undisputed fact that also undercuts his claim of religious necessity.").

Diaz further does not dispute that the views that she now claims to hold are different from those held by the church of which she claims to be a member. When Diaz sought exemption to the Vaccination Policy, she sought the advice and support of her pastor, first calling him and then following up with an email asking for his help. Dkt. No. 164 ¶ 47; Dkt. No. 171-2 ¶ 47. The pastor advised her that "it is not possible for a Catholic to claim an exemption from the vaccination on religious grounds," and that she could seek only "a personal exemption on grounds of conscience." Dkt. No. 164 ¶ 48; Dkt. No. 171-2 ¶ 48; Dkt. No. 163-11. "A showing of sincerity does not necessarily require strict doctrinal adherence to standards created by organized religious hierarchies." *Moussazadeh*, 703 F.3d at 791; *see also Martinelli v. Dugger*, 817 F.2d 1499, 1503–04 (11th Cir. 1987), *abrogated on other grounds by Harris v. Chapman*, 97 F.3d 499 (11th Cir. 1996). "Sincere religious belief cannot be subjected to a judicial sorting of the heretical from the mainstream." *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 261 (5th Cir. 2010). However, Diaz's belief that her religion barred her from taking a vaccine made with aborted human fetal cells appears to have been newly adopted only in response to the demand that she take the Covid-19 vaccine. She bases her objection on the letter she received from the Colorado Catholic Conference, an organization with which she had no prior affiliation and has no current affiliation. Dkt. No. 164 ¶ 47; Dkt. No. 171-2 ¶ 47. The letter is available for download from the internet from anyone who seeks it. There is no evidence

that she held the views that she now holds at any time either before or after Defendant required her to take the Covid-19 vaccine.  Diaz has demonstrated that her convictions with respect to the Covid-19 vaccine are strongly held, but she has not demonstrated that they are religious.  *See Mason v. Gen. Brown Cent. School Dist.*, 851 F.2d 47, 52 (2d Cir. 1988) ("Everyone makes basic choices about where to live, what to eat, and how to raise children.  Merely because these decisions are important, and may be supported by strong conviction, does not render them religious.").

In the end, Diaz's claim fails on the same grounds that Gardner-Alfred's claim fails.  The Court does not adopt a standard requiring that one always agrees with the leaders of their religious institution, always follow the dictates of their religion without fail, and always adopts religious views without regard to secular or intellectual sentiments, for one's religious beliefs to be found sincere.  Many religions were founded based on the views of dissidents.  The Romans "drove to stamp out Christianity as a disturber of its pagan unity, the Inquisition [tried to stamp out the views of dissidents] as a means to religious and dynastic unity."  *See West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 641 (1943).  More recent examples abound.  *See, e.g.*, Brett G. Scharffs, *The Journey from Persecution to Inclusion: A Case Study of the Church of Latter-Day Saints in America*, 97 Notre Dame L. Rev. Reflection 264 (2022).  Even those are known to sometimes stray from their religious obligations may hold their views sincerely.  *See Grayson v. Schuler*, 666 F.3d 450, 454 (7th Cir. 2012) ("[A] sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance; for where would religion be without its backsliders, penitents, and prodigal sons?").  Religious objections are not necessarily inconsistent with intellectual objections.  *Thomas*, 450 U.S. at 714; *see also Callahan v. Woods*, 658 F.2d 679, 684 ("But where, as here, the court has found that the

allegedly religious belief is sincerely held, the presence of longstanding secular objections does not refute the finding of sincerity . . . .").

In this case, however, Diaz offers no evidence other than her own say-so to support the notion that she has a sincere religious objection to the Covid-19 vaccine. Her argument therefore would have the Court adopt a rule of law that whenever someone with a political objection to a rule wraps that objection in religious garb, she is entitled to a jury trial and—if she prevails—is entitled to an accommodation. She does not cite any law that would support such an extreme proposition. In *Eatman v. United Parcel Service*, 194 F. Supp. 2d 256, plaintiff brought a claim against his former employer under Title VII for allegedly discriminating against his religious beliefs by failing to accommodate his choice to wear his hair in dreadlocks. *Id.* at 267–68. The defendant challenged the plaintiff's claim by arguing that his decision to wear dreadlocks was "not a religious act but a personal choice." *Id.* at 268 (citing *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 682 (9th Cir. 1998)). The court granted summary judgment on the claim in favor of the defendant because of plaintiff's admission that wearing dreadlocks was a "personal choice" and "not a mandate" of his religion, concluding that it was "not enough that Eatman also considers his locks a 'testament' or an 'outward expression' of his commitment to Protestantism and the principles of Nubianism." *Id.* at 269 (citations omitted). Put differently, the court dismissed the objection to the challenged policy because it did not originate in, and was not required by, the plaintiff's faith, even if the plaintiff did consider the objection to be an expression of his religious faith. *Id.* The same result follows here.

II.     **Defendant Is Entitled to Summary Judgment Against Diaz on the Alternative Grounds that Adherence to the Vaccination Policy Does Not Violate Her Articulated Views**

Defendant further argues that it is entitled to summary judgment against both Diaz and Gardner-Alfred on the grounds that the Vaccination Policy does not substantially burden or conflict with their views, even if they were rooted in religion.  Dkt. No. 165 at 19–22.

That argument is without merit as to Gardner-Alfred.  Her views appear to have been designed for the purpose of generating a conflict with the Vaccination Policy.  She has framed those views as opposition to "the invasive techniques of traditional Western medicine," Dkt. No. 163-3 at ECF p. 12; Dkt No. 164 ¶ 16; Dkt. No. 171-2 ¶ 16; Dkt. No. 171-7 at ECF p. 3, which would include a vaccine that invades the body.  She further stated that her religion forbids her from receiving any Covid-19 vaccines and taking Covid-19 tests.  In response to the Vaccination Policy, she solicited and paid for a statement that "the practice of Vaccination (et.al [sic]) is contrary to My sincere and conscientiously held Religious Beliefs and Convictions, and violates the Free Exercise of these Principles."  Dkt. No. 163-6 at ECF pp. 9, 16.

The argument has merit, however, with respect to Diaz.  Diaz was deposed in this case and given numerous occasions to articulate her views; those views were that she opposed any vaccine or medicine that was manufactured with or contains the cells of a human fetus.  Dkt. No. 163-6 at ECF pp. 18, 46.  She also had the opportunity to present any evidence that articulated a different view; she was asked specifically whether taking a vaccine or medication that did not contain and was not manufactured with fetal cells would violate her religion.  Dkt. No. 163-6 at ECF p. 46.  She answered no.  *Id.*  It is not disputed that the Moderna and Pfizer vaccines do not contain human fetal cells.  Dkt. No. 164 ¶ 58; Dkt. No. 171-2 ¶ 58; *see also* Dkt. No. 171 at 2 ("[I]t is true that the Pfizer and Modern vaccines were not themselves manufactured with fetal cell lines.").  The Court does not doubt that there are others for whom taking a vaccine

that was developed with the benefit of research from human fetal cells would violate a sincerely held religious view. On the evidence presented, however, no reasonable jury could find that a requirement that Diaz take either the Moderna or Pfizer vaccine would violate Diaz's views.

### A.    Burden On, or Conflict With, Religious Beliefs

Even if a reasonable juror could find that Plaintiffs' objections to the vaccines were rooted in her sincere religious beliefs, Plaintiffs must also show under each of the three claims that their sincerely held beliefs are "burdened" by or in "conflict" with the government policy. The Constitution and the two statutes ask almost the identical question—is the complaining plaintiff required to take action that violates her religious beliefs or forego from action compelled by her religious beliefs. A challenged action imposes a "substantial burden" under RFRA when it gives the religious practitioner the choice between (1) engaging in conduct that seriously violates her religious beliefs or (2) facing serious consequences. *See Holt*, 574 U.S. at 361 (explaining the substantial burden standard under RLUIPA, a sister statute of RFRA, which "allows prisoners 'to seek religious accommodations pursuant to the same standard as set forth in RFRA'" (and stating that these protections "are no less than the guarantee of the Free Exercise Clause" (quoting *Gonzales*, 546 U.S. at 436)). In the Free Exercise context, a challenged policy is considered to have burdened the plaintiff's religious beliefs where it "[puts the plaintiff] to the choice of curtailing [her] mission or [taking actions] inconsistent with [her] beliefs." *Fulton*, 141 S. Ct. at 1876. Plaintiffs challenging a policy under Title VII must show that their religious beliefs "conflict with employment requirements" and that "they were disciplined for failure to comply with the conflicting employment requirement." *Knight*, 275 F.3d at 167 (citing *Philbrook*, 757 F.2d at 481). A policy that disciplines employees whose religious beliefs "conflict with employment requirements" within the context of Title VII necessarily places a "burden" on them within the context of RFRA and the First Amendment because it forces them

to choose between engaging in the conduct that goes against their religious beliefs or facing serious consequences, such as termination of their employment.  Thus, if a policy creates a "burden" in the Free Exercise context, it also creates a "substantial burden" under RFRA and a "conflict" under Title VII.

When analyzing whether a challenged policy imposes a burden on or conflicts with a claimant's religious beliefs, courts employ an objective test.  *Catholic Health Care System v. Burwell*, 796 F.3d 207, 217 (2d Cir. 2015), *judgment vacated on other grounds by* 578 U.S. 993 (2016).  "Whether a law substantially burdens religious exercise . . . is a question of law for courts to decide, not a question of fact."  *Priests for Life v. U.S. Dept. of Health and Human Services*, 772 F.3d 229, 247 (D.C. Cir. 2014).  A policy imposes a burden on a claimant where it "forces them to engage in conduct that their religion forbids or . . . prevents them from engaging in conduct their religion requires."  *Henderson v. Kennedy*, 253 F.3d 12, 16 (D.C. Cir. 2001).  Put differently, "a person may not be compelled to choose between the exercise of a First Amendment right and participation in an otherwise available public program."  *Thomas*, 450 U.S. at 716.

B.     **The Vaccination Policy Does Not Require Diaz to Violate Her Claimed Religious Views**

Defendant argues that Diaz cannot as a matter of law demonstrate a substantial burden or conflict between her claimed religious views and the Vaccination Policy.  Dkt. No. 165 at 20. Defendant points to the fact that Diaz testified that if a vaccine was not made with aborted fetal cell lines and her doctor recommended that she take that vaccine, she would have no issue with doing so.  *Id.*  According to Defendant, because Diaz's doctor recommended that she take the vaccine, and because Diaz proffered no evidence that the Pfizer or Moderna vaccines contain or are manufactured with aborted fetal cell lines, there is no conflict with her religious views.  *Id.*

44

Defendant argues that Diaz's claimed objection to the Vaccination Policy is "based on demonstrably false and unsupported factual assumptions that the vaccines contain aborted fetal cell lines or were manufactured using them." *Id.* at 21.

Diaz responds that a reasonable jury could find that her sincerely held religious beliefs do conflict with the Vaccination Policy. Dkt. No. 171 at 16. Diaz argues that because aborted fetal cell lines were used at the testing phase of the research and development of the Pfizer and Moderna vaccines, the Vaccination Policy conflicted with her sincerely held religious beliefs. *Id.* at 16–17. Diaz claims that at minimum, her stated concern with aborted fetal cell lines, combined with the use of aborted fetal cell lines in the research and development of the Pfizer and Moderna vaccines, are sufficient to create a genuine issue of material fact that must be resolved by a jury at trial. *Id.* at 16.

On a motion for summary judgment, however, it is not sufficient for the non-moving party to rest on the allegations of her complaint. *See* Fed. R. Civ. P. 56(c); *see also Celotex*, 477 U.S. at 324 ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . . ."); *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001) (holding that once the moving party demonstrates that there are no genuine issues of material fact, the non-moving party "must come forth with evidence sufficient to allow a reasonable jury to find in [its] favor"). Nor can the non-moving party defeat summary judgment by arguments of counsel in an opposition brief. *See, e.g.*, *Gottlieb*, 84 F.3d at 518 ("In order to defeat a summary judgment motion . . . the opposing party is required to come forward with materials envisioned by the Rule . . . . [It] cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements . . . ." (internal citation omitted)). The evidence is undisputed that Diaz does not have a religious (or

other) objection to vaccines that do not contain or were not manufactured with aborted fetal cell lines.  Dkt. No. 163-6 at ECF p. 46; Dkt. No. 164 ¶ 41; Dkt. No. 171-2 ¶ 41.  Further, Diaz testified that she does not object to medication if she does not know whether the medication contains or is manufactured with aborted fetal cells.  Dkt. No. 163-6 at p. 18.  Put differently, her only religious objection is to the ingestion of vaccines that contain or are manufactured with aborted fetal cell lines.  Dkt. No. 164 ¶ 40; Dkt. No. 171-2 ¶ 40.

Specifically, "Diaz explained at deposition that her [religious] objection is to vaccines that 'contain,' 'are manufactured with' or are 'produced with' aborted fetal cell lines."  Dkt. No. 164 ¶ 40 (quoting Dkt. No. 163-6); Dkt. No. 171-2 ¶ 40 (Diaz's Rule 56.1 statement, confirming that the assertion is "[u]ndisputed").  Diaz's testimony was given under oath.  Dkt. No. 164 ¶ 40; Dkt. No. 171-2 ¶ 40.  Diaz testified that if a medication was not made with aborted fetal cell lines and her doctor recommended it, she would take it and that she has no objection to vaccines "'that don't contain aborted fetal cell lines' or 'are not manufactured with aborted fetal cell lines.'"  Dkt. No. 164 ¶ 41 (quoting Dkt. No. 163-6); Dkt. No. 171-2 ¶ 41 (Diaz's Rule 56.1 statement, confirming that the assertion is "[u]ndisputed").  She testified that the Covid-19 vaccine violated her religious beliefs because that "the COVID vaccine is produced with aborted fetal cell lines."  Dkt. No. 163-6 at ECF p. 5.  Diaz stated:

Q. If [a vaccine] wasn't made with aborted fetal cell lines, and your doctor recommended it, would you take it?

A. Yes.

. . .

Q. Ms. Diaz, do you object to all vaccines?

A. No.

Q. So which vaccines do you not object to?

A. The ones that don't contain aborted fetal cell lines.

Q. Right.  The ones that are not manufactured with aborted fetal cell lines?

A. Yes.

*Id.* at ECF pp. 45–46; Dkt. No. 164 ¶ 41; Dkt. No. 171-2 ¶ 41.[13]   If Diaz had a broader,

religiously-based objection to the Vaccination Policy, she had the opportunity at her deposition

or later in a declaration to express that view.  She did not do so.

---

[13] Elsewhere in her deposition testimony, Diaz was asked about medications that she took before and after she objected to the Vaccination Policy, and whether those medications violated her claimed religious beliefs.  Dkt. No. 163-6 at ECF p. 18.  When asked about one of her medications, "[i]f you knew that it was manufactured with aborted fetal cell lines, you wouldn't take it, right?"  *Id.*  Diaz responded, "Yes."  *Id.*  She was then asked, "[b]ut because you don't know, you can take it, right?"  *Id.*  Diaz again responded, "Yes."  *Id.*  It is also an undisputed fact that before and after Diaz sought exemption from the Vaccination Policy, she filled and refilled prescription medications without ever inquiring into whether the prescription medications were manufactured with or contained aborted fetal cells.  Dkt. No 164 ¶¶ 55, 56; Dkt. No 171-2 ¶¶ 55,  56.

Later in her deposition, however, Diaz testified that she did not remember knowing whether any of the Covid-19 vaccines were manufactured with or contained aborted fetal cell lines when she objected to them:

> Q. Did you consider, back in 2021, when you made your accommodation request whether there was a vaccine that wasn't produced with aborted fetal cell lines?
>
> A. I can't remember.
>
> Q. Okay.  So you don't know, sitting here today, whether the Pfizer vaccine was produced with aborted fetal cell lines?
>
> A. I can't remember.
>
> Q. And you don't whether the Maderna [sic] vaccine was?
>
> A. I can't remember.
>
> Q. And you don't remember whether the Johnson & Johnson vaccine was?
>
> A. I can't remember.

Diaz's objection to the Vaccination Policy thus was based at best on a mistaken understanding—an understanding that she could have cleared up by asking the question or doing any basic research. Two of the Covid vaccines—the Pfizer and Moderna vaccines—indisputably do not contain, and are not manufactured with aborted fetal cell lines, Dkt. No. 164 ¶ 59; Dkt. No. 171-2 ¶ 59. Diaz does not contend otherwise. The expert report of Dr. Clare Rock included as an exhibit to Defendant's declaration in support of the motion for summary judgment, Dkt. No. 163-1, is undisputed on this point:

> The mRNA Covid-19 vaccines produced by Pfizer and Moderna are neither manufactured with nor contain aborted fetal cell lines. They do not use any fetal cell cultures in order to manufacture or produce the vaccine. In other words, the mRNA vaccines themselves do not contain any aborted fetal cells or fetal cell cultures, nor are they manufactured or produced with such cells or cell cultures.

Dkt. No. 164 ¶ 58.[14] Aborted cell lines may have been used in the testing phase for those vaccines but once the vaccine was shown to be effective no aborted cell lines were used. *Id.*

---

Q. Did you research the vaccines before you made your religious accommodation request?

A. I can't remember.

Q. Did you know anything about the vaccines before you made your religious accommodation request?

. . .

A. I can't remember.

Q. You can't remember whether you knew anything about them?

A. No.

Dkt. No. 63-6 at ECF pp. 4–5. To the extent that Diaz conceives of her religious objection to the Covid-19 vaccines as an objection to vaccines that *she knows* are manufactured with or contain aborted fetal cells, the Vaccination Policy still does not substantially burden or conflict with that belief because Diaz did not know whether the vaccines were manufactured with or contained aborted fetal cells.

[14] In her Rule 56.1 response, Diaz disputes this assertion on the grounds that fetal cell lines were used in the testing of the mRNA vaccines. Dkt. No. 171-2 ¶ 58. However, that response fails to

The Vaccination Policy could be satisfied by the taking of the Pfizer and Moderna vaccine.  Dkt. No. 161-2.

This case is similar to *Watkins-El v. Department of Education*, 2016 WL 5867048 (E.D.N.Y. Oct. 7, 2016).  There, the court denied a plaintiff's request for a preliminary injunction against a local immunization requirement in part because plaintiff had based "his opposition on the assertion that these vaccines contain 'money cells, pork derivatives, and aborted human fetuses,' which Plaintiff's religion dictates he cannot consume," but that "[p]laintiff present[ed] no evidence that these vaccines in fact contain the substances to which he object[ed]."  *Id.* at *3 (internal citation omitted).  Similarly, in *Pollard v. United States Parole Commission*, 2016 WL 4290607 (S.D.N.Y. Aug. 11, 2016), the court likewise held that a requirement that a parolee wear a GPS monitoring device that must be periodically charged did not substantially burden the parolee's religious beliefs—which prohibited him from inserting a plug into an outlet or swapping out batteries during the Sabbath—because the monitoring device's charge could last for more than a full day.  *Id.* at *12 ("The Court accepts [petitioner's] statement that during the Sabbath, which lasts 25 hours, the tenets of his Jewish faith prohibit him from either inserting a plug into an outlet to charge the batteries that power his location monitor or swapping out those batteries for previously charged ones. . . .  The question posed by a RFRA challenge, however, is whether the GPS monitoring condition 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'  There is no indication that it does."  (internal citation omitted)).  The same conclusion follows here.

---

identify any evidence to call into question the assertion in Defendant's Rule 56.1 statement that the Covid-19 vaccines were not manufactured with and do not contain aborted fetal cell lines. The assertion is thus deemed admitted.  *See Rhee*, 2023 WL 3319532, at *4.

Plaintiff Diaz has not created a genuine issue of fact regarding the burden imposed on her by the challenged policy, and therefore does not state a *prima facie* claim under RFRA, Title VII, or the First Amendment, and summary judgment is appropriate with regard to her claims.

## III.   Defendants Are Not Entitled to Summary Judgment on Grounds of Fraud Upon the Court and Unclean Hands

Defendant argues that the Court should grant summary judgment in its favor for the "additional, independent reason that their conduct in pursuing these claims constitutes a fraud on this Court and unclean hands." Dkt. No. 165 at 32. Defendant argues that Gardner-Alfred "testified falsely many times under oath on the core issues in this case: before an Administrative Law Judge in an unemployment hearing on May 20, 2022; at her deposition in this action on February 6, 2023; and before this Court on May 9, 2023." *Id.* at 33. Defendant also argues that Diaz "brought suit based on demonstrably false religious premises, then hid the evidence that her objections were in fact secular by speciously claiming that her *hundreds* of relevant emails were 'spam,'" thereby forfeiting her right to have her claim decided on the merits. *Id.* at 34 (quoting Dkt. No. 149 at 16). For purposes of completeness, the Court addresses this argument and rejects it.

It is accurate that the Court found that Gardner-Alfred testified falsely. Dkt. No. 149 at 25. The evidence also supports that Diaz hid evidence that undercut her claims. *Id.* at 29. Defendant has moved only under Rule 56, however, and Rule 56 is an improper vehicle for Defendant to request dismissal for the kinds of litigation misbehavior Defendant identifies. Rule 56 is directed to the question whether discovery has resulted in any genuine issue of material fact for trial. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587. If there exist such genuine issues, the motion is properly denied; if there do not exist such factual issues, the motion is properly granted. *See* Fed. R. Civ. P. 56(a). Rule 56 does provide a limited avenue for courts to impose

sanctions "[i]f satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay . . . ." Fed. R. Civ. P. 56(h).  In such cases, "[a]n offending party or attorney may . . . be held in contempt or subjected to other appropriate sanctions." *Id.*  But Defendant here does not base their request for dismissal in an argument that Plaintiffs submitted an affidavit or declaration in bad faith in connection with their memorandum of law in opposition to Defendant's summary judgment motion.  The bulk of the evidence on summary judgment was offered by Defendant and it is that evidence that shows that the views of the Plaintiffs were not genuinely held but were contrived to avoid an inconvenient civic obligation.  The motion is denied for that reason alone.

Instead, Defendant could have made a separate motion asking the Court, in the exercise of its inherent authority, to dismiss the case based on Plaintiffs' litigation conduct. *Id.*  In addition to the powers conferred upon courts expressly by rule and by statute, federal courts also have inherent power to sanction parties for bad faith conduct during litigation. *See Chambers v. Nasco, Inc.*, 501 U.S. 32, 46, 51 (1991) ("Furthermore, when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power.  But if in the informed discretion of the court, neither the statute or the Rules are up to the task, the court may safely rely on its inherent power.").  Fraud upon the court occurs "when a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process," in which case the party has "forfeited his right to have his claim decided on the merits." *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002).  But Defendant has already moved for relief based on much of the same conduct it invokes to ask for dismissal here and the Court rejected the notion that the Amended Complaint should be dismissed, instead

imposing sanctions.  *See generally* Dkt. No. 149.  Defendant does not identify any further conduct by Plaintiffs, occurring subsequent to the Court's order on Defendant's motion for sanctions, that would lead to the drastic result of dismissal here.  Dkt. No. 165 at 33–34. Accordingly, while the Court finds that Plaintiffs have not presented evidence from which a reasonable jury could return a verdict for either of them on any of their claims, it declines to also order dismissal for litigation misconduct.

## CONCLUSION

Because the Court concludes that no reasonable jury could find that Gardner-Alfred or Diaz has made out a *prima facie* claim under RFRA, the First Amendment, or Title VII, the court need not proceed to the other issues raised by Plaintiffs and Defendant.  Accordingly, Defendant's motion for summary judgment is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. No. 158 and to close this case.


SO ORDERED.


Dated: September 25, 2023
     New York, New York                                      LEWIS J. LIMAN
                                             United States District Judge